# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNIDAD LATINA EN ACCIÓN and | ) | |
| JUNTA FOR PROGRESSIVE | ) | |
| ACTION, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | Civ. No. 3:07-cv-1224(MRK) |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF HOMELAND SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

---

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
## MOTION FOR SUMMARY JUDGMENT OF DEFENDANT
## U.S. DEPARTMENT OF HOMELAND SECURITY

---

April 25, 2008

*Oral argument respectfully requested*

Plaintiffs Unidad Latina en Acción and Junta for Progressive Action, Inc. hereby oppose Defendant U.S. Department of Homeland Security's Motion for Summary Judgment [Dkt. #19]. For the reasons set forth below, such motion should be denied, and this Court should order Defendant to release all records, or segregable portions thereof, improperly withheld.

## Background

On June 4, 2007, the Board of Aldermen of the City of New Haven, Connecticut approved a plan that would make New Haven the first city in the nation to offer municipal identification cards to all of its residents, regardless of their immigration status. <u>See</u> John Christofferson, "City OKs ID cards for illegal immigrants," <u>Associated Press</u>, June 6, 2007 [Moshenberg Decl., Ex. A]. The City implemented this program primarily as a public safety measure, in an effort to help city police gain the trust of undocumented immigrants and reduce muggings by helping those immigrants open bank accounts. See <u>id.</u>; Statement of New Haven Mayor John DeStefano, Jr. (May 17, 2007) [Moshenberg Decl., Ex. B]. The identification program was originally proposed by two New Haven community groups, Plaintiffs here: Unidad Latina en Acción, an unincorporated association, and Junta for Progressive Action, Inc., a non-profit organization (together, "Plaintiffs"). <u>See</u> "A City to Model: Six Proposals for Protecting Public Safety and Improving Relationships Between Immigrant Communities and the City of New Haven" (October 2005) [Moshenberg Decl., Ex. C]. The measure was approved by the city's Board of Aldermen on June 4, 2007. <u>See</u> Christoffersen, "City OKs ID cards for illegal immigrants" [Moshenberg Decl., Ex. A].

On June 6, 2007—less than forty-eight hours after final passage of the New Haven identification program—federal agents raided the city, arresting 29 men and women. <u>See</u> Letter from Secretary of Homeland Security Michael Chertoff to Sen. Christopher Dodd (June 14, 2007) [Moshenberg Decl., Ex. D] at 2; Letter from Assistant Homeland Security Secretary Julie

Myers to Mayor John DeStefano, Jr. (July 2, 2007) [Moshenberg Decl., Ex. E] at 1-2.  The raid

was planned and led by a Fugitive Operation Team based in the Hartford office of the U.S.

Bureau of Immigration and Customs Enforcement ("ICE"), a component of the U.S. Department

of Homeland Security ("DHS").  Id.  Assistant Secretary of Homeland Security Julie Myers

admitted that only five of those individuals arrested were on the agency's target list; all the

others were merely in the wrong place in the wrong time.  Id.

       Concerned that the federal raid may have been inspired by a desire to retaliate against

New Haven for its municipal identification program, Plaintiffs sent two different Freedom of

Information ("FOI") requests to Defendant on June 26, 2007, seeking records about the raid;

DHS's reaction to New Haven's municipal identification program; and immigration enforcement

in general.[1]  See Exs. A, B to Decl. of Catrina Pavlik-Keenan [Dkt. #19].  More than twenty

working days passed without Defendant releasing the requested records, as required by 5 U.S.C.

§ 552(a)(6)(B)(i).  Their administrative remedies thus exhausted, see 5 U.S.C. § 552(a)(6)(C)(i),

Plaintiffs filed this suit on August 10, 2007 [Dkt. #1].  Defendant moved for summary judgment

on April 4, 2008, attaching a declaration, exhibits, and an index of records withheld in their

entirety [Dkt. #19].

## Standard of Review

       The purpose of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, is "to pierce

the veil of administrative secrecy and to open agency action to the light of public scrutiny."

Dep't of Air Force v. Rose, 425 U.S. 352, 361 (1976).  FOIA thus "adopts as its most basic

---

[1] Plaintiffs also filed a request with the Connecticut State Police, seeking records in the State Police's possession, under the Connecticut state FOI statute, Conn. Gen. Stat. §§ 1-200 et seq.  Defendant is not a party to that matter. That matter relates to about 22 pages worth of records—substantially fewer records than this matter.  The Connecticut Freedom of Information Commission ordered the State Police to release all responsive records, and the State Police have sought judicial review in Superior Court.  See Junta for Progressive Action, Inc., et al. v. Danaher, Docket #FIC 2007-416 (Conn. Freedom of Info. Comm'n Oct. 24, 2007), available at http://www.state.ct.us/foi/2007FD/20071108/FIC2007-416.htm.  See also Moshenberg Decl. at ¶¶ 3.

premise a policy strongly favoring public disclosure of information in the possession of federal agencies." Halpern v. FBI, 181 F.3d 279, 286 (2d Cir. 1999).  The FOIA exemptions pursuant to which an agency may withhold information, 5 U.S.C. §§ 552(b)(1) - (b)(9), are narrowly construed and the Government bears the burden of proving that any one applies.  See Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 7-8 (2001) (FOIA exemptions are narrowly construed); Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 755 (1989) (burden of proving that withholding the records is not improper falls on the agency).  These "limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act."  Klamath Water Users, 532 U.S. at 7-8.

Indeed, just four months ago, Congress amended the Act to correct the fact that, "in practice, the Freedom of Information Act has not always lived up to the ideals of that Act." Openness Promotes Effectiveness in Our National Government ("OPEN Government") Act of 2007, Pub. L. No. 110-175, 121 Stat. 2524, § 2(5). Those ideals include an informed public with the "widest possible understanding of the quality of government service." Id. at § 2(1)(C). The amendment stresses that FOIA is meant to "ensure that the Government remains open and accessible to the American people and is always based not upon the 'need to know' but upon the fundamental 'right to know.'"  Id. at § 2(6).

To win summary judgment in a FOIA case, Defendant must first submit an affidavit proving that it "conduct[ed] a search reasonably calculated to uncover all relevant documents, and, if challenged, must demonstrate beyond material doubt that the search was reasonable." Truitt v. Dep't of State, 897 F.2d 540, 542 (D.C. Cir. 1990) (internal quotations omitted).

When a Defendant agency has withheld documents in whole or in part pursuant to the series of exemptions authorized by the FOIA, "the defending agency must prove that each document that falls within the class requested either has been produced, is unidentifiable, or is

3

wholly exempt from the [FOIA's] inspection requirements." Nat'l Cable Television Ass'n, Inc. v. FCC, 479 F.2d 183, 186 (D.C. Cir. 1973). To meet its burden of proving that an exemption applies, the Government may submit a declaration and index setting forth the bases for its claimed exemption under FOIA. See Vaughn v. Rosen, 484 F.2d 820, 826-28 (D.C. Cir. 1973). This so-called Vaughn index must be a "detailed analysis [of the withheld material] in manageable segments, without resort to conclusory and generalized allegations of exemptions." Halpern, 181 F.3d at 290 (internal quotations omitted). In determining whether an exemption applies in a particular case, the Court must undertake a de novo review of the agency's decision to withhold documents; the Court may examine documents in camera where necessary to perform this review. 5 U.S.C. § 552(a)(4)(B). The statute also requires that a defendant agency disclose any "reasonably segregable portion of a record." 5 U.S.C. § 552(b). A defendant agency must explain the process by which it has reviewed withheld material for segregable portions. Rugiero v. Dep't of Justice, 257 F.3d 534, 553 (6th Cir. 2001).

Summary judgment may not be granted where a "genuine issue as to any material fact" exists. Fed. R. Civ. P. 56(c). See also Miller v. Wolpoff & Abramson, LLP, 321 F.3d 292, 300 (2d Cir. 2003) (finding summary judgment to be appropriate "only if the moving party shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law"). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is genuine "if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." Id. In ruling on a motion for summary judgment, this Court "must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." L.B. Foster Co. v. America Piles, Inc., 138 F.3d 81, 87 (2d Cir. 1998). If this Court "find[s] either that the rationale of the particular

4

exemption did not apply to these documents, or that the agency had failed to demonstrate the prerequisites to proper invocation of the exemption," it may order the agency to release the records.  Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 858 (D.C. Cir. 1980).

## Argument

Summary judgment for Defendant is not appropriate on the factual record presented here. First, Defendant has not met its burden of proving it carried out an adequate search for responsive records: Defendant's declaration does not provide a reasonable level of detail about the search terms and the types of searches performed, or the structure of the agency's file system; and it was not executed by an agency employee personally responsible for supervising the search.  See Section I, infra.  Second, Defendant has wrongly claimed the "high 2" exemption for records that are neither "predominantly internal" nor "related solely to personnel rules and practices": records shared with other agencies are not internal to Defendant, and records generated for a one-time use are not related solely to personnel rules and practices.  See Section II, infra.  Third, Defendant has wrongly claimed the "deliberative process privilege" for records that are neither "predecisional" nor "deliberative."  See Section III.A, infra.  Fourth, in claiming the attorney-client privilege for certain records, Defendant has failed to meet its burden of proving that the records were indeed kept confidential.  See Section III.B, infra.  Fifth, Defendant wrongly withheld the names of agents involved in planning and executing the raid.  Where a FOIA requester has, as here, provided extensive record evidence that warrant a reasonable belief that government impropriety might have occurred, the public interest in learning the agents' names outweighs their own privacy interests.  See Section IV, infra.  Sixth, Defendant has wrongly claimed exemption (b)(7)(E) for some records that are not "investigatory records compiled for law enforcement purposes," and for other records that would reveal investigatory techniques already generally known.  See Section V, infra.  Finally, Defendant failed to meet its

burden as to the non-segregability of those records withheld in full, especially with respect to lists of individuals and their nationalities and criminal convictions.  See Section VI, infra.  Where Defendant has failed to meet its burden to justify withholding, this Court should order Defendant to release the records in question, or, in the alternative, provide them for in camera review.  See Section VII, infra.

## I.     DEFENDANT HAS NOT MET ITS BURDEN OF PROVING IT CARRIED OUT AN ADEQUATE SEARCH FOR RESPONSIVE RECORDS.

The D.C. Circuit has clearly enunciated the standard for an adequate affidavit in support of a motion for summary judgment in a FOIA case: "In order to establish the adequacy of a search . . . agency affidavits must be . . . relatively detailed and non-conclusory."  SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal citation omitted).  See also Nat'l Parks & Conservation Ass'n v. Kleppe, 547 F.2d 673, 680 (D.C. Cir. 1976) (holding that conclusory and generalized allegations are unacceptable as means of sustaining agency burden). The Pavlik-Keenan Declaration is wholly inadequate to this standard. With a few exceptions, and contrary to FOIA case law, the Pavlik-Keenan Declaration does not explain the search methodology employed; identify the search terms used; or describe the agency file systems ostensibly searched.  Moreover, also in violation of FOIA precedent, the Declarant was not the individual personally responsible for supervising the search.

"[A]gency affidavits that do not denote which files were searched, or by whom, do not reflect any systematic approach to document location, and do not provide information specific enough to enable [the requester] to challenge the procedure utilized are insufficient." Weisberg v. Dep't of Justice, 627 F.2d 365, 371 (D.C. Cir. 1980) (internal citations omitted). The Pavlik-Keenan Declaration lacks reasonable detail, and is insufficient to allow this Court and the Plaintiffs to fairly assess the adequacy of the search performed.

A.      *The declaration does not provide a reasonable level of detail about the search terms and the type of search performed.*

The Pavlik-Keenan Declaration is insufficient because it contains little—and, at times, virtually no—detail about the method of the search conducted in response to Plaintiffs' FOIA requests.  The Declaration identifies searches conducted in three discrete locations: the Hartford Detention and Removal Operations field office ("Hartford DRO"), see id. ¶¶ 17, 23; the Special Agent in Charge, Boston Office of Investigations ("SAC Boston OI"), see id. at ¶¶ 20, 26; and the Resident Agent in Charge, New Haven Office of Investigations ("RAC New Haven OI"), see id. ¶ 19.  The Pavlik-Keenan Declaration provides varying amounts of detail for the searches conducted in each office, but in all three instances it is insufficiently detailed.  In particular, the Declaration fails to specify the methods used to search particular databases, and the search terms used to query those sources.  Without such detail, the Plaintiffs and this Court are unable to fairly assess the adequacy of Defendant's search.

"It is elementary that an agency responding to a FOIA request must conduct a search reasonably calculated to uncover all relevant documents." Truitt, 897 F.2d at 542.  Summary judgment for the government is not proper "if the record leaves substantial doubt as to the sufficiency of the search."  Id.  With the advent of electronic databases, recent cases have emphasized the need for search affidavits to specify "the search terms and the type of search terms" in an affidavit "averring that all files likely to contain responsive materials were searched." Valencia-Lucena v. U.S. Coast Guard, 180 F.3d 321, 326 (D.C. Cir. 1999).  See also Morley v. CIA, 508 F.3d 1108 (D.C. Cir. 2007) (search affidavit inadequate where it did not "identify the terms searched or explain how the search was conducted"); Dinisio v. FBI, 445 F. Supp. 2d 305, 312 (W.D.N.Y. 2006) (agency affidavit should set forth "the search terms and the type of search performed").

The Pavlik-Keenan Declaration fails to specify the search methodology used, does not identify which search terms were employed by the ICE employees conducting the search, and nowhere specifies how far back in time records were searched.[2]  At its *most* detailed, it merely states summarily that at Hartford DRO, "a search of" five databases "yielded" or "did not yield responsive records."  See Pavlik-Keenan Decl. ¶¶ 31–33.  Also at Hartford DRO, agents "manually searched . . . their own emails for information responsive to Plaintiffs' 52604 FOIA request."  Id. ¶ 29.  Similarly, the Declaration states that "RAC New Haven searched two (2) email folders which contain information relating to all New Haven immigration matters."  Id. ¶ 43.  When the Declaration does provide the terms used for searching e-mails, it remains insufficient in two ways: it does not state *which* e-mail accounts and folders were searched; and it suggests that the terms used to search were inadequate.  In regards to the former problem, the Declaration never specifies, for example, if sent, outgoing, and/or archived e-mail was searched;[3] it merely states that e-mail was searched.  See, e.g., id. ¶¶ 27, 29.

The Declaration mentions search terms in only two places.  First, at ¶ 27, and in reference to request 53939, it says that at Hartford DRO, "the Supervisory Deportation and Detention Officer ('SDDO') *instructed* the detention officers to search their e-mails for the terms stated above."  (Emphasis added.)  Not only does this sentence not specify that the search actually was conducted, but it also leaves ambiguous which "terms" it references.[4]  In the second instance, also regarding request 53939, it states that the outgoing SAC e-mail was searched for nine specified terms:  "New Haven", "Elm City Resident Card", "Board of Alderman" [sic], "June",

---

[2] Plaintiffs 52939 request seeks records going back to January 1, 2005.  See Ex. B to Pavlik-Keenan Decl.

[3] The one exception is ¶ 41, which states that the SAC Boston's "[o]ut going correspondence" was searched.

[4] Presumably, the "stated above" refers to the following sentence:  "The SDDO . . . questioned the detention officers regarding whether the[y] possessed any material relating to or mentioning the 'Elm City Resident Card,' 'A City to Model' report, the NHPD General Order 06-02, any material relating to New Haven as a sanctuary city, or any policy of non-cooperation between New Haven Police Officers and federal immigration officials."  Id. ¶ 43.  What "terms" the officers searched for can certainly not be gleaned from this sentence.

"city model", "general", "order", "sanctuary", and "raid." *Id.* ¶ 41.  Not only is one of the terms, "Aldermen", misspelled, and another, "city model", leaves out the preposition "to", but in general, this list demonstrates that ICE simply did not include a number of synonyms that would be likely to produce responsive records, including "municipal ID", "municipal identification", "ID", "city council", "DeStefano", "resident card", "immigrant(s)", and "aliens."

Finally, portions of the Declaration suggest that, when ostensibly searching for records responsive to *both* of Plaintiffs' FOIA requests, ICE focused on collecting records responsive only to request 52604, which is primarily concerned with the June 6, 2007 raid.  For example, SAC Boston initially "did not conduct a search in response to Plaintiffs' 52604 *and* 52939 FOIA request [because] the June 6, 2007 operation occurred in New Haven."  Id. ¶ 38 (emphasis added).  This fact, however, is entirely irrelevant to the 52939 request, which sought records from January 1, 2005 to the present on a variety of topics—and never once mentions the June 6, 2007 operation.  See Ex. B to Pavlik-Keenan Decl.  Although the Declaration says that "[d]uring the course of litigation, SAC Boston OI conducted a search for records regarding [both] requests and verified its original belief that it did not have any records response to [either]," id. ¶ 40; it does not specific how or what was searched.  And given that the "original belief" was ill-founded, ¶ 40 raises more questions than it answers.

B.      *The declaration fails to describe the structure of the agency's file system.*

The Pavlik-Keenan Declaration is also inadequate because it fails to describe the general structure of the record keeping systems of the Hartford DRO, SAC Boston OI, and RAC New Haven OI.  Instead, it simply names and describes in a short sentence the sources searched, without specifying, inter alia: other available sources of records; where the sorts of records sought by Plaintiffs are generally kept; and how such records are entered into the various databases maintained by the agency.

Such details are essential to an adequate search affidavit. See Rabin v. U.S. Dep't of State, CIA, 980 F. Supp. 116, 121 (E.D.N.Y. 1997) (affidavit deemed insufficient because it "[did] not describe the general structure of the Agency's record keeping system, or the methods by which the Agency generally conducts its searches."); Church of Scientology of Cal. v. IRS, 792 F.2d 146, 151 (D.C. Cir. 1986) (Scalia, J.) (agency's affidavit should "describe at least generally the structure of the agency's file system which makes further search difficult."). Detailed information about the structure of the records is vital to determining whether a search was adequate, as it helps the Court and the plaintiffs to determine whether a more extensive search would have been impracticable or impossible.  A proper search affidavit should "describe at least generally the structure of the agency's file system" in such a way that it explains why any further search is unlikely to disclose additional responsive information.  Katzman v. CIA, 903 F. Supp. 434, 438 (E.D.N.Y. 1995) (internal citations omitted).

The Pavlik-Keenan Declaration fails to meet this standard in regards to all three locations where searches for responsive records were conducted.  In regards to the SAC Boston OI, it states merely that an unknown person or person there "conducted a search for records regarding [both] requests," id. ¶ 38, and that the Deputy Special Agent in Charge "consulted" with two other individuals "regarding whether [they] would have any [responsive] records."  Id. ¶ 41.  The Declaration does say that "out going [sic] SAC correspondence and email" were searched, id.; but it does not attempt to explain why only outgoing correspondence was searched.  In describing the RAC New Haven OI, the Declaration states that only two e-mail folders were searched because "all information concerning New Haven immigration matters are contained in these two (2) email folders."  Id. ¶ 43.  Not only is it implausible that ICE's Resident Agent in Charge of the New Haven Office of Investigations would have no paper files that would be relevant to either of Plaintiffs' requests, but this single statement does not explain whether, for

example, the two e-mail folders contains outgoing or deleted e-mails; how far back it goes in time; or how broadly the RAC New Haven OI interpret "New Haven immigration matters."  The Declaration is only marginally better when describing the search at Hartford DRO.  See id. ¶¶ 27-29.  In regards to request 52939, it states that detention officers were "questioned" whether they had information on certain topics, see id. ¶ 27, and "instructed" to search their e-mails.  Id. Not surprisingly, the officers returned no information, and the Declaration states in a conclusory fashion that "[t]he Hartford DRO Office did not search any other system of records for the information requested in Plaintiffs' 52393 FOIA request, as ICE/DRO does not maintain any system of records that would maintain such records."  Id.

Even the most detailed description given by the Declaration is legally insufficient.  In describing the databases searched by ICE/DRO for records responsive to the 52604 request, see id.  ¶¶ 28-29, the Declaration fails to explain what other databases were available and why ICE did not believe that other sources would be reasonably likely to contain records sought by Plaintiffs.  Courts have held that when an agency decides to constrain its search to particular databases, its search affidavit must provide some justification for doing so.  Merely naming and describing the sources searched is wholly insufficient. See James v. U.S. Customs & Border Protection, 474 F. Supp. 2d 154, 159 (D.D.C. 2007) ("vague, cursory" description of database without an explanation of why that database "is the exclusive source of potentially responsive material" did not provide "sufficient detail" for the court to determine that the search was reasonable as a matter of law); Biberman v. FBI, 528 F. Supp. 1140, 1144 (S.D.N.Y. 1982) (defendant should use "the indices it has available," and cannot rely on a declaration that, because the only index searched was "the primary record system," it is not required to use another readily available database.).

C. *Defendant has failed to provide an affidavit from an agency employee personally responsible for supervising the search.*

The Pavlik-Keenan Declaration is also inadequate because the Declarant was not personally responsible for supervising the search, has no specialized personal knowledge of the search, and relies solely on second-hand statements from unnamed ICE employees whom she did not directly supervise.  As such, it does not meet the standard set forth in FOIA case law.

That the Declarant did not herself conduct the search is not fatal.  See Tarullo v. U.S. Dep't of Defense, 170 F. Supp. 2d 271, 275 (D. Conn. 2001) (stating that "[the agency] need not submit an affidavit from the employee who actually conducted the search.").  Courts have emphasized that an affidavit must come from the individual personally responsible for supervising the search.  See, e.g., id. (agency must submit "an affidavit of an agency employee responsible for *supervising* the search.") (emphasis added, internal citation omitted); Katzman, 903 F. Supp. at 438 (holding that "defendant . . . failed to meet its burden of establishing the thoroughness of its procedures" by submitting an affidavit which failed to elaborate upon the extent of the affiant's "involvement with respect to the plaintiff's search request"; directing defendant "to furnish affidavits from supervisory personnel . . . who *personally* oversaw the processing of the plaintiff's search request.") (emphasis added); Carney v. Dep't of Justice, 19 F.3d 807, 812 (2d Cir. 1994) ("An affidavit from [the] agency employee responsible for supervising [the] FOIA search" should be obtained), cert. denied, 513 U.S. 823 (1994).

When an affiant is responsible for supervising a search by numerous employees, or a search that ranges over several departmental divisions, it is sometimes appropriate for the affidavit to rely upon second-hand statements from supervisees. However, such statements are generally used to supplement or augment the affiant's personal testimony based on his or supervision of the search, rather than to supplant that testimony entirely.  See, e.g., Maynard v.

CIA, 986 F.2d 547, 561 (1st Cir. 1993) (affidavits relying in part on "second-hand" information from subordinates employees conducting a FOIA search were sufficient because those affidavits were provided by individuals directly responsible for supervising the searches); Meeropol v. Meese, 790 F.2d 942, 951 (D.C. Cir. 1986) (approving reliance upon affidavit of agency employee responsible for supervising search, although he necessarily relied upon information provided by staff members who actually performed search).

The Pavlik-Keenan Declaration does not meet any of the above requirements. The declarant was not personally responsible for supervising the search.  She does not elaborate on the extent of her supervision of that search; rather, she claims only to be responsible for "oversight of the ICE FOIA office."  Pavlik-Keenan Decl. ¶ 2.  Thus, Defendant's affidavit fails to elaborate upon the extent of her "involvement with respect to the plaintiff's search request." Katzman, 903 F. Supp. at 438.  Rather than supplementing her testimony about the details of the searches, the Declaration provides hearsay statements from unidentified ICE employees whom she did not supervise. The Pavlik-Keenan Declaration is therefore deficient, and cannot discharge Defendant's obligation to provide a reasonably detailed search affidavit.

For the foregoing reasons, a "genuine issue as to [] material fact" exists, Fed. R. Civ. P. 56(c), with respect to the sufficiency of Defendant's search.  Summary judgment for Defendant should thus be denied.  Since Defendant had eight months since this action was filed to prepare the affidavit, merely ordering Defendant to produce a more detailed affidavit does not provide Plaintiffs with sufficient relief.  To the contrary, since a genuine dispute of material fact persists, this Court should allow Plaintiffs to take discovery with respect to the issue of the sufficiency of Defendant's search.  See Murphy v. FBI, 490 F. Supp. 1134, 1136 (D.D.C. 1980) ("It is beyond question that discovery is appropriate" in a FOIA case if the government's dispositive motion leaves a factual issue concerning the adequacy of the agency's search).

## II.     DEFENDANT HAS WRONGLY WITHHELD NON-EXEMPT RECORDS UNDER THE "HIGH (b)(2)" EXEMPTION.

Defendant has improperly withheld records under exemption (b)(2), which allows an agency to withhold "matters that are . . . related solely to the internal personnel rules and practices of an agency."  5 U.S.C. § 552(b)(2).  Plaintiffs challenge Defendant's claim of "high 2" to withhold certain records that are not "internal," or are not "related solely to . . . personnel rules and practices of an agency." [5]

Exemption (b)(2) only applies to records that are "related *solely* to the *internal* personnel rules and practices of an agency."  5 U.S.C. § 552(b)(2) (emphasis added).  As the en banc D.C. Circuit held in Crooker v. Bureau of Alcohol, Tobacco and Firearms, "[t]he word 'internal' in Exemption 2 plainly limits the exemption to those rules and practices that affect the internal workings of an agency. 'Related solely to' limits the exemption to those matters that are truly internal . . ."  670 F.2d 1051, 1056 (D.C. Cir. 1981) (en banc).  The threshold test for exemption (b)(2) is "predominant internality"—in other words, that the record "is used for predominantly internal purposes; it is designed to establish rules and practices for agency personnel . . . [and] it involves no 'secret law' of the agency[.]"  Id. at 1073.  For this reason, the paradigmatic example of a record that meets the "predominant internality" test is a manual or memorandum that directs agency personnel in how generally to carry out a certain type of task or operation.  See, e.g., Caplan v. Bureau of Alcohol, Tobacco & Firearms, 587 F.2d 544 (2d Cir. 1978) (ATF manual on how to conduct searches and raids).  To the contrary, "[i]nformation that merely has the potential for bringing to light the practices by which an agency collects and processes information does not come within the ambit of the exception."  Rugiero, 257 F.3d at 549.  This "predominant

---

[5] Defendant has also claimed the "low 2" exemption to redact internal codes on DACS and TECS database printouts, see Def.'s Mem. in Supp. of Summ. J., at 12-13; and to redact internal agency telephone numbers, see id. at 13.  Plaintiffs do not contest these particular "low 2" withholdings.

internality" test comes prior to any analysis of whether release of the records might enable individuals to circumvent the law.  See Sussman v. U.S. Marshals Service, 494 F.3d 1106, 1112 (D.C. Cir. 2007); Crooker, 670 F.2d at 1074.

In addition, it is not sufficient that a record merely be "internal" for it to fall under exemption (b)(2), it must also be "related solely to . . . personnel rules and practices."  The mere fact that a document was created and used internally does not bring it within exemption (b)(2)'s ambit, for such a result would be "potentially all-encompassing[.]"  Crooker, 670 F.2d at 1057. After all, "virtually everything that goes on in the Federal Government, and much that goes on outside of it, could be said to be 'related' through some chain of circumstances to the 'internal personnel rules and practices of an agency.'"  Id.  For this reason, the Sixth, Ninth, and Tenth Circuits have held that even predominantly internal records are not exempt under (b)(2) if they have no connection to personnel rules or practices.  See Abraham & Rose, PLC v. United States, 138 F.3d 1075, 1081 (6th Cir. 1998) ("[I]nformation that merely has a potential for shedding light *on the practice of collecting and compiling information* is not sufficiently related to a personnel rule or practice to satisfy the first prong under Exemption 2 analysis."); Maricopa Audubon Soc'y v. U.S. Forest Serv., 108 F.3d 1082, 1086 (9th Cir. 1997); Audubon Soc'y v. U.S. Forest Serv., 104 F.3d 1201, 1204 (10th Cir. 1997).  Indeed, the Supreme Court in Rose, 425 U.S. at 362-63, noted that exemption (b)(2) was specifically intended to narrow its overly broad predecessor, which implicated "any matter relating solely to the internal management of an agency."  5 U.S.C. § 1002 (1964 ed.).  See also S. Rep. No. 89-813, at 8 (1965) ("Exemption No. 2 relates only to the internal personnel rules and practices of an agency. Examples of these may be rules as to personnel's use of parking facilities or regulations of lunch hours, statements of

policy as to sick leave, and the like.").[6]

Here, DHS has sought to apply "high 2" to withhold "documents created internally prior to the execution of a law enforcement operation including: lists identifying persons to be apprehended; surveillance techniques and methods; the operational plan; the use of sources of information other than an individual; and the manner in which fugitive operational teams are manned and equipped."  Def.'s Mem. in Supp. of Summ. J., at 14.[7]  In many cases, Defendant justifies the exemption by noting that the document was "created internally prior to the execution of an ICE law enforcement operation and may be shared with other agencies participating in the law enforcement operation."  See, e.g., Def.'s Vaughn Index at 13, ¶ 3.4-52604.

But these records fail the test of "predominant internality": as Sussman makes clear, "the application of [the (b)(2)] exemption to information reflecting communication between agencies is more problematic," and the agency bears the burden of proof as to whether such information is indeed "predominantly internal."  494 F.3d at 1112 (internal citations omitted).  This reflects the insight that if one agency shares a record with another agency, it is at least questionable whether that record can be considered "predominantly internal" to the first agency.  Here, DHS has failed to meet the burden that records shared with other agencies participating in the June 6, 2007 immigration raid—not just with other agencies of the U.S. government, but also with the

---

[6] The House Report to exemption (b)(2), H.R. Rep. No. 89-1497, at 10 (1966), claims a much broader scope for the exemption.  But as the Supreme Court noted in Rose, since the House of Representatives unanimously passed the Senate bill without amendment, the Senate Report is generally considered the preferred statement of legislative intent: "Almost all courts that have considered the difference between the Reports have concluded that the Senate Report more accurately reflects the congressional purpose."  425 U.S. at 363.

[7] Def.'s Mem. in Supp. of Summ. J., at 14, notes that Defendant has applied the "high 2" exemption to the following records: 2.42-53311 to 2.59-5311; 3.3-52604; 3.31-52604; 3.69-52604 to 3.81-52604; 3.93-52604 to 3.96-52064; and 3.103-52604 to 3.112-52604.  Defendant's Memorandum fails to note that Defendant's Vaughn Index also claims the "high 2" exemption for the following records: 2.29-53311 to 2.39-53311; 3.4-52604 to 3.12-52604; 3.14-52604 to 3.30-52604; 3.32-52604 to 3.44-52604; 3.82-52604 to 3.86-52604; 3.97-52604 to 3.99-52604; 3.101-52604 to 3.102-52604; 3.113-52604 to 3.114-52604; 3.119-52604 to 3.122-52604; and 3.130-52604 to 3.147-52604.  DHS nowhere explains why its Memorandum significantly understates its application of the "high 2" exemption.  Plaintiffs' argument about the inapplicability of the "high 2" exemption applies to all the above records.

Connecticut State Police[8]—are predominantly internal *to DHS*.

Moreover, such records are not "related solely to . . . personnel rules and practices." Black's Law Dictionary (8th ed. 2004) defines a "rule" as, inter alia, "a general norm mandating or guiding conduct or action in a given type of situation"; Webster's Dictionary (3d unabridged ed. 1971) defines a "practice" as a "repeated or customary action."  Both terms require continuity of behavior: a single act or event does not constitute a "rule" or "practice."  Yet by Defendant's admission, these records were generated for one single raid that was carried out on June 6, 2007. Beyond that one raid, they have no generally applicable use to the agency as "internal personnel rules and practices": if the ICE agents wish to carry out another immigration raid, they cannot rely on the same operations plan and target list, they will have to generate a new one.  These records are thus substantively different from the types of general-use records that exemption (b)(2) properly applies to, such as internal manuals and operating instructions.[9]

In sum, Plaintiffs do not contest Defendant's redaction of administrative database codes and internal agency phone numbers.  But as to records such as operational plans and target lists created prior to the June 6, 2007 immigration raid, Defendants have not met their burden of proof that those records are "predominantly internal," nor that they represent "personnel rules and practices."  This is especially so for records that Defendant shared with other agencies prior to the raid, and records actually created subsequent to the raid.  This Court should thus order Defendant to turn over all records or portions thereof currently withheld under the "high 2"

---

[8] See, e.g., Def.'s Vaughn Index at 27-30, ¶ 3.15-52604 to 3.16-52604 ("This document is a facsimile memo from an ICE field office to the Connecticut State Police.  The facsimile memo is requesting the assistance of officers at a specified date, time, and location."); id. at 25-27, ¶¶ 3.13-52604, 3.14-52604 to 3.15-52604 (fax cover sheet from Connecticut State Police to ICE withheld in part, and the fax itself withheld in its entirety).

[9] Finally, it is inexplicable how those records created subsequent to the June 6, 2007 raid could possibly be described as a "document [] created internally prior to the execution of the ICE operation to apprehend individuals of interest."  See Vaughn Index at 49-51, ¶ 3.82-52604 et seq. ("Dates range from 4/40/07 through 08/03/07").  See also, e.g., id. at 54-56, ¶ 3.93-52604 to 3.95-52604 ("06/27/07 and 08/03/07"); id. at 65-67, ¶ 3.147-52604 ("6/8/07").  Plainly, post-raid records were not created "prior to" the ICE operation, and Defendant provides this Court with no other reason that they would relate to "internal personnel rules and practices."

exemption, or in the alternative, order <u>in camera</u> review of those records to determine whether they are indeed "related solely to the internal personnel rules and practices" of Defendant.

## III.   DEFENDANT HAS WRONGLY WITHHELD NON-EXEMPT RECORDS UNDER EXEMPTION (b)(5).

> *A.    ICE has not sustained its burden of proving that the requested records are protected by the deliberative process privilege.*

The deliberative process privilege embodied by 5 U.S.C. § 552(b)(5) attaches only to records that are both "(1) predecisional" *and* "(2) deliberative." <u>Nat'l Council of La Raza v. Dep't of Justice</u>, 411 F.3d 350, 356-7 (2d Cir. 2005) (citation and quotation marks omitted).  In <u>NLRB v. Sears, Roebuck & Co.</u>, 421 U.S. 132, 151-52 (1975) [hereinafter <u>Sears</u>], the Supreme Court drew a sharp distinction between "predecisional communications, which are privileged [under Exemption 5], and communications made after the decision and designed to explain it, which are not."  The Court reasoned that the governmental interest in keeping confidential post-decisional records is relatively weak, <u>id.</u> at 151 ("it is difficult to see how the quality of a decision will be affected by communications with respect to the decision occurring after the decision is finally reached"); while "the public is vitally concerned with the reasons which did supply the basis for an agency policy actually adopted."  <u>Id.</u> at 153.

A "predecisional" document is one "generated before the adoption of an agency policy[.]"  <u>Coastal States Gas Corp.</u>, 617 F.2d at 866.  In contrast, a record is "postdecisional"—and therefore subject to disclosure—if it "set[s] forth the reasons for an agency decision already made." <u>Renegotiation Bd. v. Grumman Aircraft Eng'g Dev.</u>, 421 U.S. 168, 184 (1975).  <u>See also</u> <u>Mobil Oil Corp. v. Dep't of Energy</u>, 102 F.R.D. 1, 4-5 (N.D.N.Y. 1983) ("[C]ommunications that relate to decisions already made must be released.  In the Court's view, once a policy is adopted, the public has a right to know the basis for that decision.") (discussing <u>Sears</u>).

To be properly exempted under exemption (b)(5), the document or record also must be

"deliberative," meaning that it was "prepared in order to assist an agency decisionmaker in arriving at his decision" and "actually . . . related to the process by which policies are formulated." Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473, 482 (2d Cir. 1999). "[T]he privilege does not protect a document which is merely peripheral to actual policy formation; the record must bear on the formulation or exercise of policy-oriented judgment." Id.

Due to this "deliberative" requirement, exemption (b)(5) does not extend to protect factual information regarding, for example, investigative observations. EPA v. Mink, 410 U.S. 73, 87-88 (1973); Grand Cent. P'ship, 166 F.3d at 482.[10] The deliberative process privilege is destroyed when a document has been adopted or incorporated by reference into a final agency policy or decision. See Sears, 421 U.S. at 153; Nat'l Council of La Raza, 411 F.3d at 357.

Here, Defendant relies on the deliberative process privilege to redact parts of four records and to withhold seven records in their entirety. The redacted documents are: 3.88-52604 and 3.125-52604 (two documents, both dated June 8, 2008, related to a specific question posed by Rep. Rosa DeLauro);[11] 3.147-52604 (notes from a June 8, 2008 conference call between New Haven Chief of Police Francisco Ortiz and ICE representatives); and 3.117-52604 (an e-mail, apparently dated June 11, 2008, regarding a phone call from New Haven Mayor John DeStefano, Jr.). The documents withheld in their entirety are: 3.144-52604 to 3.146-52604 (three undated

---

[10] FOIA requires that "any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b). Therefore, "if the withheld document contains factual material, the Court must determine whether the factual material is inextricably intertwined with the privileged opinions and recommendations such that disclosure would compromise the confidentiality of deliberative information that is entitled to protection under Exemption 5, or whether it is reasonably segregable from the opinions and recommendations and therefore subject to disclosure." NRDC v. Nat'l Marine Fisheries Serv., 409 F. Supp. 2d at 383 (internal citation omitted).

[11] Both documents appear to contain the same redacted information. Although the documents are clearly regarding a question posed by Rep. DeLauro, see 3.126-52604, the Government describes the documents inaccurately in every filing. The Pavlik-Keenan Declaration says that exemption (b)(5) was applied to communications in response to "a state agency's inquiries." Id. at ¶ 66. The Vaughn Index description, to which the Defendant's Memorandum cites, states that the documents "reflect[] the information compiled and prepared for the purpose of responding to the Mayor's questions regarding the operation." Def.'s Mem. in Supp. of Summ. J., at 17.

documents containing hand-written notes of a law enforcement agent "compiled and retrieved by a law enforcement agent for the purpose of executing the operation"); and 3.93-52604 to 3.96-52604 (four e-mails, dated June 27, 2008 and August 3, 2008, among ICE personnel concerning a response to questions posed by Mayor DeStefano regarding the June 6 raid.)

In withholding these records, Defendant errs in three ways.  First, Defendant erroneously characterizes the records as "predecisional."  See Def.'s Mem. in Supp. of Summ. J., at 17 ("All these records are predecisional since they were all prepared in order to assist ICE in arriving at a decision.").  With the possible exception of the three undated pages of handwritten notes by a law enforcement agent, all of the records are dated *after* the June 6 raid.  Indeed, Defendant argues the records were predecisional not to the raid itself, but to a separate, later decision: namely, how to explain its *initial* decision to conduct the raid in the first place, and how to explain the allegedly unconstitutional conduct of its officers during the operation.  See Pavlik-Keenan Decl. ¶ 66 ("Defendant withheld documents that consist of internal correspondence and communications of a pre-decisional nature in preparation of an official response to a state agency's inquiries regarding the law enforcement operation.").  An examination of the "inquires" to which Defendant was responding demonstrates why withholding here would transgress the Supreme Court's holding in Sears that "communications made after [a] decision [that are] designed to explain it" are not exempt from disclosure.  421 U.S. at 151-52.

In records 3.88-52604 and 3.125-52604, Defendant has redacted a paragraph of text that is apparently responding to the third of seven questions that Rep. DeLauro had sent to Defendant.[12]  Like the other six questions, see record 3.126-52604 (listing all seven questions), the third question requested an explanation:

---

[12] In the e-mails, sent at 11:50 a.m. on June 8, 2008 the block of redacted text is preceded by, "Please see the questions below from Rep. DeLauro's office. However, on question 3".  Seven minutes later, someone replied, asking "How long do you think it would take to compile that information?"

> 3.      Please explain the conduct of the officers.   We have learned from
> witnesses that officers barged into houses without showing warrants, that
> individuals were verbally abused and children manhandled, and that no
> information was given to residents of the house about the reason for the raids.

Id.  When Defendant provided Rep. DeLauro with an answer to all seven questions, it gave

purely factual explanations of, inter alia, the conduct of its officers during the raid.  See record

3.126-52604.  The other two partially redacted records are in the same vein: both involve

requests made by Mayor DeStefano for an explanation concerning the timing of the decision to

conduct the raid, and the conduct of the ICE officers during the raid.[13]  Four of the records

withheld in their entirety, 3.93-52604 to 3.96-52604, also appear to be communications

regarding these same questions.

However, as Sears makes clear, Defendant may not invoke exemption (b)(5) merely by

claiming that the "decision" of how to explain a prior decision is one protected by the

deliberative process privilege; this argument would essentially give the agency the opportunity to

entirely erase the distinction drawn by the Supreme Court.  See Sears, 421 U.S. at 153 n.19

(describing "postdecisional" opinions as "looking back on and explaining . . . a decision already

reached or a policy already adopted" and stating that "their disclosure poses a negligible risk of

denying to agency decisionmakers the uninhibited advice which is so important to agency

decisions.").  Indeed, these records are the paradigmatic example of the kind of information

identified by the Sears Court as outside of exemption (b)(5)'s protection: post-decisional

communications "designed to explain" the original decision.  421 U.S. at 151-52.  Defendant's

attempt to manufacture a later decision is nothing more than an attempted end-run around Sears.

---

[13] Record 3.117-52604 is an e-mail of considerable length, apparently redacted in its entirety, responding to an e-mail sent at 2:01 p.m. on June 11, 2008, with the subject line "FW: Call from Mayor Stefano" [sic] and the body text of "see attachment !"  The preceding e-mail, sent three minutes earlier, says "Look over the attachment, please work with Wes to respond to each allegation." The "allegation[s]" are presumably the concerns expressed by Mayor DeStefano over the timing of the raid and the conduct of the ICE officers and his requests for explanation.  The unredacted portion of 3.147-52604 suggests it is essentially the same.

Defendant also errs in applying exemption (b)(5) to records it mischaracterizes as "deliberative," when those records do not bear on policy-related deliberations.  See Def.'s Mem. in Supp. of Summ. J., at 18 ("The documents . . . address agency opinions regarding the operation and thus relate to a process to facilitate an agency determination—i.e., are deliberative.").  Only deliberations relating to *policy* formulation are protected by the deliberative process privilege.  See Grand Cent. P'ship, 166 F.3d at 482 ("A document is deliberative when it is actually . . . related to the process by which policies are formulated.").  Defendant attempts to label the documents "deliberative" by claiming that the documents "do not articulate established agency policy."  Def.'s Mem. in Supp. of Summ. J., at 18.  Indeed, as Defendant seems to concede, this is not a "deliberation" but a "determination."  Id. at 18.  Although Defendant omits a description of what was to be "determin[ed]," it can be supplied by context: in responding to inquiries from elected officials, Defendant sought to *reconstruct* why the raid happened when it did, and how its officers behaved in carrying it out.  This is not the "deliberative process" that FOIA exempts.  In sum, since Defendant cannot present any policy to which the record bears, it cannot withhold the records under exemption (b)(5).  See Tigue v. U.S. Dep't of Justice, 312 F.3d 70, 80 (2d Cir. 2002) ("[T]he privilege does not protect a document which is merely peripheral to actual policy formation; the record must bear on the formulation or exercise of policy-oriented judgment.") (quoting Grand Cent. P'ship, 166 F.3d at 482).[14]

There is yet a third reason why Defendant errs in withholding these records under the

---

[14] Moreover, even were this Court to find that the records relate to an agency "policy," Defendant fails to prove that the withheld records have not been adopted by the agency, which would strip the records of any deliberative process privilege that may have attached.  See Nat'l Council of La Raza, 411 F.3d at 356-7.  To determine whether a record has been adopted, either formally or informally, the Second Circuit looks at the totality of the circumstances rather than relying on any bright-line test.  Id. at 357 n.3.  In its Vaughn Index entries for the records partially and wholly withheld pursuant to the deliberative process privilege, Defendant never even asserts, let alone proves, that they were not adopted as agency policy.  It is quite likely that at least one of the draft responses to Mayor DeStefano and Rep. DeLauro was indeed "adopted" as the agency's response, thus forfeiting any exemption (b)(5) protection that might otherwise have attached.  Without a showing that the agency failed to "adopt" the withheld records, Defendant cannot carry its burden of proving that the deliberative process privilege attaches to these records.

deliberative process privilege: the withheld data is apparently purely factual information about *what had happened* prior to and during the raid. Defendant's <u>Vaughn</u> Index seemingly concedes as much when it states that the information was withheld because "it reflects the *information compiled and prepared* for the purpose of responding to the Mayor's questions re: the operation." <u>Id.</u> at 3.88-52604, 3.117-52604 & 3.125-52604 (emphasis added). <u>See also id.</u> at 3.147-52604 (same). If, as appears likely, the redacted information is purely factual, then it is not properly withheld under exemption (b)(5).[15] This Court should thus perform an <u>in camera</u> review of the records to determine whether the redacted material is indeed "purely factual."

The remaining three records withheld in their entirety pursuant to exemption (b)(5), 3.144-52604 to 3.146-52604, are hand-written notes of a law enforcement agent. Defendant's invocation of the deliberative process privilege here is baffling. The <u>Vaughn</u> Index entry self-contradictorily states that "ICE withheld the documents as it is *pre-decisional in nature* and reflects the thought process of the law enforcement agent and the information compiled and retrieved by a law enforcement agent *for the purpose of executing the operation*." <u>Id.</u> (emphasis added). The Pavlik-Keenan Declaration and Defendant's Memorandum give virtually no description of the handwritten notes,[16] and fail to explain how they can be both "for the purpose

---

[15] <u>See</u> <u>NRDC v. Nat'l Marine Fisheries Serv.</u>, 409 F. Supp. 2d 379, 385 (S.D.N.Y. 2006) ("[P]reliminary findings as to objective facts are not shielded, because an agency does not have the same discretion in determining facts as determining policy."). <u>See also</u> <u>Trentadue v. Integrity Comm.</u>, 501 F.3d 1215, 1227 (10th Cir. 2007) (exemption (b)(5) inapplicable to "largely factual" material detailing the death of a prisoner in a federal detention facility); <u>Petroleum Info. Corp. v. Dep't of Interior</u>, 976 F.2d 1429, 1431, 1435 (D.C. Cir. 1992) (exemption (b)(5) inapplicable to draft "information [regarding] public lands" with no connection to policy); <u>Playboy Enter., Inc. v. Dep't of Justice</u>, 677 F.2d 931, 933 (D.C. Cir. 1982) (exemption (b)(5) inapplicable to the majority of a "302-page document to the Attorney General" detailing the activities of an FBI informant); <u>Adams v. United States</u>, 686 F. Supp. 417, 420 (S.D.N.Y. 1988) (ordering disclosure of "factual findings and conclusions" of Army Inspector General withheld pursuant to exemption (b)(5)).

[16] In its cursory mention of the notes, <u>see</u> Def.'s Mem. in Supp. of Summ. J., at 17, contains a citation to <u>Abdelfattah v. DHS</u>, 488 F.3d 178, 183-84 (3d Cir. 2007), which affirmed the withholding of a draft incident report under exemption (b)(5). Insofar as Defendant relies on <u>Abdelfattah</u> to justify withholding the handwritten notes, such reliance is misplaced. In that case, the Third Circuit was persuaded that the deliberative process privilege protected a draft incident report because "the draft report involved discussions 'between [the agency's] subordinates and seniors' and . . . 'may have been modified to ensure accurate reporting and clarify misleading statements.'" <u>Id.</u> at

of executing the operation" and "pre-decisional in nature."  If the notes were created to help "execut[e] the operation," then, by necessity, the decision to conduct the operation had already been made; Defendant cannot even use the contrived "decision," discussed <u>supra</u>, of how to respond to inquiries from Mayor DeStefano and Rep. DeLauro as a basis for these notes being "predecisional."   Most importantly, however, Defendant makes no attempt to unravel this mystery, and therefore it has failed to carry its burden to establish that the records are exempt.

> B.      *Defendant has not sustained its burden of proving that the requested records are protected by the attorney-client privilege*

A party invoking the attorney-client privilege protected by exemption (b)(5) "must show (1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice."  <u>Pritchard v. County of Erie</u>, 473 F.3d 413, 419 (2d Cir. 2007).  The attorney-client privilege is construed narrowly, and is applied "only where necessary to achieve its purpose."  <u>Id.</u> at 418.  "The burden of establishing the applicability of the privilege rests with the party invoking it."  <u>Id.</u>  Pursuant to a claim of attorney-client privilege, Defendant withheld four records in their entirety: 3.93-52604 to 3.96-52604.  The Pavlik-Keenan Declaration, at ¶ 67, states in conclusory fashion that the withheld records "contain[] communications between an ICE employee and ICE counsel" and "consisted of the employee providing information for the purpose of seeking legal advice and counsel rendering legal advice."  These statements, though sufficient to satisfy the first prong of the <u>Pritchard</u> test, fail to carry Defendant's burden in regards to the second and third prongs.

A "fundamental prerequisite" to asserting the attorney-client privilege is "confidentiality both at the time of the communication and maintained since."  <u>Coastal States Gas Corp.</u>, 617 F.2d

---

183 (alteration in original).  Here, in contrast, there is no indication that the notes were a "draft"; involved any give-and-take between subordinates and seniors; or were modified in any way.  Any claim that the notes were "predecisional" or "deliberative"—much less both—is purely illusory.

at 863.  Therefore, Defendant must "affirmatively establish" both that "confidentiality was expected in the handling of these communications, and that it was reasonably careful to keep this confidential information protected from general disclosure."  Id.[17]  Since Defendant has not provided any evidence as to confidentiality, it has, by definition, failed to carry its burden.

Additionally, although the Pavlik-Keenan Declaration, at ¶ 67, states that the communications involved an employee seeking legal advice, such a conclusory statement is insufficient to establish the third part of the test described in Pritchard.   473 F.3d at 419.  As the Second Circuit explained, in order for the attorney-client privilege to be invoked, the "*predominant purpose* of the communication" must be "to render or solicit legal advice."[18]  Id. at 420 (emphasis added).  The Second Circuit cautioned, however, that

> The predominant purpose of a communication cannot be ascertained by quantification or classification of one passage or another; it should be assessed dynamically and in light of the advice being sought or rendered, as well as the relationship between advice that can be rendered only by consulting the legal authorities and advice that can be given by a non-lawyer.

Id. at 420-21.  See also id. at 421 n.9 ("Normally, the capacity in which a lawyer receives or generates a communication is related to determining whether the communication actually involves a lawyer; in other words, a lawyer not acting in her capacity as a lawyer is not a lawyer for the purpose of the attorney-client privilege.").  As with confidentiality, Defendant has failed to carry its affirmative burden of demonstrating that the "predominant purpose" of the communications they seek to withhold pursuant to the attorney-client privilege was "to render or solicit legal advice."  The records must be disclosed, or at least submitted for in camera review to

---

[17] Similarly, Defendant must demonstrate that the material contained in the e-mails has not been incorporated into its policy, since, if it has been incorporated, the attorney-client privilege could not be invoked to bar disclosure.  See Nat'l Council of La Raza, 411 F.3d at 360-61

[18] "Legal advice," Pritchard explained, "[f]undamentally . . . involves the interpretation and application of legal principles to guide future conduct or to assess past conduct."  473 F.3d at 419.

determine whether they are properly withheld pursuant to the attorney-client privilege.[19]

## IV.   DEFENDANT HAS WRONGLY WITHHELD AGENTS' NAMES.

Defendant has redacted the name of nearly every federal and state employee, claiming exemptions (b)(6) and (b)(7)(C).  See Pavlik-Keenan Decl. at ¶¶ 70, 73.  Exemption (b)(6) protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," while exemption (b)(7)(C) protects "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. §§ 552(b)(6), (b)(7)(C).  To determine whether exemptions (b)(6) and (b)(7)(C) are applicable, this Court conducts a de novo review, "balancing the privacy interest at stake against the public interest in disclosure."  Lesar v. U.S. Dep't of Justice, 636 F.2d 472, 486 (D.C. Cir. 1980).

"It is settled that there is 'no blanket exemption for the names of all FBI personnel in all documents.'  The [D.C. Circuit] has also recognized that in their position as public officials, FBI agents and other law enforcement personnel 'may not have as great a claim to privacy as that afforded ordinarily to private citizens.'"  Butler v. U.S. Dep't of Justice, Civ. A. No. 86-2255 HHG, 1994 WL 55621, at *5 (D.D.C. Feb. 3, 1994) (quoting Lesar).  Indeed, the public interest in knowing the names of agents can outweigh the agents' privacy interests in keeping their names secret where the lawfulness of the agents' actions is seriously called into question.  See Sussman, 494 F.3d at 1115 ("Names of private individuals are thus generally exempt from disclosure except, for example, where they are required to confirm or refute allegations of improper government activity."); Castaneda v. United States, 757 F.2d 1010, 1012 (9th Cir.

---

[19] Given that a large percentage of Defendant's other post-raid communications involved merely trying to ascertain what had happened and when, it seems quite likely that this e-mail chain was dominated by those same issues.

1985) ("Where it appears that the motives or truthfulness of the investigator are in doubt, the public need for supervision and disclosure is necessarily heightened."); <u>Baez v. U.S. Dep't of Justice</u>, 647 F.2d 1238, 1339 (D.C. Cir. 1980) ("We think that the public interest might be served by the release of the names of particular agents in instances . . . in which the performance of a particular agent otherwise is called into question."); <u>Canadian Javelin, Ltd. v. Sec. & Exch. Comm'n</u>, 501 F. Supp. 898, 904 (D.D.C. 1980) ("There is a legitimate public interest in knowing who at the SEC conducted an investigation so those individuals can be subjected to inquiry.").

As the Supreme Court held in <u>Nat'l Archives & Records Admin. v. Favish</u>, 541 U.S. 157, 174 (2004), "where there is a privacy interest protected by Exemption 7(C) and the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties . . . . the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred."  Under the <u>Favish</u> standard, this Court need not determine that government impropriety *did indeed* occur in the June 6, 2007 immigration raid; nor does <u>Favish</u> call upon this Court to weigh Plaintiffs' and Defendant's contrary evidence and determine whether, on balance, government impropriety is *more likely to have occurred than not*.  Rather, under <u>Favish</u>, this Court merely decides whether Plaintiffs have provided evidence that would warrant a reasonable person to believe that government impropriety *might have* occurred.  See <u>News-Press v. U.S. Dep't of Homeland Sec'y</u>, 489 F.3d 1173, 1192 (11th Cir. 2007) (denying defendant's motion for summary judgment where plaintiff presents evidence of government impropriety); <u>Lahr v. Nat'l Transp. Safety Bd.</u>, 435 F. Supp. 2d 1153 (C.D. Cal. 2006) (same); <u>Associated Press v. U.S. Dep't of Defense</u>, No. 05-5468, 2006 WL 270739, at *4 (S.D.N.Y. Sept. 20, 2006) (same).

That standard is met here.  Unlike in <u>Favish</u>, where the plaintiff had merely alleged government impropriety, Plaintiffs herein provide extensive record evidence that Defendant

27

planned and executed the June 6, 2007 immigration raid at least partly in retaliation against the

City of New Haven's municipal identification policy and other immigrant-friendly city policies,

in violation of the First and Tenth Amendments.  See Moshenberg Decl., ¶¶ 5-17.[20]  In addition,

---

[20] The timing of the raid—less than 48 hours after the New Haven Board of Aldermen approved the municipal identification program—certainly warrants a belief by a reasonable person that the raid was at least partly motivated by retaliation.

The ICE agents who planned and executed the June 6, 2007 raid were certainly aware of New Haven's municipal identification program.  Perhaps the most telling piece of evidence is a record already disclosed by Defendant in this case, Def.'s record 3.115-52604, a note from ICE Boston Field Office Director Bruce Chadbourne to Assistant Secretary for Homeland Security Julie Myers (June 6, 2007).  The note states, "This operation has the potential to generate media attention as the city government of New Haven voted yesterday to give illegal aliens city identification cards."  See also Def.'s record 3.136-52604, e-mail from unknown DHS employee to unknown DHS employee (June 5, 2007, 11:38 am) ("Here is an A/S Note for tomorrow's HQ approved New Haven FUGOPN.  I added verbiage to reflect that New Haven City Counsel [sic] voted last night to give ID cards to illegal aliens so that they could open bank accounts and possibly obtain various forms of public assistance.").

Equally telling is a statement made by ICE spokesman Marc Raimondi the day after the raid, that "There is truly no safe haven for fugitive aliens."  Quoted in Jennifer Medina, "Arrests of 31 in U.S. Sweep Bring Fear in New Haven," N.Y. Times, June 8, 2007 [Moshenberg Decl., Ex. F], at 1.  This statement suggests that Mr. Raimondi saw the raid at least in part as a response to the City of New Haven's attempts to create a safe haven for undocumented residents.  Other, higher-ranking DHS officials would later backtrack on that statement.  See, e.g., Letter from Secretary Chertoff to Sen. Dodd (June 14, 2007) [Moshenberg Decl., Ex. D], at 4 ("I want to assure you there is no relationship between the operation's execution date and the City of New Haven's immigration policy.").  But Mr. Raimondi's statement was the agency's first public statement after the raid, made before the agency realized that members of Congress would be conducting inquiries.

As Assistant Secretary Myers wrote, "[t]he New Haven enforcement initiative's plan was submitted on April 20, 2007, and approved on May 4, 2007, by Headquarters DRO."  Letter from Assistant Secretary Myers to Mayor DeStefano (July 2, 2007) [Moshenberg Decl., Ex. E], at 1.  Indeed, this is shortly after the municipal identification policy first gained national media prominence.  See, e.g., "Whose America? Two Cities Take Different Approach to Undocumented Residents," NBC Nightly News, March 20, 2007 [Moshenberg Decl., Ex. G]; Anthony Fiola, "Looking the Other Way on Immigrants; Some Cities Buck Federal Policies," Wash. Post, April 10, 2007 [Moshenberg Decl., Ex. H], at 2 ("In New Haven, Conn., for example, officials have prohibited police from asking about an immigrant's legal status, and in July the city will introduce municipal identification cards, providing undocumented immigrants with a 'locally legal' form of ID"); Michele Wucker, "A Safe Haven in New Haven," N.Y. Times, April 15, 2007 [Moshenberg Decl., Ex. I].  This evidence leads to the reasonable inference that ICE agents first planned the raid and submitted the plan to headquarters after learning of the municipal identification plan from media coverage; and then decided to carry out the raid only after the New Haven Board of Aldermen approved the raid.

In addition, ICE's near-exclusive focus on Fair Haven, the principal Latino neighborhood of New Haven, also gives rise to the reasonable inference that the June 6, 2007 raid was at least partly motivated by retaliation.  See Melinda Tuhus, "Despite Raids, IDs For All," In These Times, July 19, 2007 [Moshenberg Decl., Ex. J], at 2 (identifying "Fair Haven, the heavily Latino section of the city" as the location of the raid); Elizabeth Hamilton, "Passion For Justice: New Haven Priest Stands Up for Immigrant Parishioners," Hartford Courant, July 23, 2007 [Moshenberg Decl., Ex. K], at1 (noting that 25 of the arrests took place in Fair Haven).

For the foregoing reasons, New Haven Mayor John DeStefano remains convinced that the June 6, 2007 raid was motivated at least in part by retaliation against the city's municipal identification program.  See Associated Press, "Timing of immigrant raid questioned," Albany (N.Y.) Times Union, Jan. 27, 2008 [Moshenberg Decl., Ex. L] ("An e-mail sent by local immigration officials to their agency head the day after the city adopted an ID program for illegal immigrants suggests that the timing of a raid soon thereafter was not coincidental, Mayor John DeStefano said."); Mayor DeStefano, News Release (June 6, 2007) [Moshenberg Decl., Ex. M], at 1 ("This is an arbitrary choice by DHS to execute administrative warrants which clearly smack of retaliation for New Haven's actions in the last week.").

Plaintiffs herein provide record evidence that in carrying out the June 6, 2007 immigration raid,
agents egregiously violated the Fourth Amendment prohibition on warrantless entry into private
homes without the consent of the occupants, and the Fourth Amendment and statutory
prohibition on warrantless arrests without probable cause.  See Moshenberg Decl., ¶¶ 18-22.[21]

---

Such retaliation, if proven, would violate the First Amendment, as the city's issuance of the municipal
identification cards constitutes expressive conduct.  See Hartman v. Moore, 126 S. Ct. 1695, 1703 (2006); United
States v. O'Brien, 391 U.S. 367 (1968); Connell v. Signoracci, 153 F.3d 74, 79 (2d Cir. 1998).  In addition, such
retaliation would violate the Tenth Amendment, as the city's issuance of the municipal identification cards serve to
further the well-established core local government function of public safety.  See United States v. Lopez, 514 U.S.
549, 564 (1995); Printz v. United States, 521 U.S. 898, 932 (1997); Gregory v. Ashcroft, 501 U.S. 452, 462 (1991).

[21] It is undisputed that the DHS agents that carried out the June 6, 2007 raid lacked the type of judicial search or
arrest warrant necessary to enter a private home without consent.  As Secretary Chertoff stated, the agents carried an
I-205 (Warrant of Deportation/Removal).  See Letter from Secretary Chertoff to Sen. Dodd (June 14, 2005)
[Moshenberg Decl., Ex. D], at 2.  Secretary Chertoff explained, "A warrant of removal is administrative in nature
and does not grant the same authority to enter dwellings as a judicially approved search or arrest warrant."  Id.
      Nor did the DHS officers have the consent of the occupants to enter the residences.  Plaintiffs herein
provides the declarations of five individuals arrested in the June 6, 2007 raid—one each from five of the houses in
Fair Haven that DHS agents entered without a warrant or the consent of the occupants.  Edinson Fernando Yangua
Calva, of 45 Barnes Avenue, Apt. C-9, stated in his Declaration [Moshenberg Decl., Ex. N], at ¶¶ 6-7,
> I got up and walked toward the door to look through the peephole in the door to see who it was,
> but by the time I moved towards the door from my seat the officers had already entered my
> apartment.  I do not know how they entered the apartment.  I did not open the door or invite them
> in.  At no time did I consent to the entry into my home of ICE agents.  At no time did any other
> person resident in my home at the time ICE arrived consent to the agents' entry into my home.
Edilberto Cedeño Trujillo, of 200 Peck Street, stated in his Declaration [Moshenberg Decl., Ex. O], at ¶¶ 9-13,
> I went to the back door and called "Who is it?" and someone yelled "Police!" through the door.  I
> heard people climbing the stairs to the apartment on the second floor.  I thought something must
> be wrong, so I opened the door just a crack.  The man on the other side pushed open the door and
> four officers ran in. . . .  I did not give my consent for the officers to enter.  No one in my house
> consented to their entry.
Cristobal Serrano-Mendez, of 11 Warren Place, stated in his Declaration [Moshenberg Decl., Ex. P], at ¶ 9,
> At no time did any of the officers present a search warrant for my apartment or an arrest warrant
> for any resident of my apartment.  At no time did I or anyone in my household give consent for the
> officers to enter.
Cirilo Sedeño Trujillo, of 199 Atwater Street, stated in his Declaration [Moshenberg Decl., Ex. Q], at ¶¶ 4-5,
> I heard a group of people running up the stairs.  These people opened the back door to the building
> and more people entered the apartment, shouting in English. . . .  I did not consent to the officers'
> entry, nor did anyone else in my home.  My bedroom door burst open and armed, uniformed
> officers entered the room, without asking permission.  Officers blocked my bedroom door,
> preventing me from leaving. . . .  All they knew about us at that point was that we looked Latino.
Eduardo Diaz-Bernal, of 230 Fillmore Street, stated in his Declaration [Moshenberg Decl., Ex. R], at ¶¶ 7-9,
> As I was about to enter the shower, men began to bang very loudly on the bathroom door. . . .  I
> did not give my consent for the officers to enter the apartment, and no other resident of the
> apartment did so.  When I opened the bathroom door, four ICE officers were standing immediately
> outside and blocked my exit from the bathroom.
The foregoing warrantless searches and seizures, if proven, violate the Fourth Amendment.  See Payton v. New
York, 445 U.S. 573, 586 (1980) ("searches and seizures inside a home without a warrant are presumptively
unreasonable.").  Absent a search warrant, entry into a dwelling is only permissible when voluntary consent has
been given by the inhabitants.  "The government has the burden of proving, by a preponderance of the evidence, that

Moreover, "there is a much stronger public interest in disclosing the names of the employees and agents who worked on the case since they may be able to provide valuable information in the context of a related civil suit." Iglesias v. CIA, 525 F. Supp. 547, 563 (D.D.C. 1981). The agents who planned and executed the June 6, 2007 raid may be able to provide valuable information in the context of the ongoing removal cases of sixteen individuals, still pending before the immigration court in Hartford, Connecticut. See Moshenberg Decl. at ¶ 4.

Evidence of government impropriety is especially clear in one e-mail sent by a DHS employee to Connecticut State Trooper Carmine Verno. See E-mail from unknown DHS agent to Trooper Verno (April 30, 2007, 11:44 am) [Moshenberg Decl., Ex. S]. Defendant has withheld this e-mail in its entirety in this litigation, but Plaintiffs obtained a redacted copy though a separate administrative proceeding against the Connecticut State Police.[22] The e-mail states, "We have 18 addresses--so it should be a fun time!! Let me know if you guys can play!!" Id. This e-mail constitutes "evidence that would warrant a belief by a reasonable person" that the author, a DHS agent, saw the immigration raids as a kind of sport or game: an attitude that, while perhaps not illegal, at least rises to the level of "Government impropriety." Favish, 541 U.S. at 174. The public has a legitimate interest in knowing which ICE agent views his work of arresting and deporting people as if it were a game, and this Court should not allow the author of that e-mail to "hide behind the FOIA[.]" Canadian Javelin, 501 F. Supp. at 904.

---

a consent to search was voluntary." United States v. Isofia, 370 F.3d 226, 230-31 (2d Cir. 2004).

     The warrantless arrests, if proven, also violate the Immigration and Nationality Act ("INA"). INA § 287(a)(2), 8 U.S.C. § 1357(a)(2), allows DHS agents to carry out warrantless arrests only when the agent "has reason to believe that the alien so arrested is in the United States in violation of any such law of regulation and is likely to escape before a warrant can be obtained for his arrest[.]" The Second Circuit has found that the "reason to believe" standard of INA § 287(a)(2) is equivalent to "probable cause" under the Fourth Amendment. See United States v. Sanchez, 635 F.2d 47, 63 n.13 (2d Cir. 1980). The five declarations provided herein demonstrate that the arresting officers were aware of no information specific to those five individuals other than their race, and thus lacked any constitutionally permissible "reason to believe" that they might be aliens present in violation of law.

[22] See Junta for Progressive Action, Inc. v. Danaher, Docket #FIC 2007-416 (Conn. Freedom of Info. Comm'n Oct. 24, 2007), available at http://www.state.ct.us/foi/2007FD/20071108/FIC2007-416.htm; Moshenberg Decl. at ¶ 3.

To the contrary, Defendant has provided no competent evidence as to the specific weight and significance of the agents' privacy interests.  Defendant's FOIA officer does not state a single fact in support of her conclusion that revealing an agent's name "could subject him/her to harassing inquiries for unauthorized access to information regarding ongoing or closed investigations; trigger hostility, harassment, or otherwise interfere with the performance of the individuals' duties by individuals who are of interest to the agency or oppose the agency's mission."  Pavlik-Keenan Decl. at ¶ 73.  See also id. at ¶ 70.  She provides no foundation or basis for her conclusion, nor does she explain the source of her personal knowledge.  Contra Fed. R. Evid. 602.  Even were this Court to deem her an expert, which it should not, she fails to indicate in any way the basis of her opinion.  Contra Fed. R. Evid. 702, 703.  Ms. Pavlik-Keenan's declaration thus fails to meet the requirement of Fed. R. Civ. P. 56(e) that declarations in support of summary judgment "shall be made on personal knowledge [and] shall set forth such facts as would be admissible in evidence[.]"  Indeed, the Pavlik-Keenan Declaration represents precisely the type of "bald claims, unsupported by any factual evidence" that the Butler court held insufficient to bear the agency's burden of proof that release of agents' names would subject them to harassment.  Butler, 1994 WL 55621, at *5.

In sum, Defendant has failed to meet its burden of proof that agents' privacy interest in keeping their names secret outweighs the public interest in their disclosure.  The public interest here, uncovering government impropriety, lies at the heart of the FOIA's core purpose of informing citizens "what their Government is up to."  Reporters Comm. for Freedom of the Press, 489 U.S. at 773.  Plaintiffs provided evidence showing that "the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake" and that "the information is likely to advance that interest," Favish, 541 U.S. at 172; Defendant countered with no evidence other than an unsupported conclusory statement in the

sworn declaration of a FOIA officer.  At the very least, Plaintiffs have shown that a "genuine

issue as to any material fact" still exists, Fed. R. Civ. P. 56(c), thus rendering inappropriate the

entry of summary judgment for Defendant.  This Court should therefore order Defendant to

disclose the names of its agents where those names appear on all responsive records; or, in the

alternative, hold an evidentiary hearing to determine whether the public interest in knowing the

names of the agents outweighs the agents' interest in keeping their names secret.

## V.     DEFENDANT HAS WRONGLY WITHHELD NON-EXEMPT RECORDS UNDER EXEMPTION (b)(7)(E).

Defendant has not met its burden of proof as to the records it seeks to withhold under

exemption (b)(7)(E), records compiled for law enforcement purposes whose production "would

disclose techniques and procedures for law enforcement investigations or prosecutions, or would

disclose guidelines for law enforcement investigations or prosecutions if such disclosure could

reasonably be expected to risk circumvention of the law[.]"  5 U.S.C. § 552(b)(7)(E).

As a threshold matter, exemption (b)(7)(E) applies only to "investigatory records

compiled for law enforcement purposes[.]"  5 U.S.C. § 552(b)(7); Lesar, 636 F.2d at 486.  Four

pages of e-mails that Defendant has withheld in full pursuant to exemption (b)(7)(E) do not meet

this preliminary requirement.  See Def.'s Vaughn index at 54-56, ¶¶ 3.93-52604 to 3.96-52604.

Although the raid took place on June 6, 2007, these e-mails are dated June 27 and August 3,

2007; Defendant's Vaughn index describes them as "Email chain among ICE personnel

regarding the attached draft response to the Mayor's concerns about the operation."  Id.  Those e-

mails, sent long after the law enforcement operation concluded, are about how to best respond to

the political fallout after the operation.  See Section III.A, supra.  Defendant provides no

explanation of how records created after the raid could possibly qualify as "investigatory," nor

how records pertaining to a draft response to a politician's concerns about an already-completed

operation could possibly qualify as "records compiled for law enforcement purposes."  It is apparent from the Vaughn index that these are records compiled for "public relations" or "legislative affairs" purposes, not for law enforcement.

Second, as to nineteen other pages of records, Defendant has not provided any evidence what effect release of the records might have.[23]  Defendant's Declaration re-states the statutory standard for exemption (b)(7)(E), but makes no attempt to tie the standard to the content of any record.  See Pavlik-Keenan Decl. at ¶ 75.  This is precisely the type of "affidavit [that] is too vague and conclusory to support summary judgment" on exemption (b)(7)(E).  PHE, Inc. v. U.S. Dep't of Justice, 983 F.2d 248 (D.C. Cir. 1993).  See also Juda v. U.S. Customs Serv., No. 99-5333, 2000 WL 1093326, at *1 (D.C. Cir. June 19, 2000) (summary judgment under exemption (b)(7)(E) denied where agency "relies on an affidavit that does not provide detailed and specific information demonstrating that the material was properly withheld" and "[n]o connection is drawn between the documents and the general standards for claiming an exemption."); Voinche v. FBI, 412 F. Supp. 2d 60, 69 (D.D.C. 2006) ("Such conclusory statements by agencies are precisely what a proper Vaughn index was meant to eliminate."); Smith v. Bureau of Alcohol, Tobacco and Firearms, 977 F. Supp. 496, 501 (D.D.C. 1997) (summary judgment denied where the agency's "descriptions of its deletions pursuant to Exemption 7(E) are too conclusory for this Court to determine whether the exemption was properly invoked.").

In addition, records may be withheld under exemption (b)(7)(E) only if they would reveal "investigative techniques and procedures generally unknown to the public."  Albuquerque Pub. Co. v. U.S. Dep't of Justice, 726 F. Supp. 851, 857 (D.D.C. 1989).  The exemption is properly

---

[23] Records 3.31-52604 and 3.69-52604 to 3.81-52604 are described only as "Personally identifiable information," and records 3.32-52604 to 3.33-52604 are described only as "Target personally identifiable information"; no other indication of what type of record it is, or what the record contains, is provided.  See Def.'s Vaughn index at 42-46. Just so, records 3.144-52604 to 3.146-52604 are described only as "Law enforcement agent handwritten notes," with no date or indication of what the notes describe or what function they played.  See id. at 62-65.

invoked to withhold "information regarding obscure or secret techniques."  Jaffe v. CIA, 573 F.

Supp. 377, 387 (D.D.C. 1983).  Here, Defendant has sought to withhold records describing

Fugitive Operations Team ("FOT") procedures that it has already released in a publicly available

report entitled An Assessment of United States Immigration and Customs Enforcement's

Fugitive Operations Teams (March 2007).  See Moshenberg Decl., Ex. T.  The report describes

the structure and functioning of FOTs, such as the FOT that planned and led the June 6, 2007

immigration raid.  For example, the report states,

> [E]ach team consists of seven members. . . .  The four deportation officers, who
> report to the supervisory deportation officer, are responsible for identifying,
> locating, and apprehending fugitive aliens.  The immigration enforcement agent
> assists in apprehending fugitives and transporting them from the place of arrest to
> an Office of Detention and Removal Operations detention facility or processing
> center.  The deportation assistant is a clerical employee who performs
> administrative tasks.  Typically, a team has seven members.

Id. at 6-7.  As another example, the report also describes in detail the function and operation of

the Fugitive Case Management Unit in Laguna Niguel, California, and the Fugitive Operations

Support Center in Burlington, Vermont, see id. at 41-42; it also describes the function and

operation of the DACS database, see id. at 14-15.  See also Letter from Secretary Chertoff to

Sen. Dodd [Moshenberg Decl., Ex. D], at 1, 3 (describing the number and funding of FOTs and

coordination with local police); Letter from Assistant Secretary Myers to Mayor DeStefano

[Moshenberg Decl., Ex. E], at 1, 2 (describing the priorities of FOTs and the equipment they use

and wear in carrying out raids).

 To the extent that Defendant seeks to withhold records that describe investigatory

techniques already publicly disclosed elsewhere, such withholding is not permitted by exemption

(b)(7)(E).  See Albuquerque Pub. Co., 726 F. Supp. at 857.  Nor may the application of generally

known investigative techniques to a specific situation be withheld under exemption (b)(7)(E): as

the Ninth Circuit noted, such reasoning would allow an agency to "withhold information under

Exemption 7(E) under any circumstances, no matter how obvious the investigative practice at issue, simply by saying that the 'investigative technique' at issue is not the practice but the application of the practice to the particular facts underlying that FOIA request." Rosenfeld v. U.S. Dep't of Justice, 57 F.3d 803, 815 (9th Cir. 1995).

Finally, Defendant argues that disclosure of the redacted and withheld information, "if combined with other information already known by those in the public, could reveal the techniques and procedures used by ICE to gather information." Def.'s Mem. in Supp. of Summ. J., at 3. This conclusory statement lacks the reasonable specificity required by the Second Circuit, see Halpern, 181 F.3d at 294; and thus does not sustain Defendant's burden to provide fact-specific justifications for its withholdings. Indeed, far from providing the "particularized descriptions of the context" surrounding each redaction and tailoring each description to the document at issue to justify "specific redactions," as required by Halpern, 181 F.3d at 294, Defendant provides statements so broad that they prevent this Court from discharging its obligation under FOIA to conduct a de novo review, and also prevent Plaintiffs from challenging the exempted material in an adversary proceeding.[24]

Since the application of exemption (b)(7)(E) requires this Court to be satisfied that the investigatory techniques withheld are not generally known to the public, in camera review serves to resolve any doubt the Court may have. See Nat'l Sec. Archive v. FBI, 759 F. Supp. 872, 885

---

[24] Defendant's theory, that disparate bits and pieces of information could somehow be combined with other information already in the public domain to enable law-breakers to frustrate legitimate investigations, has been strongly criticized by commentators who note that, if taken to its logical conclusion, it allows an agency to withhold virtually anything. See David E. Pozen, The Mosaic Theory, National Security, and the Freedom of Information Act, 115 Yale L.J. 628, 632 (2005) (such claims "contravene the text and purpose of FOIA"); David Cole, Enemy Aliens: Double Standards and Constitutional Freedoms in the War on Terrorism 20-21, 32-33 (2003) (assailing the government's use of this theory in immigration proceedings); Susan M. Akram & Maritza Karmely, Immigration and Constitutional Consequences of Post-9/11 Policies Involving Arabs and Muslims in the United States: Is Alienage a Distinction Without a Difference?, 38 U.C. Davis L. Rev. 609, 652 (2005) (same); Robert P. Deyling, Judicial Deference and De Novo Review in Litigation over National Security Information under the Freedom of Information Act, 37 Vill. L. Rev. 67, 84 (1992) (calling this theory "one of the most serious challenges to effective judicial scrutiny of executive claims"); Steven J. Lepper, Developments under the Freedom of Information Act— 1982, 1983 Duke L.J. 390, 397-98 (arguing that this theory gives FOIA an unlegislated tenth exemption).

(D.D.C. 1991); <u>Fitzgibbon v. U.S. Secret Serv.</u>, 747 F. Supp. 51, 60 (D.D.C. 1990) (where

agency's claims supporting exemption (b)(7)(E) "are general and cursory at best, [] the only way

the Court can ascertain whether the assertions are correct is by way of an <u>in camera</u> review.").

## VI.   DEFENDANT HAS FAILED TO MEET ITS BURDEN OF PROOF ON THE NON-SEGREGABILITY OF MANY DOCUMENTS WITHHELD IN FULL.

Summary judgment should also be denied because Defendant failed to meet its burden of

proving that it disclosed all reasonably segregable portions of otherwise-exempt records.  The

FOIA statute requires that "[a]ny reasonably segregable portion of a record shall be provided to

any person requesting such record after deletion of the portions which are exempt under this

subsection."  5 U.S.C. § 552(b).  Claims of non-segregability must be made with the same degree

of detail as required for claims of exemption.  See <u>Vaughn</u>, 484 F.2d at 820; <u>Mead Data Cent.,</u>

<u>Inc. v. Dep't of Air Force</u>, 566 F.2d 242, 260-61 (D.C. Cir. 1977).

> [U]nless the segregability provision of the FOIA is to be nothing more than a precatory precept, agencies must be required to provide the reasons behind their conclusions in order that they may be challenged by FOIA plaintiffs and reviewed by the courts.  In addition to a statement of its reasons, an agency should also describe what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document.

<u>Mead Data Cent.</u>, 566 F.2d at 261.  "The focus in the FOIA is information, not documents, and

an agency cannot justify withholding an entire document simply by showing that it contains

some exempted material."  <u>Id.</u> at 260.

Here, Defendant has provided almost no explanation for its decision to withhold certain

records in their entirety, rather than providing them in redacted form.  Defendant's FOIA officer

merely states that she has "reviewed all the ICE documents . . . line-by-line, to identify

information exempt from disclosure . . . .  In my determination, any release of the exempted

materials could reasonably compromise an ongoing investigation, lead to the identification of

individuals, techniques and methods, or other items that are properly protected by the

exemptions asserted."  Pavlik-Keenan Decl. at ¶ 76.  This is precisely the type of "sweeping, generalized claims of exemption for documents" that <u>Mead Data Central</u> held insufficient to meet an agency's burden of proof under the FOIA's segregability requirement.[25]  566 F.2d at 260.  Ms. Pavlik-Keenan provides no reasons for her conclusory statement, and no indication of what portion of the information in any record is non-exempt and how that material is dispersed throughout the record.  For example, she provides no explanation of why one group of e-mails can be released in redacted form, while another group of e-mails must be withheld in their entirety.  <u>Compare</u> <u>Vaughn</u> Index at 49- 51, ¶ 3.82-52604 <u>et seq.</u>, <u>with</u> <u>id.</u> at 54-56, ¶ 3.93-52604.

In addition, Defendant has entirely withheld its target lists, i.e. the lists of individuals whom ICE agents were seeking on June 6, 2007.  For example, Defendant's <u>Vaughn</u> index, at 13-15, describes record 3.4-52604 as "a target apprehension chart which contains columns of personally identifiable information including: A-File number, name, date of birth, country of citizenship, address, conviction status, social security number, predator status, and apprehension status regarding specific individuals.  The document also contains law enforcement officer's notes regarding specific details of apprehension locations."[26]

Plaintiffs here do not contest Defendant's reliance on exemptions (b)(6) and (b)(7)(C) to withhold the names, addresses, dates of birth, A-File numbers, and social security numbers.  Moreover, Plaintiffs here do not context Defendant's reliance on exemption (b)(7)(E) to withhold the names of those individuals on the target list who have not yet been apprehended.

---

[25] In <u>Mead Data Central</u>, as here, the Air Force supported its motion for summary judgment with a declaration.  The Air Force's declaration simply "stated [] that there 'were no factual portions . . . which could be reasonably segregated.'  [] No supporting justification was offered for this conclusion . . ."  566 F.2d at 260.  The D.C. Circuit found this insufficient to meet the agency's burden of proof on segregability, ordering that "if the Air Force decides to continue in its claim that the non-exempt material in these documents is not reasonably segregable after reconsideration pursuant to the remand of this case, it must provide a more detailed justification than the conclusory statements it has offered to date."  <u>Id.</u> at 261.

[26] Defendant's <u>Vaughn</u> index indicates that the following records, all withheld in their entirety, are all various iterations of the target list: 2.29-53311 to 2.39-53311; 3.3-52604 to 3.5-52604; 3.17-52604; 3.18-52604; 3.19-52604; 3.20-52604 to 3.24-52604; 3.28-52604 to 3.29-52604; 3.32-52604 to 3.33-52604; and 3.113-52604.

However, Defendant offers no reason why those columns could not simply be redacted, and the *rest* of the record disclosed. Defendant provides no evidence that a list of countries of origin, conviction statuses, predator statuses, apprehension statuses, and field notes would be in any way traceable to specific individuals—a necessary precondition for any "invasion of personal privacy." See U.S. Dep't of State v. Ray, 502 U.S. 164, 175-76 (1991) (finding only a de minimis privacy interest in "highly personal information regarding marital and employment status, children, living conditions and attempts to enter the United States," as long as names and other identifying information are redacted). Likewise, Defendant fails to explain how disclosure of a list of countries of origin, conviction statuses and predator statuses, with all personally identifying information redacted, would enable any individual to escape detection by determining whether they were or were not on the list.

On the other hand, the public has a strong interest in knowing the national origins of individuals targeted by ICE for enforcement action, especially given widely publicized claims of racial profiling by ICE.[27] Likewise, the public has a strong interest in knowing how many people on ICE's target list have been convicted of a crime, in order to monitor and evaluate the agency's

---

[27] See Rep. Jose E. Serrano, News Release (Feb. 15, 2008) [Moshenberg Decl., Ex. V], at 1 ("My office has received numerous reports of abusive behavior and perceived racial profiling on the part of some ICE field officers"); Albor Ruiz, "Coalition Rips ICE's Raids as Unfair & Illegal," N.Y. Daily News, Nov. 11, 2007 [Moshenberg Decl., Ex. W], at 2 ("According to the document, ICE uses 'criminal investigation' as a pretext to arrest and deport undocumented immigrants 'under circumstances that clearly demonstrate racial profiling'"); "Regional Roundup: ICE increases its raids for illegals," Grand Forks (N.D.) Herald, April 23, 2007 [Moshenberg Decl., Ex. X], at 3 ("The lawsuit alleges that ICE agents made searches without warrants and used racial profiling during the raid"); American Civil Liberties Union, News Release (March 19, 2007) [Moshenberg Decl., Ex. Y], at 1 ("Immigrants' rights groups across the state say they have received complaints about racial profiling."); Rosanna Ruiz, "Guilty pleas in hiring of immigrants," Houston Chronicle, Feb. 28, 2007 [Moshenberg Decl., Ex. Z], at 2-3 ("During one raid . . . Hispanics were separated from non-Hispanics for questioning regardless of citizenship status."); Kelly Brewington and Matthew Dolan, "Immigration Raid: Latino Community Angered by 24 Arrests in City," Baltimore Sun, Jan. 24, 2007 [Moshenberg Decl., Ex. AA], at 2 ("[A]dvocates in Baltimore's burgeoning Latino immigrant community expressed outrage, saying the officers' tactics were akin to racial profiling."); Jeremiah Stettler, "Protest targets meat-plant raid," The Salt Lake Tribune, Dec. 21, 2006 [Moshenberg Decl., Ex. BB], at 1 ("The operation has rankled some Utahns, particularly in the Latino community, who said Wednesday that federal agents used excessive force and racial profiling"); National Council of La Raza, News Release (Dec. 21, 2006) [Moshenberg Decl., Ex. CC], at 1 ("Various news reports and accounts from members of the community have claimed that racial profiling was used to single out workers for questioning").

frequent public claims that they are focusing their enforcement efforts primarily on individuals with criminal backgrounds.[28]  For this reason, Plaintiffs respectfully request that this Court order Defendant to release national origin data, conviction and predator status data, and apprehension status data and field notes on all lists of individuals currently withheld in their entirety.

Defendant has not met its burden of proof on its claim that non-exempt material cannot be segregated from exempt material in those records withheld in their entirety.  In camera review is thus appropriate for all records withheld in their entirety, at least on the issue of segregability.  See 5 U.S.C. § 552(a)(4)(B) (the court "may examine the contents of such agency records in camera").  See also Rose, 425 U.S. at 373-77; Hopkins v. U.S. Dep't of Hous. and Urban Dev., 929 F.2d 81, 85-86 (2d Cir. 1991) (finding error in a district court's decision not to perform an in camera review, where the agency "offered no details as to the contents of specific reports, but only asserted in a conclusory fashion that any factual observations contained in the reports are 'inextricably intertwined' with the reports' privileged opinions and recommendations."); Ray v. Turner, 587 F.2d at 1187.

## VII.   IN CAMERA REVIEW IS APPROPRIATE WHERE DEFENDANT HAS FAILED TO MEET ITS BURDEN OF PROOF ON CLAIMED EXEMPTIONS.

In some FOIA cases, when the defendant agency fails to provide sufficiently specific evidence to meet its burden of proof for summary judgment on its claimed exemptions, a court will order the agency to produce a more detailed Vaughn index.  See, e.g., Voinche, 412 F. Supp.

---

[28] As Assistant Secretary of Homeland Security Julie Myers wrote,

> According to policy, [Fugitive Operations Teams] prioritize their efforts using the following criteria: (1) Fugitives who are a threat to national security; (2) Fugitives who pose a threat to the community; (3) Fugitives who were convicted of violent crimes; (4) Fugitives who have criminal records; and lastly (5) Non-criminal fugitives.

Letter from Assistant Secretary Myers to Christina DeConcini (July 6, 2007) [Moshenberg Decl., Ex. U], at 2.  See also U.S. Immigration and Customs Enforcement website [Moshenberg Decl., Ex. DD], at 1 ("[T]he highest priority [is] placed on those fugitives who have been convicted of crimes"); id. at 3 ("ICE prioritizes its immigration enforcement actions by targeting the greatest national security and public safety threats"); id. at 7 ("The highest priority of the [National Fugitive Operations Program] is placed on those fugitives who pose a threat to national security and community safety."); "ICE Access Fact Sheet" (August 2007) [Moshenberg Decl., Ex. EE], at 2 ("[T]he highest priority [is] placed on those fugitives who have been convicted of crimes").

2d at 69; <u>Smith</u>, 977 F. Supp. at 501.  But here, Defendant has already produced three different

drafts of a <u>Vaughn</u> index over the course of more than seven months since Plaintiffs filed this

action.  <u>See</u> Pavlik-Keenan Decl. ¶ 52 (on October 26, 2007, Defendant sent Plaintiffs "summary

charts detailing the exemptions applied"); <u>id.</u> at ¶¶ 57-58 (on December 14, 2007 and January 9,

2008, Defendant sent Plaintiffs "Vaughn indexes"); Def.'s Consolidated Amended <u>Vaughn</u> Index

(filed April 14, 2008).  Since Defendants have now had ample opportunity to perfect its <u>Vaughn</u>

index, Plaintiffs respectfully suggest that merely granting Defendant more time to perfect its

<u>Vaughn</u> index (and effectively requiring a second round of summary judgment motions based on

that index) would provide insufficient remedy to Plaintiffs.  To the contrary, Plaintiffs

respectfully request that if this Court finds Defendant's current declaration and <u>Vaughn</u> index

insufficient to meet its burden of proof as to any claimed exemption for any withheld record, this

Court should order Defendant to produce the record to Plaintiffs, or, in the alternative, provide

the record for <u>in camera</u> review.  5 U.S.C. § 552(a)(4)(B).

As the D.C. Circuit held in <u>Ray v. Turner</u>, "The ultimate criterion is simply this: Whether

the district judge believes that <u>in camera</u> inspection is needed in order to make a responsible <u>de</u>

<u>novo</u> determination on the claims of exemption."  587 F.2d 1187, 1195 (D.C. Cir. 1978).  Since

Defendant has failed to provide sufficiently specific evidence to allow this Court to make a <u>de</u>

<u>novo</u> determination, such criterion has been met in this case.

## Conclusion

In conclusion, summary judgment is not appropriate on the factual record presented here.

Defendant has not met its burden under the FOIA exemptions for many of the withheld records,

nor has it met its burden with respect to the adequacy of its search for responsive records or the

segregability of records withheld in their entirety.  This Court should order Defendant to disclose

the wrongly withheld records, or, in the alternative, provide them for <u>in camera</u> review.

Respectfully submitted,

Dated: April 25, 2008                    _____/s/_____
                                         Michael Wishnie (ct27221)
                                         Christopher Lasch (ct27139)
                                         *Counsel for Plaintiffs*

On the Memorandum:                       The Jerome N. Frank Legal Services Organization
Simon Moshenberg                         PO Box 209090
Justin Cox                               New Haven, CT 06520-9090
Law Student Interns                      Telephone: (203) 432-4800
                                         Facsimile: (203) 432-1426
                                         michael.wishnie@yale.edu

## **Certificate of Service**

I hereby certify that on April 25, 2008, a copy of the foregoing Plaintiff's Memorandum in Opposition to Motion for Summary Judgment of Defendant U.S. Department of Homeland Security, along with all attached declarations and exhibits, was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.


_____/s/_____
Michael Wishnie (ct 27221)
The Jerome N. Frank Legal Services Organization
PO Box 209090
New Haven, CT 06520-9090
Telephone: (203) 432-4800
Facsimile: (203) 432-1426
michael.wishnie@yale.edu