# Appendix of
# <u>Unpublished Cases</u>

# FREEDOM OF INFORMATION COMMISSION
## OF THE STATE OF CONNECTICUT

In the Matter of a Complaint by      FINAL DECISION

Junta for Progressive Action, Inc.;
Unidad Latina en Accion; and
The Jerome N. Frank
Legal Services Organization,

        Complainants

   against         Docket #FIC 2007-416

John A. Danaher III, Commissioner,
State of Connecticut,
Department of Public Safety,

      Respondent      November 8, 2007


    The above-captioned matter was heard as a contested case on October 31, 2007, at which time the complainants and the respondent appeared, stipulated to certain facts and presented testimony, exhibits and argument on the complaint.

    After consideration of the entire record, the following facts are found and conclusions of law are reached:

  1. The respondent is a public agency within the meaning of §1-200(1)(A), G.S.

  2. It is found that by letter dated July 12, 2007, the complainants made a written request for copies of records, from January 1, 2007 through the present, relating to the respondent's participation in an immigration enforcement action that resulted in the arrest of approximately 29 people in the New Haven area on the morning of June 6, 2007. The complainants requested:

    a. All records relating to the planning, coordination, execution of and follow-up on the June 6 arrests;

    b. All records of any communication with any officer or staff of the U.S. Department of Homeland Security ("DHS"), including, but not limited to, the Office of the Bureau of Immigration & Customs Enforcement ("ICE"), pertaining to the June 6 arrests;

    c. All records of any communication with any officer or staff of the U.S. Marshal Service pertaining to the June 6 arrests;

    d. All records of any communication with any officer or staff of the New Haven municipal government, including, but not limited to, the New Haven Police Department, pertaining to the June 6 arrests;

     e.   All records pertaining to any communication with the press about
the June 6 arrests; and

     f.   All records detailing total staff time and money spent planning,
coordinating and executing the June 6 arrests.

   3.   It is found that, by the same letter of July 12, 2007, the complainants also requested copies
of all records created after December 31, 2001 related to the following:

     a.   Any and all complaints received about the activities of alleged
immigrants, or Hispanics in general, in or around New Haven,
Connecticut, and all records pertaining to any follow-up action taken
in response to such complaints;

     b.   All materials mentioning the New Haven municipal identification
card and the "Elm City Resident Card," including but not limited to
mention of the debate before the New Haven Board of Aldermen and
its passage on June 4, 2007;

     c.   All materials mentioning the New Haven Police Department General
Order 06-02; and

     d.   All materials mentioning the creation, existence or possibility of a
"sanctuary" or policy of non-cooperation of New Haven police
officers with federal immigration officials.

   4.   It is found that, by letter dated July 20, 2007, the respondent acknowledged receipt of the
complainants' request for the records described in paragraphs 2 and 3, above. It is found that such
letter indicated the respondent's intent to review and respond to the complainants' request, but did not
include copies of any of the records that the complainants requested.

   5.   It is found that by letter dated July 31, 2007 and filed August 2, 2007, the complainants
appealed to this Commission, alleging that the respondent violated the Freedom of Information ("FOI")
Act by failing to provide copies of any of the records described in paragraphs 2 and 3, above.

   6.   It is found that the respondent gathered records from within his agency that were responsive
to the complainants' request. It is found that, because DHS prepared the records, the respondent
believed it was appropriate to give DHS the opportunity to exempt information contained in such
records pursuant to the federal FOI Act, 5 U.S.C. §552. It is found that DHS reviewed the records and
sent copies to the respondent that included notations of what information DHS would exempt pursuant
to the federal FOI Act.

   7.   It is found that when the respondent received the records back from DHS, he notified the
complainants, by letter dated October 1, 2007, that he was providing copies of records described in
paragraphs 2 and 3, above. It is found that the respondent provided 14 pages of records, of which 13
pages contained redactions. It is found that the respondent withheld entirely an additional 11 pages of
records.

8.  It is found that the records provided to the complainants and those withheld entirely contained redactions of information claimed to be exempt pursuant to both the Connecticut and the federal FOI Acts.

9.  It is found that on October 30, 2007, the respondent provided copies of some of the same records to the complainant, but with fewer redactions. It is found that, on that date, the respondent also provided redacted copies of three additional e-mails. It is found that the respondent claimed the redacted information was exempt pursuant to provisions of both the Connecticut and the federal FOI Acts.

10.  Upon order of the hearing officer, the respondent submitted unredacted copies of the records, described in paragraphs 9, above, for in camera inspection, which pages shall be identified herein as IC-2007-416-1 through IC-2007-416-21. It is found that the respondent failed to include with his in camera submission three e-mails (one dated June 4, 2007 and two dated June 19, 2007) that he provided to the complainants with redactions on October 1, 2007.

11.  Section 1-200(5), G.S., defines "public records or files" as:

> Any recorded data or information relating to the conduct of the public's business prepared, owned, used, received or retained by a public agency, … whether such data or information be handwritten, typed, tape-recorded, printed, photostated, photographed or recorded by any other method.

12.  Section 1-210(a), G.S., provides in relevant part that:

> Except as otherwise provided by any federal law or state statute, all records maintained or kept on file by any public agency, whether or not such records are required by any law or by any rule or regulation, shall be public records and every person shall have the right to . . . receive a copy of such records in accordance with section 1-212.

13.  Section 1-212(a), G.S., provides in relevant part that "any person applying in writing shall receive, promptly upon request, a plain or certified copy of any public record."

14.  It is found that the respondent submitted insufficient evidence that it was reasonable to delay nearly three months before providing only 14 pages of copies of records to the complainants.

15.  It is concluded that the respondent violated the FOI Act by failing promptly to provide the records described in paragraphs 2 and 3, above.

16.  With respect to whether the records described in paragraphs 2 and 3, above, are public records within the meaning of the Connecticut FOI Act, it is found that several of the records that the complainants requested were prepared by the respondent, and several others were prepared by DHS or ICE. It is found that DHS or ICE sent the records it prepared to the respondent prior to the complainants' request.

17.  It is found that the respondent "used, received or retained" the records he received from the

federal agencies and the records he prepared, within the meaning of §1-200(5), G.S.

18. It is found that the respondent also "maintained or kept on file" the records he received from the federal agencies and the records he prepared, within the meaning of §1-210(a), G.S.

19. It is found, therefore, that the records described in paragraph 2 and 3, above, are public records within the meaning of §§1-200(5) and 1-210(a), G.S.

20. Upon careful examination of IC-2007-416-1 through IC-2007-416-21, it is found that the records consist of three pages of a Department of Public Safety Investigation Report, a single page handbill, cover pages to two facsimile transmissions, one page with a list of 29 names and corresponding identifying information, three pages containing six e-mail messages, one page with a list of 32 names and corresponding identifying information, and 10 pages of records that the respondent publicly identified as the ICE "Operational Order/Plan" for the New Haven arrests.

21. The respondent claims that the federal FOI Act, applied through §1-210(a), G.S., exempts from mandatory disclosure the redacted information in *all* the records. The respondent further claims that the Connecticut FOI Act also exempts from mandatory disclosure the redacted information on the two lists of names (IC-2007-416-7 and IC-2007-416-11), one of the e-mails (IC-2007-416-10), and the "Operational Order/Plan" (IC-2007-416-12 to IC-2007-416-21).

22. It is found, however, that the federal FOI Act, by its express terms, applies only to federal agencies. The federal FOI Act, 5 U.S.C. §551, defines agency, in relevant part, as follows:

> "[A]gency" means each authority of the Government of the United
> States, whether or not it is within or subject to review by another agency.

23. It is found that the respondent is not an authority of the Government of the United States, within the meaning of 5 U.S.C. §551.

24. It is found, moreover, that 5 U.S.C. §552 is not a "federal law" that provides an exception to the disclosure requirement of §1-210(a), G.S. As the complainants observed in their Memorandum of Law submitted in advance of the hearing in this matter, it is found that a federal law provides an exception to §1-210(a)'s requirement of mandatory disclosure only where the federal law *prohibits* disclosure. It is found that the federal FOI Act requires agencies to disclose certain records, but does not prohibit disclosure of any public records. "(1) Each agency shall make available to the public information as follows …" 5 U.S.C. §552(a). It is found that subsection (b) excuses agencies from the affirmative duty of disclosure in certain circumstances. "This section [(a)] does not apply to …" 5 U.S.C. §552(b).

25. It is found, therefore, that the redactions to the copies of records provided to the complainants that were based on a claim of exemption pursuant to provisions of the federal FOI Act and §1-210(a), G.S., are without merit.

26. With respect to the respondent's other claims of exemption pursuant to the Connecticut FOI Act, the respondent contends that §1-210(b)(3)(D), G.S., permits him to exempt one line of the e-mail records (IC-2007-416-10) and the 10-page Operations Plan/Order (IC-2007-12 through IC-2007-21).

27. Section 1-210(b)(3)(D), G.S., provides in relevant part,

Nothing in the Freedom of Information Act shall be construed to require disclosure of … records of law enforcement agencies not otherwise available to the public which records were compiled in connection with the detection or investigation of crime, if the disclosure of said records would not be in the public interest because it would result in the disclosure of … (D) investigatory techniques not otherwise known to the general public …

28. With respect to whether the records described in paragraph 26, above, were compiled in connection with the detection or investigation of crime, it is found that ICE compiled the records in anticipation of the service of *administrative* warrants on persons suspected of having violated *civil* immigration laws. It is found that neither ICE nor DHS undertook the operation for the enforcement of state or federal criminal law.

29. It is found that the respondent's role in the operation was to assist ICE agents and facilitate their enforcement action. It is found that the respondent did not consider the operation to be a criminal law enforcement activity. It is found that the operation produced no arrests for violation of federal or state criminal law.

30. It is found that records compiled in connection with the detection or investigation of administrative regulations are not compiled in connection with the detection or investigation of crime, within the meaning of §1-210(b)(3), G.S. Thomas and The Hartford Courant v. Legal Affairs Unit, State of Connecticut, Department of Public Safety, Docket #FIC1996-153 (Internal Affairs report was not exempt, because it was "an investigation into alleged violations of *administrative* regulations, and was not compiled in connection with the detection or investigation of crime." (Emphasis in original.))

31. It is found that none of the records described in paragraph 26, above, were "compiled in connection with the detection or investigation of crime," within the meaning of §1-210(b)(3), G.S.

32. The respondent nonetheless contends that disclosure of the records described in paragraph 26, above, would reveal an investigatory technique not otherwise known to the general public, within the meaning of §1-210(b)(3)(D), G.S.

33. It is found that the records of the Operations Plan (IC-2007-12 through IC-2007-21), are broad-based operating procedures. Details of the some of the procedures reveal anticipated steps in the investigation that *ICE* undertook to prepare for the June 6 arrests. It is found that nothing in the Operations Plan reveals any technique of the *respondent*.

34. It is found that the claimed exempt information in the e-mail message (IC-2007-416-10) does reveal an investigatory technique of the respondent.

35. It is found, however, that none of the investigatory techniques revealed in IC-2007-416-10 or IC-2007-12 through IC-2007-21 are otherwise unknown to the general public, within the meaning of §1-210(b)(3)(D), G.S. It is found that the respondent's investigatory technique, described in paragraph 34, above, is not at a level beyond what the public perceives through television or other media, nor is it so detailed as to reveal any unknown aspects of otherwise known techniques. Donovan v. Greenwich Police Department, FIC1987-173, (remanded hearing, February 26, 1992).

36. It is found, with respect to the investigatory techniques revealed in the Operations Plan (IC-2007-12 through IC-2007-21), that the Operations Plan does not reveal any detailed information that is not already publicly available concerning the widely known "Operation Return to Sender." It is found that Exhibits E and F in this matter support the complainants' contention that any investigatory techniques in the redacted records are not unknown to the general public.

37. It is found that the records described in paragraph 26, above, would not reveal an investigatory technique not otherwise known to the general public, within the meaning of §1-210(b)(3)(D), G.S. It is concluded that the respondent violated the Connecticut FOI Act by failing to provide such records to the complainants.

38. With respect to IC-2007-416-7 and IC-2007-416-11, which are two lists of names and accompanying identifying information, the respondent claims that §1-210(b)(2), G.S., permits him to refuse to disclose those records entirely.

39. Section 1-210(b)(2), G.S. permits the non-disclosure of "personnel or medical files and similar files the disclosure of which would constitute an invasion of personal privacy."

40. The Supreme Court set forth the test for the exemption contained in §1-210(b)(2), G.S., in Perkins v. Freedom of Information Commission, 228 Conn. 158, 175 (1993). The claimant must first establish that the files in question are personnel, medical or similar files. Second, the claimant must show that disclosure of the records would constitute an invasion of personal privacy. In determining whether disclosure would constitute an invasion of personal privacy, the claimant must establish both of two elements: first, that the information sought does not pertain to legitimate matters of public concern, and second, that the disclosure of such information is highly offensive to a reasonable person. The Commission takes administrative notice of the multitude of court rulings, commission final decisions,[1] and instances of advice given by the Commission staff members,[2] which have relied upon the Perkins test, since its release in 1993.

41. The respondent claims the records described in paragraph 38, above, are files "similar" to personnel or medical files, within the meaning of §1-210(b)(2), G.S.

42. It is found that the respondent failed to submit any evidence concerning the nature or purpose of the information contained in the records described in paragraph 38, above.

43. It is found that the records described in paragraph 38, above, are not "similar" files within the meaning of §1-210(b)(2), G.S.

44. Accordingly, it is found that §1-210(b)(2), G.S., does not permit the respondent to refuse to disclose the records identified as IC-2007-416-7 and IC-2007-416-11. It is concluded that the respondent violated the FOI Act by failing to provide such records to the complainants.

45. With respect to the three e-mails, described in paragraph 10, above, which the respondent provided in redacted form to the complainants on October 1, 2007, but failed to submit in unredacted form for in camera review, it is found that the respondents failed to prove that the redacted information is exempt from disclosure pursuant to the Connecticut FOI Act.

46. Accordingly, it is concluded that the respondent violated §1-210(a) and §1-212(a), G.S., of

the Connecticut FOI Act by failing to provide copies of the three e-mail messages without redaction to the complainants.

47. With respect to the complainants' request for records described in paragraph 3, it is found that none of the records provided to the complainants or submitted in camera are responsive to that request. It is found that the respondent provided insufficient evidence that his search for such records was diligent.

48. With respect to the diligence of the respondent's search for records described in paragraph 2, above, it is found that the respondent did not attempt to obtain copies of archived, deleted, or sent e-mail communications.

49. Accordingly, it is concluded that the respondent violated the FOI Act by failing to prove that he provided all the records that the complainants requested, as described in paragraphs 2 and 3, above.

The following order by the Commission is hereby recommended on the basis of the record concerning the above-captioned complaint:

1.  The respondent shall forthwith provide the complainants with unredacted copies of the records previously provided with redactions to the complainants on October 1, 2007 and October 30, 2007.

2.  As agreed by the parties, the respondent shall provide to the complainants an unredacted copy of the record described in paragraph 2.f, above.

3.  The respondent shall forthwith undertake a diligent search for the e-mail communications described in paragraph 48, above.  As agreed by the parties, the respondent is to search for e-mails from April 1, 2007 through July 12, 2007.  The respondent shall provide the complainants with all unredacted copies of any records produced by such search and shall provide an affidavit as to the diligence of his search.

4.  The respondent shall forthwith undertake a diligent search for the records described in paragraphs 3 and 47, above.  The respondent shall provide the complainants with all copies of any records produced by such search and shall provide an affidavit as to the diligence of his search.

5.  The respondent shall henceforth strictly comply with the requirements of §1-210(a) and §1-212(a), G.S.

Approved by Order of the Freedom of Information Commission at its special meeting of November 8, 2007.

Petrea A. Jones
Acting Clerk of the Commission

PURSUANT TO SECTION 4-180(c), G.S., THE FOLLOWING ARE THE NAMES OF EACH
PARTY AND THE MOST RECENT MAILING ADDRESS, PROVIDED TO THE FREEDOM OF
INFORMATION COMMISSION, OF THE PARTIES OR THEIR AUTHORIZED
REPRESENTATIVE.

THE PARTIES TO THIS CONTESTED CASE ARE:

Junta for Progressive Action, Inc.;
Unidad Latina en Accion; and
The Jerome N. Frank
Legal Services Organization
c/o Michael Wishnie, Esq.,
Simon Moshenberg and
Justin Cox
PO Box 209090
New Haven, CT 06520-9090

John A. Danaher III, Commissioner,
State of Connecticut,
Department of Public Safety
c/o Henri Alexandre, Esq.
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105

_____

Petrea A. Jones
Acting Clerk of the Commission

FIC/2007-416FD/paj/11/8/2007

## 1.  ENDNOTES

### A. Court cases

Payne v. City of Danbury, 267 Conn. 669 (2004); Director, Retirement & Benefits Services Div. v.
FOIC, 256 Conn. 764 (2001); Rocque v. FOIC, 255 Conn. 651 (2001); Dept. of Public Safety v FOIC,
242 Conn. 79 (1997); Conn. Alcohol & Drug Abuse Commission v. FOIC, 233 Conn.28 (1995);
Kurecza v. FOIC, 228 Conn. 271 (1994); First Selectman v. FOIC, 60 Conn. App. 64 (2000); Dept. of
Children & Families v. FOIC, 48 Conn. App. 467 (1998); Almeida v. FOIC, 39 Conn. App. 154
(1995); Dept. of Transportation v. FOIC, Super Ct JD NB CV 01-0508810 (Schuman, J. 2001); City
Treasurer, City of Hartford v. FOIC, Super Ct JD NB CV 99 0496222 (Cohn, J. 2000); Rocque,
Commissioner of Environmental Protection v. FOIC, Super Ct JD NB CV 98 0492734 (Hartmere, J.
1999); Director, Retirement & Benefits Services Div. v. FOIC, Super Ct JD NB CV 98 0492692
(Hartmere, J. 1999); First Selectman, Town of Ridgefield v. FOIC, Super Ct JD NB CV 99-0493041
(McWeeny, J. 1999); Chairman, Bd. of Education Town of Darien v. FOIC, Super Ct JD Htfd NB CV
97 0575674 (McWeeny, J. 1998); Waters, Commissioner of State of Conn. Dept. of Administrative
Services v. FOIC, Super Ct JD Htfd/NB CV 96 0565853 (McWeeny, J. 1997); Armstrong,
Commissioner of State of Conn. Dept. Of Correction v. FOIC, Super Ct JD Htfd/NB CV 96 0563608

(McWeeny, J. 1997); <u>Dept. of Children & Families v. FOIC</u>, Super Ct JD Htfd NB CV 96 0562546
(McWeeny, J. 1997); <u>State of Conn. Office of Protection and Advocacy for Persons with Disabilities v.
FOIC</u>, Super Ct JD Htfd/NB CV 95 0554467 (McWeeny, J. 1997); <u>Youngquist v. FOIC</u>, Super Ct JD
Htfd/NB, CV 95 0554601 (McWeeny, J. 1996 and 1997); <u>Cracco v. FOIC</u>, Super Ct JD Htfd/NB, CV
94 0705371 (Dunnell, J. 1995); <u>Cracco v. FOIC</u>, Super Ct JD Htfd NB, CV 93 0705370, (Dunnell, J.
1995); <u>Cracco v. FOIC</u>, Super Ct JD Htfd NB, CV 94 0705369, (Dunnell, J. 1995); <u>Simonds v. FOIC</u>,
Super Ct JD Htfd/NB, CV 93 070 41 39 (Maloney, J. 1994); <u>Gallagher v. FOIC</u>, Super Ct JD Htfd/NB,
CV 93 0531514 (Maloney, J. 1994).

## B. FOIC Decisions

Docket #FIC 2003-285; Frank C. Violissi, Jr. v. First Selectman, Town of Chester (May 26, 2004);
Docket #FIC 2003-074; Heather M. Henderson v. State of Connecticut, Department of Public Safety,
Legal Affairs Department (Dec. 10, 2003); Docket #FIC 2003-020; Hugh Curran v. Mayor, City of
Waterbury (Sept. 10, 2003); Docket #FIC 2002-580; Ken Byron and The Hartford Courant v. First
Selectman, Town of Westbrook (Sept. 10, 2003); Docket #FIC 2003-038 Chris Dehnel and The
Journal Inquirer v. First Selectman, Town of Ellington (Aug. 27, 2003); Docket #FIC 2002-531Chris
Dehnel and Journal Inquirer First Selectman, Town of Ellington (Aug. 27, 2003); Docket #FIC
2003-055; Robert Mack v. Director, State of Connecticut, Department of Correction, Labor Relations
(July 23, 2003); Docket #FIC 2002-345; Josh Kovner, Chris Keating, and The Hartford Courant v.
Chief, Police Department, City of Middletown (July 23, 2003); Docket #FIC 2002-338; Amy L. Zitka
and The Middletown Press v. Chief, Police Department, City of Middletown; and Professional
Standards Unit Supervisor, Police Department, City of Middletown (July 23, 2003); Docket #FIC
2002-465; Fred Radford v. Chairman, Police Commission, Town of Trumbull; and Chief, Police
Department, Town of Trumbull (July 9, 2003); Docket #FIC 2002-118; Kimberly W. Moy and the
Hartford Courant v. Superintendent of Schools, Southington Public Schools (Feb. 26, 2003); Docket
#FIC 2002-020; Maurice Timothy Reidy and The Hartford Courant v. Chief, Police Department, Town
of Newington and Brendan Fitzgerald (Oct. 23, 2002); Docket #FIC 2001-489 Jonathan Kellogg, Trip
Jennings and Waterbury Republican-American Chief, Police Department, Borough of Naugatuck and
Rick Smolicz (Sept. 25, 2002); Docket #FIC 2002-173; Carrie J. Campion v. Director, Department of
Human Resources, Town of Fairfield (Aug. 28, 2002); Docket #FIC 2001-425 Joseph Mincewicz,
Commissioner, State of Connecticut, Department of Public Safety, Division of State Police; and State
of Connecticut, Department of Public Safety, Division of State Police (Aug. 28, 2002); Docket #FIC
2001-421 Jean M. Morningstar and University Health Professionals Local 3837, AFT-CFEPE,
AFL-CIO v. Executive Vice President for Health Affairs, State of Connecticut, University of
Connecticut Health Center; and State of Connecticut, University of Connecticut Health Center; and
Justin Radolf, M.D., Director, Center for Microbial Pathogenesis, School of Medicine, University of
Connecticut Health Center (Aug. 28, 2002); Docket #FIC 2002-093 Sean P. Turpin v. Director,
Department of Human Resources, Town of Greenwich and Steve Demetri (July 24, 2002); Docket
#FIC 2002-034; MariAn Gail Brown, Michael P. Mayko and Connecticut Post Michael Lupkas,
Comptroller, City of Bridgeport; Christopher Duby, Chief of Staff, City of Bridgeport; Mark Anastasi,
City Attorney, City of Bridgeport; and Gregory Conte, Deputy Chief of Staff, City of Bridgeport (June
26, 2002); Docket #FIC 2001-364; Karen Guzman and The Hartford Courant v. City of New Britain
Docket (June 26, 2002); Docket #FIC 2001-180 James H. Smith and The Record Journal Publishing
Company v. Commissioner, State of Connecticut, Department of Public Safety, Division of State
Police; and State of Connecticut, Department of Public Safety, Division of State Police (Feb. 13,
2002); Docket #FIC 2001-129; Kimberly W. Moy and The Hartford Courant v. Police Commission,
Town of Southington (Feb. 13, 2002); Docket #FIC 2001-251 Fred Radford v. Chief, Police

Department, Town of Trumbull (Jan. 23, 2002); Docket #FIC 2000-624; Eric Gustavson v. Board of Education, Brookfield Public Schools (June 13, 2001); Docket #FIC 2000-557; Wendy John v. Richard Blumenthal, Attorney General, State of Connecticut, Office of the Attorney General; Wil Gundling, William McCullough, Phillip Schulz, Margaret Chapple, Assistant Attorneys General, State of Connecticut, Office of the Attorney General; and State of Connecticut, Office of the Attorney General (June 13, 2001); Docket #FIC 2000-268; Michael Costanza and The Day v. Director of Utilities, Utilities Department, City of Groton; and Mayor, City of Groton (April 25, 2001); Docket #FIC 2000-198; William J. Stone v. Personnel Administrator, State of Connecticut, Department of Transportation, Bureau of Finance and Administration; and State of Connecticut, Department of Transportation (April 20, 2001); Docket #FIC 2000-537; James Leonard, Jr. v. Chief, Police Department, City of New Britain (March 28, 2001); Docket #FIC 2000-348; Bradshaw Smith v. Office of the Vice Chancellor for Information Services, State of Connecticut, University of Connecticut; and State of Connecticut, University of Connecticut (February 28, 2001); Docket #FIC 2000-474; Robert H. Boone and Journal Inquirer v. Chief, Police Department, Town of Windsor Locks (Jan. 24, 2001); Docket #FIC 2000-265; Lisa Goldberg and The Hartford Courant v. Superintendent of Schools, Vernon Public Schools (Jan. 24, 2001); Docket #FIC 2000-569; Mary Hyde v. Chief, Police Department, Town of Seymour (Dec. 13, 2000); Docket #FIC 2000-049; Nicholas B. Wynnick v. Board of Directors, Ansonia Public Library, Town of Ansonia (Dec. 13, 2000); Docket #FIC 2000-136; Thomas E. Lee v. Board of Education, Trumbull Public Schools; and Superintendent of Schools, Trumbull Public Schools (Nov. 29, 2000); Docket #FIC 2000-135; Thomas E. Lee v. Board of Education, Trumbull Public Schools; and Superintendent of Schools, Trumbull Public Schools (Nov. 29, 2000); Docket #FIC2000-086; Mitchell D. Poudrier v. Superintendent of Schools, Killingly Public Schools (Sept. 13, 2000); Docket #FIC 2000-173; Robert H. Boone and the Journal Inquirer v. Anthony Milano, District Manager, Metropolitan District Commission; and Metropolitan District Commission (Aug. 23, 2000); Docket #FIC 2000-094; James D. Goodwin v. Communications Specialist, State of Connecticut, Department of Social Services, Public and Government Relations Unit (Aug. 9, 2000); Docket #FIC 2000-022; Thedress Campbell v. City Treasurer, City of Hartford (Aug. 9, 2000); Docket #FIC 2000-137; Robert H. Boone and Journal Inquirer v. Metropolitan District Commission (July 12, 2000); Docket #FIC 1999-560; Leo F. Smith v. Robert H. Skinner, First Selectman, Town of Suffield; and Selectmen's Office, Town of Suffield (July 12, 2000); Docket #FIC 1999-556; Delores Annicelli v. Director, New Haven Housing Authority, City of New Haven; and New Haven Housing Authority, City of New Haven (July 12, 2000); Docket #FIC 1999-548; Leo F. Smith v. John P. Lange, Human Resources Director, Town of Suffield; and Department of Human Resources, Town of Suffield (July 12, 2000); Docket #FIC 1999-547; Leo F. Smith v. John P. Lange, Human Resources Director, Town of Suffield; and Department of Human Resources, Town of Suffield (July 12, 2000); Docket #FIC 1999-525; Leo F. Smith v. John P. Lange, Human Resources Director, Town of Suffield; and Department of Human Resources, Town of Suffield (July 12, 2000); Docket #FIC 2000-118; Elizabeth Ganga and Connecticut Post v. Police Department, Town of Stratford (June 28, 2000); Docket #FIC 2000-095; Ron Robillard and the Chronicle v. Chairman, Board of Education, Eastford Public Schools; and Board of Education, Eastford Public Schools (June 28, 2000); Docket #FIC 2000-093; Megan J. Bard and The Norwich Bulletin v. Chairman, Board of Education, Eastford Public Schools; and Board of Education, Eastford Public Schools (June 28, 2000); Docket #FIC 1999-575; Bruce Kaz v. Robert Skinner, First Selectman, Town of Suffield; and Ted Flanders, Building Inspector, Town of Suffield (June 28, 2000); Docket #FIC 1999-519; Robert J. Fortier v. Personnel Director, Town of East Hartford; and Mayor, Town of East Hartford (June 14, 2000); Docket #FIC1999-550; James and Susanne Milewski v. Deputy Chief, Police Department, Town of Clinton; and Police Department, Town of Clinton (May 24, 2000); Docket #FIC 2000-005; Fred B. Feins v. President and Chief Executive Officer, Granby Ambulance Association, Inc., Town of Granby (May 10, 2000); Docket #FIC1999-606; Robert L. Corraro and IBEW Local 90 v. Town Attorney,

Town of Hamden; and Electrical Contractors, Inc. (May 10, 2000); Docket #FIC 1999-533; Donald J. Lanouette, Jr. v. Chief, Police Department, Town of Madison; and Police Department, Town of Madison (April 26, 2000); Docket #FIC 1999-502; Christopher Hoffman and New Haven Register v. Director of Personnel, State of Connecticut, Southern Connecticut State University; and Personnel Office, State of Connecticut, Southern Connecticut State University (April 26, 2000); Docket #FIC1999-440; Anne Hamilton and The Hartford Courant James Martino, Chief, Police Department, Town of Avon; Peter A. Agnesi, Lieutenant, Police Department, Town of Avon; and Police Department, Town of Avon (March 8, 2000); Docket #FIC1999-333; Lynn Fredricksen and New Haven Register v. Chief, Police Department, Town of Madison; and Police Department, Town of Madison (March 8, 2000); Docket #FIC 1999-289; Thomas Moran v. Director, Human Resources, Town of Simsbury; and Department of Human Resources, Town of Simsbury (Feb. 9, 2000); Docket #FIC 1999-328; Victor Zigmund v. Director, State of Connecticut, Department of Mental Health and Addiction Services, Human Resources Operations, Connecticut Valley Hospital, Whiting Forensic Division (Jan. 26, 2000); Docket #FIC 1999-100; Janice D'Arcy and The Hartford Courant v. Chief, Police Department, Town of Cheshire; Police Department, Town of Cheshire; Town Manager, Town of Cheshire; and Town of Cheshire (Jan. 26, 2000); Docket #FIC 1999-355; Wayne Mercier v. Patricia C. Washington, Director of Personnel, City of Hartford; and Department of Personnel, City of Hartford (Nov. 10, 1999); Docket #FIC 1998-391; Jonathan F. Kellogg and The Republican American v. Department of Education, City of Waterbury (Oct. 13, 1999); Docket #FIC 1999-161; Michael W. Cahill v. Chief, Police Department, Town of Hamden; and Police Department, Town of Hamden (Sept. 22, 1999); Docket #FIC 1998-294; Robert J. Bourne v. Department of Public Utilities, City of Norwich, and City of Norwich (Sept. 22, 1999); Docket #FIC 1998-293; Joseph J. Cassidy v. Department of Public Utilities, City of Norwich, and City of Norwich (Sept. 22, 1999); Docket #FIC 1999-040; Judith F. Machuga and State of Connecticut, Division of Public Defender Services, Superior Court, G.A. 13 v. Chief, Police Department, Town of East Windsor; and Police Department, Town of East Windsor (Aug. 25, 1999); Docket #FIC 1999-144; Robert H. Boone and Journal Inquirer v. William Gifford, Chief, Police Department, Town of Windsor Locks; Police Department, Town of Windsor Locks; and Windsor Locks Police Commission (July 28, 1999); Docket #FIC 1999-096; Paul Marks and The Hartford Courant v. Chief, Police Department, Town of Windsor Locks; and Police Department, Town of Windsor Locks (July 28, 1999); Docket #FIC 1999-064; Joan Coe v. First Selectman, Town of Simsbury; Director, Human Resources Department, Town of Simsbury; and Town of Simsbury (July 28, 1999); Docket #FIC 1999-150; Andrew Nargi v. Office of Corporation Counsel, City of Torrington; and City of Torrington (July 14, 1999); Docket #FIC 1999-135; Warren Woodberry, Jr. and The Hartford Courant v. Acting Town Manager, Town of Rocky Hill and Town of Rocky Hill (July 14, 1999); Docket #FIC 1999-015; Richard Manuel Rivera v. Superintendent of Schools, Torrington Public Schools; and Board of Education, Torrington Public Schools (June 9, 1999); Docket #FIC 1998-372; William C. Kaempffer and New Haven Register v. Police Department, City of New Haven; City of New Haven; and James Sorrentino (June 9, 1999); Docket #FIC 1997-361; Dominick L. Santarsiero v. Director, Human Resources, City of Stamford (June 10, 1998); Docket #FIC 1999-019; David K. Jaffe v. State of Connecticut, Connecticut Lottery Corporation, Human Resources; State of Connecticut, Connecticut Lottery Corporation, Security Division; and State of Connecticut, Connecticut Lottery Corporation (April 28, 1999); Docket #FIC1998-325; Virginia Groark and The Day v. Freedom of Information Officer, State of Connecticut, Department of Public Health, Office of Special Services, Communications Division; and Agency Personnel Administrator, State of Connecticut, Department of Public Health, Human Resources Division (April 28, 1999); Docket #FIC 1998-208; Thedress Campbell v. City Treasurer, City of Hartford; and City of Hartford (April 14, 1999); Docket #FIC 1998-265; Benjamin M. Wenograd and Service Employees International Union Local 760 v. John Roughan, Executive Director, East Hartford Housing Authority; and East Hartford Housing Authority, Town of East Hartford (March 24, 1999); Docket #FIC

1997-363; Diana R. Raczkowski v. Mayor, Town of Naugatuck (March 11, 1998); Docket #FIC 1997-307; Krystin Bratina v. Chief, Hartford Fire Department, City of Hartford (March 11, 1998); Docket #FIC 1998-288; Christian Miller and the New Haven Register v. Superintendent, Branford Public Schools; and Board of Education, Branford Public Schools (Feb. 24, 1999); Docket #FIC 1998-255; Joan O'Rourke v. Chief, Police Department, City of Torrington; and Police Department, City of Torrington (Jan. 27, 1999); Docket #FIC 1998-251; John Ward v. Beverly L. Durante, Personnel Administrator, Housatonic Area Regional Transit; and Housatonic Area Regional Transit (Jan. 27, 1999); Docket #FIC 1998-163; Lawrence A. Butts v. Director, State of Connecticut, Department of Environmental Protection, Human Resources Division; and State of Connecticut, Department of Environmental Protection, Human Resources Division (Dec. 9, 1998); Docket #FIC 1998-162; Lawrence A. Butts Chairperson, State of Connecticut, Department of Environmental Protection, Human Resources Division; and State of Connecticut, Department of Environmental Protection, Human Resources Division (Dec. 9, 1998); Docket #FIC 1998-232; Scott Clark, Amy Kertesz, Michael Gates and the Ridgefield Police Union v. First Selectman, Town of Ridgefield; and Town of Ridgefield (Nov. 18, 1998); Docket #FIC 1998-193; Daniel P. Jones and The Hartford Courant v. Commissioner, State of Connecticut, Department of Environmental Protection; and State of Connecticut, Department of Environmental Protection (Nov. 18, 1998); Docket #FIC 1998-121; Ernie Cantwell and International Association of Firefighters, Local No. 1073 v. Director, Personnel Department, City of Middletown and Personnel Department, City of Middletown (Oct. 14, 1998); Docket #FIC 1998-120; Ernie Cantwell and International Association of Firefighters, Local No. 1073 v. Director, Personnel Department, City of Middletown (Oct. 14, 1998); Docket #FIC 1998-094; Janice D'Arcy and The Hartford Courant v. Chief, Meriden Police Department, City of Meriden and Meriden Police Department (Oct. 14, 1998); Docket #FIC 1997-422; Joseph A. Johnson, Jr. and Greenwich Time v. Chief, Greenwich Police Department, Town of Greenwich; and Greenwich Police Department, Town of Greenwich (Sept. 9, 1998); Docket #FIC 1998-023; Deborah Maynard v. Superintendent, Voluntown School District; and Principal, Voluntown Elementary School, Voluntown School District (Aug. 12, 1998); Docket #FIC 1997-298; Allan Drury and The New Haven Register v. Chief, East Haven Police Department, Town of East Haven; and Town of East Haven (June 10, 1998); Jonathan Lucas and Greenwich Times v. Director, Department of Human Resources, Town of Greenwich; and Town of Greenwich (May 27, 1998); John C. Rettman v. Meriden Police Department, Internal Affairs Division; and Paul Rowen (May 13, 1998); Docket #FIC 1997-318; Dennis Carnot v. Chief, Meriden Police Department, City of Meriden; Internal Affairs Division, Meriden Police Department, City of Meriden; Meriden Police Department, City of Meriden; and Paul Rowen (May 13, 1998); Docket #FIC 1997-175; Matthew Brown, Ken Byron and The Hartford Courant v. Superintendent of Schools, Plymouth Public Schools; and Board of Education, Town of Plymouth (February 18, 1998); Docket #FIC 1997-123; John Christoffersen and The Advocate v. Superintendent of Schools, Stamford Public Schools and Director of Personnel, Stamford Public Schools (Feb. 11, 1998); Docket #FIC 1997-088; John B. Harkins v. Acting Town Manager, Town of Tolland (Jan. 28, 1998); Docket #FIC 1997-085; Joe Johnson and Greenwich Time v. Chief of Police, Greenwich Police Department (Jan. 28, 1998); Docket #FIC 1997-142; Laura Amon v. Program Manager, Affirmative Action Division, State of Connecticut, Department of Transportation (Dec. 3, 1997); Docket #FIC 1996-572; Ken Byron and The Hartford Courant v. Chief of Police, Town of Wethersfield (Nov. 12, 1997); Docket #FIC 1997-238; Kimberley A. Thomsen and the Republican-American v. Acting Superintendent, Waterbury Police Department (Oct. 29, 1997); Docket #FIC 1997-089; Steven Edelman v. Commissioner, State of Connecticut, Department of Mental Retardation; and State of Connecticut, Department of Mental Retardation (Oct. 22, 1997); Docket #FIC 1996-551; Judith A. Amato v. Executive Director, New Britain Housing Authority; and New Britain Housing Authority (Aug. 27, 1997); Docket # FIC 1996-539; Ann Marie Derwin v. Legal Advisor, State of Connecticut, Department of Public Safety;

and State of Connecticut, Department of Public Safety (Aug. 27, 1997); Docket #FIC 1996-592; Francine Karp v. Mayor, City of Bristol; Director of Personnel, City of Bristol; and Dennis Daigneault (July 23, 1997); Docket #FIC 1996-243; Joanne C. Tashjian v. Personnel Officer, State of Connecticut, Workers' Compensation Commission; and State of Connecticut, Workers' Compensation Commission (June 4, 1997); Docket #FIC 1996-322;Carolyn Moreau and The Hartford Courant v. Chief of Police, Southington Police Department; and Susan Williams (May 28, 1997); Docket #FIC 1996-465; John Gauger, Jr., Joseph Cadrain and Richard Westervelt v. Kenneth H. Kirschner, Commissioner, State of Connecticut, Department of Public Safety; Dawn Carnese, Legal Advisor, State of Connecticut, Department of Public Safety; and Lt. David Werner, Commanding Officer, Troop "B", State of Connecticut, Department of Public Safety, Division of State Police (April 9, 1997); Docket #FIC 1996-315; David W. Cummings v. Christopher Burnham, Treasurer, State of Connecticut (April 9, 1997); Docket #FIC 1996-521; Carol Butterworth v. Town Council, Town of Tolland (March 26, 1997); Docket #FIC 1996-421; John B. Harkins v. Chairman, Tolland Town Council (March 26, 1997); Docket #FIC 1996-314; David W. Cummings v. Christopher Burnham, Treasurer, State of Connecticut (April 9, 1997); Docket #FIC 1996-119; David W. Cummings v. Jesse M. Frankl, Chairman, State of Connecticut, Workers' Compensation Commission (March 26, 1997); Docket #FIC 1996-215; Alice M. Gray v. Chief of Police, Manchester Police Department, and Assistant Town Attorney, Town of Manchester (Feb. 26, 1997); Docket #FIC 1996-159; Carolyn Moreau and The Hartford Courant v. Police Chief, Southington Police Department (Jan. 22, 1997); Docket #FIC 1996-124; Donald H. Schiller, Michael Kelley and The Record-Journal Publishing Company v. Police Chief, Town of Southington Police Department, and Town of Southington Police Department (Jan. 22, 1997); Docket #FIC 1996-134; Betty Halibozek v. Superintendent of Schools, Middletown Public Schools; and Supervisor of Maintenance and Transportation, Board of Education, City of Middletown (Dec. 11, 1996); Docket #FIC1996-006; Joseph Cadrain and Richard Westervelt v. Gerald Gore, Legal Affairs Unit, State of Connecticut, Department of Public Safety; and State of Connecticut, Department of Public Safety, Division of State Police (Dec. 11, 1996); Docket #FIC 1996-153; Tracey Thomas and The Hartford Courant v. Legal Affairs Unit, State of Connecticut, Department of Public Safety (Nov. 20, 1996); Docket #FIC1995-419; Robie Irizarry v. Warden, Willard Correctional Institution, State of Connecticut, Department of Correction (Oct. 23, 1996); Docket #FIC 1995-368; Thomas Lally v. Executive Director, State of Connecticut Board of Education and Services for the Blind, and Special Projects Coordinator, State of Connecticut, Board of Education and Services for the Blind (Oct. 9, 1996); Docket #FIC 1995-403; Jesse C. Leavenworth and The Hartford Courant v. Superintendent of Schools, Regional School District #7 (Sept. 25, 1996); Docket #FIC 1995-361; Christopher Hoffman and the New Haven Register v. James J. McGrath, Chief of Police, Ansonia Police Department and Eugene K. Baron, Brian Phipps, and Howard Tinney as members of the Ansonia Board of Police Commissioners (Sept. 25, 1996); Docket #FIC1995-358; Lyn Bixby and The Hartford Courant v. State of Connecticut, Department of Administrative Services (Sept. 25, 1996); Docket #FIC 1996-056; Francine Cimino v. Chief of Police, Glastonbury Police Department; Town Manager, Town of Glastonbury; and Town of Glastonbury (Sept. 25, 1996); Docket #FIC 1995-343; John J. Woodcock, III v. Town Manager, Town of South Windsor (July 24, 1996); Docket #FIC 1995-324; John J. Woodcock, III and Kathryn A. Hale v. Dana Whitman, Jr., Acting Town Manager, Town of South Windsor (July 24, 1996); Docket #FIC 95-251; Lyn Bixby & The Hartford Courant v. Commissioner, State of Connecticut, Department of Correction (July 10, 1996); Docket #FIC 1995-252; Valerie Finholm and The Hartford Courant v. Commissioner, State of Connecticut, Department of Children and Families (May 22, 1996); Docket #FIC 1995-193; Terence P. Sexton v. Chief of Police, Hartford Police Department (May 8, 1996); Docket #FIC 1995-125; Chris Powell and Journal Inquirer v. Commissioner, State of Connecticut, Department of Social Services (March 13, 1996); Docket #FIC 1995-081; Bruce Bellm, Kendres Lally, Philip Cater, Peter Hughes, Carol Northrop, Brad Pellissier, Todd Higgins and Bruce Garrison v. State of Connecticut, Office of Protection and Advocacy for

Persons with Disabilities, Sharon Story and Marlene Fein (March 13, 1996); Docket #FIC 1995-074;
Jeffrey C. Cole and WFSB/TV 3 v. James Strillacci, Chief of Police, West Hartford Police Department
(Jan. 24, 1996); Docket #FIC 1995-026; Curtis R. Wood v. Director of Affirmative Action, State of
Connecticut, Department of Correction (Jan. 24, 1996); Docket #FIC 1995-132; Michael A. Ingrassia
v. Warden, Walker Special Management Unit, State of Connecticut Department of Correction (Dec.
27, 1995); Docket #FIC 1995-048; Jane Holfelder v. Canton Police Department (June 14, 1995);
Docket #FIC 1994-351; Edward A. Peruta v. O. Paul Shew, Rocky Hill Town Manager and Director of
Public Safety; Donald Unwin, Mayor of Rocky Hill, William Pacelia, Deputy Mayor of Rocky Hill;
and Curt Roggi, Rocky Hill Town Attorney (May 28, 1995); Docket #FIC 1994-160; John Springer
and The Bristol Press v. Chief of Police, Bristol Police Department (April 5, 1995); Docket #FIC
1994-077; Kathryn Kranhold and The Hartford Courant v. Director, New Haven Health Department
(Feb. 8, 1995); Docket #FIC 1994-099; Frank Faraci, Jr. v. Middletown Police Department, Mayor of
Middletown, and Middletown City Attorney (Feb. 2, 1995); Docket #FIC 1994-011; Robert Grabar,
Edward Frede and The News-Times v. Superintendent of Schools, Brookfield Public Schools and
Brookfield Board of Education (Aug. 24, 1994); Docket #FIC 1993-279; Jay Lewin v. New Milford
Director of Finance (March 23, 1994).

## 2. Affidavit of Eric Turner, January 9, 2002.

### AFFIDAVIT OF ERIC V. TURNER

Eric V. Turner, having been duly sworn, does hereby depose as follows:

1.  I am over the age of eighteen (18) years and understand the obligation of an affirmation.

2.  I am a member of the Connecticut Bar and am currently employed as Director of Public Education for the Connecticut Freedom of Information Commission, having first been employed by said commission in 1996.

3.  I am providing this affidavit in light of the Supreme Court decision in *Director, Retirement & Benefits Services Division v. Freedom of Information Commission*, 256 Conn. 764 (2001), in which the court apparently invites a reconsideration of *Perkins v. Freedom of Information Commission*, 228 Conn. 158 (1993). See, *Director*, supra at 782, fn 13, 785 (Zarella, J. concurring).

4.  As part of my responsibilities as Director of Public Education for said commission, I have developed, organized and scheduled speaking engagements, seminars and programs explaining the duties and rights established under the Connecticut Freedom of Information Act.

5.  Since I assumed my current position in 1996, there have been approximately 290 such speaking engagements, seminars and programs in Connecticut and I have personally lectured in approximately 80 such speaking engagements, seminars and programs.

6.  As part of the presentation I have prepared for such speaking engagements, seminars and programs, the subject of the Connecticut General Statues Section 1-210(b)(2) exemption for personnel, medical and similar files the disclosure of which would constitute an invasion of personal privacy is stressed because of the great interest in that exemption and the confusion generated by a series of inconsistent and contradictory court decisions prior to *Perkins*, supra. See, e.g., *Chairman v. Freedom of Information Commission*, 217 Conn. 193 (1991) (establishing "reasonable expectation of privacy" test; query whether subjectively or objectively applied) and *Board of Education v. Freedom of Information Commission*, 210 Conn. 590 (1989) (confirming a "balancing" test), which was overruled by the *Chairman* case.

7.  Since the Supreme Court ruling in *Perkins*, supra, all Freedom of Information Commission staff members who conduct such speaking engagements, seminars and programs discuss in detail the rulings in that case and its progeny.

8.  As part of my responsibilities as Director of Public Education, I also answer telephone and other inquiries from public officials and the public. Since my employment with said commission, I have answered thousands of such inquiries, including hundreds of inquiries concerning the Connecticut General Statutes Section 1-210(b)(2) exemption. In responding to such inquiries I discuss in detail the *Perkins* case and its progeny.

9.  Based on the foregoing experiences, it is my opinion that the *Perkins* decision, and its progeny, have

had a beneficial effect on public officials and the public itself because they can rely on a now long-standing and clear test with respect to the Connecticut General Statutes Section 1-210(b)(2) exemption, which helps them determine whether that exemption is applicable to the practical problems they encounter with respect to personnel, medical and similar information.  Indeed, the many court and Freedom of Information Commission decisions applying the *Perkins* test have given public officials and the public a now consistent body of law concerning that statutory exemption.

Eric V. Turner

**COUNTY OF HARTFORD**

**ss:  Hartford**

**STATE OF CONNECTICUT**

Subscribed and attested to before me this 9th day of January, 2002.

Mitchell W. Pearlman
Commissioner of the Superior Court

Westlaw.

Not Reported in F.Supp.                     FOR EDUCATIONAL USE ONLY                                   Page 1

Not Reported in F.Supp., 1994 WL 55621 (D.D.C.)

**(Cite as: Not Reported in F.Supp., 1994 WL 55621)**

**C**

Butler v. U.S. Dept. of Justice

D.D.C.,1994.

Only the Westlaw citation is currently available.

United States District Court, District of Columbia.

David H. BUTLER, Plaintiff,

v.

UNITED STATES DEPARTMENT OF JUSTICE, Defendant.

**CIV. A. No. 86-2255 HHG.**

Feb. 3, 1994.

MEMORANDUM

HAROLD H. GREENE, District Judge.

I

**\*1** In this protracted litigation the plaintiff, David Butler, is seeking access, pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552*et seq.,* to records held by the Department of Justice. Pending before the Court are cross-motions for summary judgment regarding the legitimacy of numerous exemptions asserted by the defendant to justify the refusal to disclose all or portions of approximately sixty documents uncovered in its search. Also pending before the Court is the question of whether the defendant has conducted an adequate search for responsive documents in light of this Court's May 10, 1989 order.

II

The plaintiff, David Butler, is currently serving a twenty-five year sentence which was imposed following his 1984 conviction of federal narcotics violations in South Carolina. Prior to that conviction Butler had been employed as an informant for the Federal Bureau of Investigation's (FBI) Miami field office. At trial, Butler staunchly maintained that the drug activity for which he was arrested was within the scope of his work for the FBI. Although the government disclosed to the defendant some documents regarding his work for the FBI, it was revealed after trial that a significant amount of material had been withheld. Mr. Butler is pursuing post-conviction relief based on alleged violations of the government's obligation to turnover to the defense exculpatory evidence in compliance with *Brady v. Maryland,* 373 U.S. 83 (1963).

In order to buttress his claim for post-conviction relief, Mr. Butler attempted to obtain documents regarding his work on behalf of the FBI through the Freedom of Information Act. Unsatisfied with the agency's response to his request, Mr. Butler initiated this litigation.

http://web2.westlaw.com/print/printstream.aspx?sv=Split&prft=H...

Following the filing of his complaint, the FBI agreed to undertake additional efforts to locate responsive documents. After the completion of these additional searches the defendant moved for summary judgment claiming that its search was adequate and that the exemptions it had asserted for specific documents were proper. The plaintiff opposed the defendant's motion, arguing that the record revealed that the search was inadequate. Butler also filed a cross-motion for summary judgment on the propriety of the exemptions asserted by the FBI.

On May 10, 1989 the Court issued an order in this case deferring its decision on the question of whether the exemptions asserted by the FBI were proper. The Court ordered the FBI to conduct an additional search for responsive documents in light of legitimate concerns raised by the plaintiff over the adequacy of the defendant's initial search.

The defendant has now completed an additional search for responsive documents and submitted additional declarations to the Court. Consequently, the question of the adequacy of the defendant's search is once again before the Court. For the reasons stated below, the Court finds that the additional search conducted by FBI personnel was thorough and sufficient under the law. The Court is also able, at this time, to address the exemptions asserted by the defendant in withholding sixty documents or portions thereof from the plaintiff. The propriety of each exemption asserted is discussed in turn.

III

**\*2** As indicated above, the first question this Court must resolve is whether the search performed by the defendant in response to the May 10, 1989 order was adequate.

The legal principles in this area are well-settled. In order to demonstrate that a search for documents requested under FOIA was adequate and legally sufficient, the government must establish beyond material doubt that its efforts were "reasonably calculated to uncover all relevant documents." *Weisberg v. Department of Justice,* 705 F.2d 1344, 1351 (D.C.Cir.1983). If the government intends to rely on affidavits or declarations to support its claim that the search was adequate, such statements must be "relatively detailed and nonconclusory and ... submitted in good faith." *Id.* (citations omitted). A search is not rendered inadequate under the reasonableness standard merely because it does not unearth every conceivably responsive document. *Id.,* (citing *Perry v. Block,* 684 F.2d 121, 128 (D.C.Cir.1982) (*per curiam* ).

The defendant's initial claim that its search was adequate, made at the time the FBI originally moved for summary judgment, was carefully scrutinized by the Court. Inconsistencies between statements made by the defendant in its briefs and assertions of other government employees raised concerns that responsive documents existed, within the possession of the defendant, which the FBI failed to discover. On that basis, the Court ordered that an additional search be conducted by the defendant, specifying particular areas which should be examined.

Upon review of the most recent filings, the Court is persuaded that the defendant's response to the May 10, 1989 has been both responsible and diligent. Special Agent Angus Llewellyn, a supervisor in the FBI's Freedom of Information-Privacy Act section, was responsible for conducting the additional search required by the Court. In his declaration, Agent Llewellyn thoroughly details the efforts he made in conducting this additional search in his public declaration. The scope of the further search to be conducted was outlined in a four-page letter agreement signed by counsel for both parties. Llewellyn, in executing this agreement, conducted several meetings with plaintiff's counsel, the Assistant United States Attorney assigned to this case, and FBI personnel in order to compile a list of all individuals who might possibly possess information about the existence and location of responsive documents.

Llewellyn's affidavit sets forth in detail the method by which he proceeded to contact the forty-four people identified through these meetings. He made efforts to pursue all leads in an open-ended fashion to maximize the chances that these individuals would provide useful information. The agent outlined in detail the communication he had with the many people

he interviewed personally. Llewellyn also diligently followed leads provided during these interviews in an effort to ensure that if responsive documents existed, he would locate them. Finally, the Court reviewed the *in camera* classified declaration of Agent Llewellyn and concludes that the documents referenced in that statement do not relate to the plaintiff and are not responsive to his request.

**\*3** The Court concludes that the FBI, through the efforts of Agent Llewellyn, has demonstrated that its search was sound under the circumstances and "reasonably calculated to uncover all relevant documents." *Weisberg, supra,* 705 F.2d at 1351.FN1

IV

Having resolved the question of the adequacy of the search, the Court must now address the legitimacy of the many exemptions asserted by the government to justify their refusal to disclose certain documents. The plaintiff challenges the validity of virtually every exemption claimed by the government. The Court will consider these disputed issues on an exemption-by-exemption basis as the parties have done in their briefs.

However, before addressing the specific FOIA exemptions relied on by the defendant, the Court first examines the defendant's claim that equitable considerations, based on a purported sealing order enter by Judge Hand in Alabama, justify the refusal to disclose certain documents. In its May 10, 1989 order, this Court clearly imposed on the defendant the burden of coming forward with some proof that Judge Hand in fact sealed the October 1982 hearing, the first of two hearings before Judge Hand concerning the plaintiff. The defendant failed to address this issue in any papers filed with the Court subsequent to the May 1989 order. Consequently, the Court assumes that this October 1982 hearing was not sealed. Information which the defendant has refused to disclose because it was raised at this hearing, must be turned over to the plaintiff.FN2 An agency invoking a FOIA exemption "bears the burden of establishing its right to withhold evidence from the public." *Senate of the Commonwealth of Puerto Rico v. Department of Justice,* 823 F.2d 574, 585 (D.C.Cir.1987) (citations omitted). The placement of this burden buttresses FOIA's underlying purpose of "facilitat[ing] public access to government documents." *Department of State v. Ray,* 112 S.Ct. 541, 547 (1991). Through such access Congress intended to "pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Department of Air Force v. Rose,* 425 U.S. 352, 361 (1976) (citations omitted). For these reasons the statute contains a "strong presumption in favor of disclosure" and the burden is on the government to justify the withholding of requested documents or portions thereof. *Ray, supra,* 112 S.Ct. at 547.

In this context, summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). "Where the evidence presented on a dispositive issue is subject to conflicting interpretations, or reasonable persons might differ as to its significance," summary judgment should not be granted. *Greenberg v. Food and Drug Admin.,* 803 F.2d 1213, 1216 (D.C.Cir.1986) (citations omitted).

A. Exemption b(7)(A)-Interference with Law Enforcement Proceedings

**\*4** The defendant relies on several aspects of FOIA exemption 7 to justify its refusal to disclose several documents in its possession. Exemption 7 generally authorizes non-disclosure of "records or information compiled for law enforcement purposes" the release of which "might be expected to produce one of six specific harms" identified by Congress and contained in this FOIA provision. *See Keys v. Department of Justice,* 830 F.2d 337, 340 (D.C.Cir.1987).

The parties do not dispute the fact that the information involved in this FOIA request was complied for law enforcement purposes. Thus, in order to justify non-disclosure, the defendant must demonstrate that one of the specific harms identified

in exemption 7 is likely to result if the information is released.

Two documents are being withheld under exemption (b)(7)(A) which protects from disclosure law enforcement records which "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). The portions of the documents withheld under this exemption refer to an escaped indictee who has evaded law enforcement authorities for several years. The release of this information has the potential to make the ultimate apprehension of this individual even more difficult. The Court is not persuaded by the plaintiff's claim that the information is stale simply because it is several years old. While the indictee remains at large, maintaining the confidentiality of the few leads the government has in its possession is important. *See Southam News v. Immigration and Naturalization Serv.*, 674 F.Supp. 881, 887 (D.D.C.1987) (even if record is not currently involved in investigation, it is exempt if it could lead to prospective law enforcement proceeding); *Ehringhaus v. Federal Trade Comm'n*, 525 F.Supp. 21, 23 (D.D.C.1980) (purpose of exemption (7)(a) is to require disclosure of closed files but not active and prospective files); *National Public Radio v. Bell*, 431 F.Supp. 509, 514-15 (D.D.C.1977) (same). The assertion of the exemption (b)(7)(A) for this material is proper.

## B. Exemption b(7)(C)-Invasion of Personal Privacy

The defendant has asserted exemption (b)(7)(C) with regard to portions of a number of documents being withheld. The FBI claims that this exemption authorizes non-disclosure of the identities of the following individuals: (1) confidential informants, (2) persons who supplied information during an internal FBI investigation, (3) the subjects of this internal investigation, and (4) FBI agents as well as supervisory personnel mentioned in responsive documents. Release of these names, the defendant claims, "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(c).

The plaintiff concedes that he not interested in "learning the identities of other confidential informants, interviewees, subjects of surveillance, [etc.]" *See* Plaintiff's Opposition to Summary Judgment at 10. Instead, Butler seeks only the release of primarily supervisory FBI employees "who were monitoring operations in which Mr. Butler was a central player." *Id.* [FN3] Given this concession, the defendant need not disclose the identities of any individuals in the first three categories listed above.

**\*5** In assessing a defendant's claim that exemption b(7)(a) applies, the Court must balance the "privacy interest at stake against the public interest in disclosure." *Keys, supra*, 830 F.2d at 346 (citations omitted). Exemption 7(c), in protecting privacy rights specifically in the context of law enforcement records, "recognizes the stigma potentially associated with law enforcement investigations and affords broader privacy rights [than exemption b(6) ] to suspects, witnesses, and investigators." *Bast v. Department of Justice*, 665 F.2d 1251, 1254 (D.C.Cir.1981).

As noted, the only disputed category of information for which the defendant invoked this exemption is that of supervisory FBI personnel. The government contends that the release of FBI personnel mentioned in these documents would expose those individuals to harassment and disruption.

The degree of protection accorded law enforcement personnel mentioned in documents pertaining to criminal investigations has been addressed by the Circuit. It is settled that there is "no blanket exemption for the names of all FBI personnel in all documents." *Lesar v. Department of Justice*, 636 F.2d 472, 487 (D.C.Cir.1980); *See Stone v. Federal Bureau of Investigation*, 727 F.Supp. 662, 664 (D.D.C.1990) (status as public officials "does not rob [individuals] of their privacy rights").

The Court of Appeals has also recognized that in their position as public officials, FBI agents and other law enforcement personnel "may not have as great a claim to privacy as that afforded ordinarily to private citizens." *Lesar, supra*, 636 F.2d

at 487. However, FBI agents do have a "legitimate interest in preserving the secrecy of matters that conceivably could subject them to annoyance or harassment ..." *Id. See also, Bast, supra,* 665 F.2d at 1255. ("while an individual's official position may enter the 7(c) balance ... it does not determine, of its own accord, that the privacy interest is outweighed."); *Simpson v. Department of Justice,* Civ. No. 87-2832, slip op. at 8 (D.D.C. Sept. 30, 1988) (non-supervisory attorneys within the Department of Justice have a cognizable privacy interest in having their identities protected).

Against this reduced privacy interest of supervisory FBI personnel, the Court balances the public interest asserted by the plaintiff in learning the names of these individuals. Mr. Butler is seeking to vacate his twenty-five year sentence on the basis of claims of innocence that could potentially be corroborated by these people. The public interest in seeing that Mr. Butler's due process rights are protected in his criminal case is significant. Moreover, the defendant has made bald claims, unsupported by any factual evidence, that the release of these names, will subject FBI supervisory personnel to harassment.

For these reasons, the Court finds that, with one exception, all names and identifying information of individuals mentioned in these documents were properly redacted by the FBI under exemption (b)(7)(C). The FBI may not redact the names or identifying information of supervisory personnel who monitored operations in which Mr. Butler played a substantial role.

## C. Exemption b(7)(D)-Information Furnished by a Confidential Source

**\*6** The defendant has also invoked Exemption b(7)(d) protecting law enforcement information, the release of which would reveal the identity of a confidential source or the information provided by that source. *See* 5 U.S.C. § 552(b)(7)(d). This Circuit has interpreted this section of FOIA broadly, holding that "once an agency establishes that it received the requested information in confidence" the source and the nature of the information will be protected, regardless of whether that individual ever testified. *Parker v. Department of Justice,* 934 F.2d 375, 378-79 (D.C.Cir.1991).

A source need not be promised total secrecy in order for material to be covered by this exemption. *Department of Justice v. Landano,* 113 S.Ct. 2014, 2020 (1993). Information is received in "confidence" if it is "furnished with the understanding that the FBI would not divulge the communication except to the extent the Bureau thought it necessary for law enforcement purposes. *Id.* The Court finds that materials redacted by the defendant because they would reveal confidential sources and information need not be disclosed.

## D. Exemption b(7)(E)-Information on Law Enforcement Techniques

This provision shields from disclosure information that would reveal "techniques and procedures for law enforcement investigations or prosecutions...." *See* 5 U.S.C. § 552(b)(7)(E). In order to be protected under this section, the law enforcement technique contained in the contested records must not be generally known to the public. *Windels, Marx, Davies & Ives v. Department of Commerce,* 576 F.Supp. 405, 413-14 (D.D.C.1983). The degree of risk posed by the release of the information is not relevant in the Court's determination. *Id.* The Court believes that the techniques outlined in the Flynn declaration fall within this exemption and the limited redactions of four documents was proper.

## E. Exemption b(7)(F)-Information Which Could Endanger Safety of any Individual

This FOIA exception permits the government to withhold documents if there is a reasonable belief that the release of the information contained in those records would threaten a person's safety. *Docal v. Bennsinger,* 543 F.Supp. 38, 48 (M.D.Pa.1981). The defendant relies on this exemption in its refusal to disclose information about an investigation conducted by the South Carolina office of the Drug Enforcement Administration (DEA). This Court has specifically

recognized the need to protect the identity of undercover DEA officers in these types of situations. *Barkett v. Department of Justice,* Civ. No. 86-2029 (July 18, 1989) (available at 1989 U.S.Dist. Lexis 7984). It was this investigation of an undercover drug conspiracy which led to the plaintiff's arrest on narcotics charges. To the extent that this exemption is asserted to protect the names of DEA agents who worked on this investigation, the Court finds that the defendant's refusal to disclose such information is appropriate. *See, e.g.,* Flynn Declaration, at ¶ 179, 188.[FN4]

### F. Exemption (b)(2)-Information on Internal Practices

**\*7** The defendant relies frequently on exemption (b)(2) which shields from disclosure agency records "related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2). The Court of Appeals has adopted a two-part test to be used in assessing the validity of an agency's reliance on this exemption. *See Schwaner v. Department of Air Force,* 898 F.2d 793, 794 (D.C.Cir.1990).

First, there must be a showing that the materials being withheld fall within the language of the statutory exemption. *Id.* Secondly, the defendant must demonstrate either that disclosure risks circumvention of an agency rule or that the information concerns "trivial administrative matters of no genuine public interest." *Id.,* (citing *Founding Church of Scientology v. Smith,* 721 F.2d 828, 830 n. 4 (D.C.Cir.1983)).

The Court of Appeals has ruled that this exemption "encompasses not merely minor employment matters, but may cover other rules and practices governing agency personnel." *Crooker v. Bureau of Alcohol, Tobacco and Firearms,* 670 F.2d 1051, 1056 (D.C.Cir.1981) (*en banc* ). The reference to "rules and practices" is particularly instructive in reviewing the assertion of this exemption by the defendant in some instances. The general focus of this exemption is to shield from public scrutiny "material used for predominantly internal purposes." *Id.* at 1073.

The Court carefully reviewed Flynn's public and *in camera* declarations, as well as the unredacted versions of the documents for which this exemption was claimed. With the exception of two specific documents the Court concludes that the information meets both criteria set forth in *Schwaner,* 898 F.2d at 794.

However, the documents discussed at ¶ 172 (Serial # 15 Miami Informant File) and ¶ 193 (Serial # 6 Miami File I) must be disclosed to the plaintiff.[FN5] Even under a broad reading of this exemption, these documents simply do not reveal an internal "rule or practice" of an agency. The information in these documents refer to the planning, execution, and review of specific operations. The documents do not discuss the implementation an existing agency procedure or practice, but instead contain discussions of plans apparently devised to respond to a particular set of circumstances. For that reason, the information does not meet the first element of the *Schwaner* test and is not protected by this exemption.

### G. Exemption (b)(3)-Information Protected by Statute

The defendants rely on exemption 3 of the FOIA with respect to a number of documents. This provision authorizes an agency to withhold materials which are protected from disclosure by other statutes. Specifically, FOIA states that materials need not be disclosed if they are:

Specifically exempted from disclosure by statute ... provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matter to be withheld.

**\*8** *See* 5 U.S.C. § 552(b)(3). The Court now addresses the two specific statutes which the defendant claims exempt

portions of certain documents from disclosure.


### (1) Grand Jury Secrecy

Five documents are being withheld pursuant to Rule 6(e) of the Federal Rules of Criminal Procedure which governs secrecy of grand jury proceedings. Under Rule 6(e)(2) of the Federal Rules of Criminal Procedure grand jurors, government employees involved in transcribing grand jury proceedings, and government attorneys involved in such matters "shall not disclose matters occurring before the grand jury." Fed.R.Crim.Pro. 6(e)(2). Even though this is a procedural rule, as opposed to a statute, it is considered a statute for purposes of this FOIA exemption. *See Fund for Constitutional Gov't v. National Archives & Records Serv. et al.*, 656 F.2d 856, 868 (D.C.Cir.1981).

Generally, the rule has been held to prohibit "revelation of a protected aspect of the grand jury's investigation." *Senate of Puerto Rico, supra,* 823 F.2d at 584. In pursuit of this goal, Rule 6(e) has been given a wide scope and prohibits the disclosure of information revealing "the identities of witnesses or jurors, the substance of testimony, the strategy or direction of the investigation, the deliberations or questions of the jurors, and the like." *Fund for Constitutional Gov't, supra,* 656 F.2d at 869 (citing *Securities and Exchange Comm'n v. Dresser Indust., Inc.,* 628 F.2d 1368, 1382 (D.C.Cir.1980)). However, there is no "*per se* rule against disclosure of any and all information which has reached the grand jury chambers." *Senate of Puerto Rico, supra,* 823 F.2d at 582.

The plaintiff contends that the FBI has attempted to use Rule 6(e) to shield information that should be disclosed under FOIA. According to the Flynn declaration, two categories of information are being withheld pursuant to Rule 6(e)-identities of witness and descriptions of documents which were subpoenaed by the grand jury. Documents which reveal the identities of witnesses who appeared before the grand jury clearly fall with the contours of the type of information this exemption is designed to protect. *Fund for Constitutional Gov't, supra,* 656 F.2d at 869. Consequently, material redacted for this reason need not be disclosed. *See* Flynn Declaration at ¶ 39.

The Court reaches a different conclusion with respect to information tending to reveal what documents were subpoenaed by the grand jury. This is not the type of information which the Court of Appeals identified as being within the scope of this exemption. *See Fund for Constitutional Gov't, supra,* 656 F.2d at 869. Moreover, the mere fact that a document was requested by a grand jury does not reveal the inner workings of that tribunal. For that reason, information redacted because it reveals or implies what materials were subpoenaed by the grand jury must be disclosed.


### (2) Wiretap Affidavits

Two other documents being withheld under exemption b(3) are the affidavits submitted in support of a wiretap issued pursuant to 18 U.S.C. § 2510*et seq.* These documents are exempt from disclosure by the FBI.

**\*9** Exemption 3 applies where a statute "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue ... or establishes criteria for withholding" such information. *See* 5 U.S.C. § 552(b)(3). The statutes authorizing the government to conduct wiretaps under certain circumstances do not specifically address the question of whether affidavits filed in support of wiretap applications must be kept confidential. However, the Court is persuaded, as defendant argues, that the procedures for obtaining a wiretap described in the relevant statutes do not contemplate making the affidavits submitted in support of each application publicly available. Defendant's Motion for Summary Judgment at 16.

H. Exemption (b)(5)-Information Protected by Work Product and Deliberative Privilege

Exemption 5 of the FOIA provides that the government need not disclose "inter-agency or intra-agency memorandums or letters which would not be available by law to a party ... in litigation with the agency." 5 U.S.C. § 552(b)(5). The Supreme Court has interpreted this exemption to exclude from disclosure documents which are "normally privileged in the civil discovery context." *National Labor Relations Bd. v. Sears, Roebuck & Co.,* 421 U.S. 132, 149 (1975). The general purpose of this exemption is to "encourage the frank discussion of legal and policy issues within the government." *Access Reports v. Department of Justice,* 926 F.2d 1192, 1194 (D.C.Cir.1991). An agency invoking Exemption 5 as the basis for withholding documents bears the burden of demonstrating the applicability of this exemption through more than just conclusory allegations. *Coastal States Gas Corp. v. Department of Energy,* 617 F.2d 854, 861 (D.C.Cir.1980); *Access Reports, supra,* 926 F.2d at 1194. Moreover, Congress intended to confine this exemption "as narrowly as [is] consistent with efficient government operations." *Senate of Puerto Rico, supra,* 823 F.2d at 584 (citations omitted).

In order to qualify as work product, a document must contain the "mental impressions, conclusions, opinions or legal theories of an attorney" and be prepared "in anticipation of litigation." *See* Fed.R.Civ.P. 26(c)(3). This privilege does not protect every document or piece of information prepared by an attorney, but is instead designed to ensure effective legal representation within the adversarial system. *Grove,* 802 F.Supp. 506, 514 (D.D.C.1992) (citing *Jordan v. Department of Justice,* 591 F.2d 753, 755 (D.C.Cir.1978) (*en banc* )).

The defendants here invoke Exemption 5 to justify non-disclosure of four documents. The Court, having reviewed the Flynn declaration and the documents at issue, finds that these materials have been properly withheld under this exemption.


I. Exemption (b)(6)-Invasion of Personal Privacy

Pursuant to this exemption, the defendant is withholding one document and the contents of the voluminous administrative inquiry file, which is the record of an internal investigation conducted by the FBI of one agent.

**\*10** Exemption 6 authorizes the government to refuse to disclose "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).

The determination of whether this exemption has been properly invoked involves a two-part analysis. *Washington Post Co. v. Department of Health and Human Serv.,* 690 F.2d 252, 260 (D.C.Cir.1982). First, the Court must decide if the information which is being withheld is "personnel, medical or similar files." *Id.* This provision has been broadly defined by the Supreme Court to include "all information that applies to a particular individual." *See Department of State v. Washington Post Co.,* 456 U.S. 595, 602 (1982).

In the second step of this analysis the Court must weigh the public interest in the information with the privacy concerns at stake to determine if disclosure is clearly unwarranted. *Washington Post, supra,* 690 F.2d at 260.

With respect to the magnitude of the privacy interest at stake, the Supreme Court, in analyzing a separate FOIA exemption, stated that the principles of "privacy encompass the individual's control of information concerning his or her person" which is not "freely available." *Department of Justice v. Reporters Comm. for Freedom of Press,* 489 U.S. 749, 763-64 (1989). Such information need not be either of an "intimate or embarrassing" nature to implicate privacy concerns. *National Ass'n of Retired Federal Employees v. Horner,* 879 F.2d 873, 875 (D.C.Cir.1989), *cert. denied,* 494 U.S. 1078 (1990).

The administrative inquiry file at issue here is the record of an internal FBI investigation into the conduct relating to one FBI employee. Specifically, the investigation pertains to two separate events only one of which is related to the plaintiff's

FOIA request. The information contained in this file clearly meets the first element of this exemption in that it is part of the personnel file of the individual who was the subject of the investigation.

In balancing the privacy concerns with the public interest in disclosure, the Court is persuaded that this file need not be released. The subject of this inquiry would certainly have his or her personal privacy invaded if the file was released since it contains raw documentation of the investigation. Moreover, the subject of the interview has a fine record within the agency and continues to hold a position of high public trust. Lastly, the ultimate conclusion of the inquiry was a mild admonishment of the subject, indicating that his overall conduct was not particularly egregious.

These considerations are weighed against the fact that the information in the administrative inquiry file would not materially advance the plaintiffs efforts to reverse his conviction. There is nothing in the file regarding Mr. Butler's claims that the FBI improperly withheld documents from him during the course of his criminal trial. Consequently, the public interest at stake here does not outweigh the privacy concerns. For these reasons, the administrative inquiry file does not need to be disclosed.[FN6]


V


*11 As evident from the discussion of these issues above, the government has properly invoked exemptions to the Freedom of Information Act with regard to the vast majority of the contested documents. In a few other instances the government has cast its net too wide in finding that certain documents are protected from disclosure.


ORDER

For the reasons stated in the attached Memorandum, it is this 3rd day of February, 1994

ORDERED that the defendant's motion for summary judgment is granted in part and denied in part; and it is further

ORDERED that the plaintiff's motion for summary judgment is granted in part and denied in part; and it is further

ORDERED that judgment be and it is hereby entered accordingly; and it is further

ORDERED that the defendant shall release, within twenty days of the date of this Order, the documents or portions thereof for which the Court, as specified in the attached Memorandum, has held that the FOIA exemption claimed by the FBI did not cover the material in question.

FN1. The Court notes that the plaintiff, who participated in the planning of the additional search, did not file any opposition to the defendant's supplemental declaration asserting that an exhaustive search had been completed.

FN2. According to the Flynn Declaration, the second paragraph of the first page of Serial # 30 of the plaintiff's informant file was withheld on this basis and must now be disclosed. It is unclear, from a reading of the Flynn Declaration, whether other documents in this file (*i.e.,* Serial # 47, # 59) were withheld because they revealed matters occurring at the first or second hearing before Judge Hand. If the information in these documents pertains to the first hearing, they must be disclosed provided that another properly asserted FOIA exemption does not justify withholding the documents.

FN3. Part of the rationale for seeking these names is that they may lead to the discovery of more responsive

documents. However, the fact that a more thorough search has now been completed does not mean that non-disclosure of these individuals is justified. Revealing the identities of these supervisory personnel may be of interest to the plaintiff for other reasons.

FN4. In two instances the defendant was too liberal in its reliance on exemption (b)(7)(F). *See, e.g.,* Flynn Declaration at ¶ 176, 185. However, in both instances other exemptions were properly asserted to cover the same information.

FN5. To the extent that b(7)(c) has been invoked to protect certain information on the identities of people mentioned in this document, those portions may be redacted.

FN6. The other document partially withheld pursuant to exemption 6 also need not be disclosed. The limited redaction made of this document were proper.

D.D.C.,1994.

Butler v. U.S. Dept. of Justice

Not Reported in F.Supp., 1994 WL 55621 (D.D.C.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                          FOR EDUCATIONAL USE ONLY                          Page 1

Slip Copy, 2006 WL 2707395 (S.D.N.Y.), 34 Media L. Rep. 2251
**(Cite as: Slip Copy, 2006 WL 2707395)**


**H**

Associated Press v. U.S. Dept. of Defense
S.D.N.Y.,2006.

United States District Court,S.D. New York.
ASSOCIATED PRESS, Plaintiff,
v.
UNITED STATES DEPARTMENT OF DEFENSE, Defendant.
**No. 05 Civ. 5468(JSR).**


Sept. 20, 2006.


Ashley I. Kissinger, Levine Sullivan Koch & Schulz, LLP, Washington, DC, David A. Schulz, Levine, Sullivan, Koch & Schulz, LLP, New York, NY, for Plaintiff.
Elizabeth Wolstein, Sarah Sheive Normand, U.S. Attorney's Office, New York, NY, for Defendant.


*OPINION AND ORDER*


JED S. RAKOFF, U.S.D.J.

**\*1** This is the second chapter in the ongoing attempts of the Associated Press ("AP") to obtain from the U.S. Department of Defense ("DOD") basic information about the people housed in the detention facility at Guantanamo Bay, Cuba. *See Associated Press v.. U.S. Dep't of Def.,* 410 F.Supp.2d 147 (S.D.N.Y.2006) ("*AP I* "). As before, the Court finds that AP is entitled to nearly all the information it seeks.

In *AP I,* AP obtained, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.,* basic identifying information about the detainees.*AP I,* 410 F.Supp.2d at 147. In the instant action, AP seeks, pursuant to FOIA requests made on November 16, 2004 and January 25, 2005:(a) documents containing allegations or accounts of detainee mistreatment by DOD personnel, and documents identifying resulting disciplinary action; (b) documents containing allegations or accounts of detainee-against-detainee abuse; (c) documents containing details and explanations of the decisions made to release or transfer detainees from Guantanamo; and (d) certain documents relating to hearings of the Administrative Review Boards (the "ARBs") held in Guantanamo Bay, Cuba,[FN1] including transcripts of the proceedings, written statements and other documents provided by detainees, witness affidavits, and documents provided to each detainee stating the basis for his detention as an enemy combatant.[FN2]*See* FOIA request dated 11/16/04, attached as Ex. A to Declaration of Adam Rappaport dated March 3, 2006 ("Rappaport Decl."); FOIA request dated 1/25/05, attached as Ex. B to Rappaport Decl. In response to these requests, DOD eventually produced approximately 1400 pages of documents, but with extensive redactions. *See* Hecker Decl. ¶¶ 5, 8-10. The parties subsequently narrowed their dispute, so that only four categories of redaction remain in issue. Now, on the parties' cross-motions for summary judgment, the Court finds that it is able to resolve these remaining disputes as a matter of law, as follows:

   FN1. The ARBs conduct annual reviews of the status of each detainee designated an "enemy combatant," and make a recommendation whether a given detainee should be released, transferred to the custody of another

country, or further detained. *See* AP's Mem. Opp. Summ. J. at 4; Declaration of Karen L. Hecker dated February 22, 2006 ("Hecker Decl.") ¶ 3a.

FN2. Prior to each detainee's ARB review, a DOD agency prepares an unclassified written summary that contains the primary factors favoring his continued detention and the primary factors favoring his release or transfer. *See* Hecker Decl. ¶ 3d. Before the ARB hearing, this document is provided to the enemy combatant in his native language and in English.*Id.*

(a) *Identifying information of detainees who allege abuse by DOD personnel.* From the records of disciplinary actions taken against DOD personnel for detainee abuse, DOD has redacted, purportedly pursuant to FOIA Exemptions 6, 5 U.S.C. § 552(b)(6), and 7(c), 5 U.S.C. § 552(b)(7)(c), the names and other identifying information of the detainees who made the allegations of abuse that led to the discipline. Specifically, there are eight files in which such redactions appear. *See* Hecker Decl. ¶ 8.

The first file concerns alleged misconduct in May 2002 involving interactions between an agitated detainee and a guard at the detention hospital. The file contains a letter reprimanding the commander of the military police battalion for failing to establish a positive leadership climate, and the investigative inquiry into the allegations that led to the discipline. The inquiry documents include statements by the subject of the investigation and military witnesses. *See id.* ¶ 8a.

**\*2** The second file concerns an investigation into alleged misconduct in September 2002. The file contains a form reflecting the nonjudicial punishment imposed on a soldier for assault based on his attempt to spray a disruptive detainee with a water hose, and the soldier's statement concerning the incident. *See id.* ¶ 8b.

The third file concerns an investigation into alleged misconduct in October 2004. The file contains the nonjudicial punishment imposed on a soldier for assault after he struck a detainee on the mouth with his fist as he tried to subdue the detainee, and the investigative inquiry into the allegations that led to the discipline. The inquiry documents include statements by the subject of the investigation and military witnesses. *See id.* ¶ 8c.

The fourth file concerns an investigation into alleged misconduct in March 2003, in which a guard was alleged to have inappropriately used pepper spray on a detainee. The file contains a draft court-martial charge sheet for an assault charge, a nonjudicial punishment form for the same allegation, the commander's recommendation regarding discipline, and the investigatory inquiry into the allegations that led to the discipline. The inquiry documents include statements by the subject of the investigation and military witnesses, as well as the standard operating procedures for pepper spray. *See id.* ¶ 8d.

The fifth file concerns an investigation into alleged misconduct in April 2003, in which a guard was alleged to have struck a detainee, failed to properly secure a detainee's cell, and been disrespectful to his superior officer. The file contains the nonjudicial punishment imposed on the guard for assault, dereliction of duty and disrespect toward a commissioned officer, and the investigatory inquiry into the allegations that led to the discipline. The inquiry documents include the findings and recommendations of the investigating officer, statements by the guard and other military witnesses, the legal advice provided to the commander regarding the investigation, and the recommendations of various commanders regarding the discipline that should be imposed. *See id.* ¶ 8e.

The sixth file concerns an investigation into alleged misconduct in January 2004, in which a guard was alleged to have verbally harassed a detainee and splashed a cleansing product in his face. The file contains the nonjudicial punishment imposed on the guard for assault and violation of a military regulation, and the investigatory inquiry into the allegations that led to this discipline. The inquiry documents include the findings and recommendations of the investigating officer, statements by the guard and other military witnesses, the legal advice provided to the commander regarding the investigation, and the recommendations of various commanders regarding the discipline that should be imposed. *See id.* ¶

8f.

The seventh file concerns an investigation into alleged misconduct in March 2004, in which guards were alleged to have mistreated a detainee by not taking him to a restroom promptly enough. The file contains the findings and recommendations of the investigating officer, statements by the guard and other military witnesses, the legal advice provided to the commander regarding the investigation, and the recommendations of various commanders regarding the investigation. *See id.* ¶ 8g.

**\*3** The eighth file concerns an investigation into alleged mistreatment in April 2003, in which interrogators were alleged to have mistreated a detainee during an interrogation. The file contains a letter reprimanding the Director of the Joint Intelligence Group, the findings and recommendations of the investigating officer, statements by the interrogators and other military witnesses, medical records of the detainee, the legal advice provided to the commander regarding the investigation, and the recommendations of various commanders regarding the discipline that should be imposed. *See id.* ¶ 8h.

From each of these eight files, DOD has redacted the names and other identifying information of the detainees involved in the incidents in question. In support of these redactions, the Government relies on FOIA Exemptions 6 and 7(c). Exemption 6 exempts from disclosure those "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."5 U.S.C. § 552(b)(6). These eight files here in issue are "similar files" under the broad definition set forth by the Supreme Court in *United States Dep't of State v. Wash. Post Co.,* 456 U.S. 595, 601-03 (1982); *see also Wood v. FBI,* 432 F.3d 78, 87 n. 6 (2d Cir.2005), and a few of the documents are actually medical records, see Hecker Decl. ¶¶ 8h, 17c. Similarly, Exemption 7(c) exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ... could reasonably be expected to constitute an unwarranted invasion of personal privacy."5 U.S.C. § 552(b)(7). The records here in issue-records of investigations to determine whether to charge U.S. military personnel with misconduct-were compiled for law enforcement purposes, *i.e.,* enforcing the Uniform Code of Military Justice. Cf. *Aspin v. Dep't of Def.,* 160 U.S.App. D.C. 231 (D.C.Cir.1973) (holding that a Commission Report, the end product of an investigation "primarily directed toward discovering and toward obtaining evidence of possible offenses under the Uniform Code of Military Justice ... with a view toward prosecution if warranted," was an "investigatory file compiled for law enforcement purposes" within the meaning of Exemption 7).

Exemptions 6 and 7(c) both require the Court to balance the privacy interest and the public interest. Exemption 7(c) affords more protection to privacy interests than Exemption 6: under Exemption 6 information may be withheld only if its disclosure "would constitute a *clearly* unwarranted expectation of personal privacy" (emphasis supplied), whereas under Exemption 7(c), information may be withheld if it "could reasonably be expected to constitute an unwarranted invasion of personal privacy."*See Nat'l Archives & Records Admin v. Favish,* 541 U.S. 157, 165-66 (2004). On the specific facts, here, however, it is hard to see that any substantial privacy interest is involved. This is not like the situation of, say, a whistleblower, whose anonymity is protected to avoid retaliation. Here, the detainees' identities were fully known to both the personnel they accused and the personnel who responded to the accusations.

**\*4** Moreover, as the Supreme Court re-emphasized just this past June in holding that parolees have a severely diminished expectation of privacy, prisoners have even less of a privacy right. *See Samson v. California,* 126 S.Ct. 2193, 2197 (2006), citing *Hudson v. Palmer,* 468 U.S. 517, 530 (1984), for its "holding that prisoners have no reasonable expectation of privacy."

*Hudson,* to be sure, left protections for rights "not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration,"*id.* at 523, and this has been interpreted, for example, to protect in appropriate circumstances the confidentiality of previously undisclosed medical information. *See Powell v. Schriver,* 175 F.3d 107, 112 (2d Cir.1999). But the records here concern, almost entirely, the behavior of the agency and its employees, not that of the

detainees, *see* Hecker Decl. ¶¶ 8a-h, and it appears that even the redacted medical records were concerned, not with the detainees' pre-existing medical conditions or treatments, but with the medical evidence *vel non* of the abuse they allegedly suffered, *see id.* ¶ 8h.Although revelation of abuse by one's captors may cause some limited embarrassment, most people in such a situation-especially individuals detained incommunicado without many procedural safeguards-would want their plights, and identities, publicized. *Cf. Lepelletier v. FDIC,* 164 F.3d 37, 46-49 (D.C.Cir.1999) ("[A]nalysis under Exemption 6 must include consideration of any interest the individual might have in the release of the information ."). Indeed, three former detainees issued a 115-page report in 2004 alleging they were beaten and otherwise mistreated while at Guantanamo, *see* Glenn Frankel, *Three Allege Guantanamo Abuse,* Wash. Post, Aug. 5, 2004, at A12, and others have conveyed allegations of abuse to the public through their attorneys, see Josh White, *Guantanamo Desperation Seen in Suicide Attempts,* Wash. Post, Nov. 1, 2005, at A1. Moreover, many current detainees have participated in hunger strikes to protest alleged abuse. See Letta Tayler, *New Allegations Of Abuse,* Newsday, Oct. 27, 2005, at A23. In all such instances, the detainees have not hesitated to reveal their identities.

As these last examples illustrate, there must be weighed against the detainees' minimal privacy interest purportedly here asserted on their behalf by their captors the considerable public interest in learning more about DOD's treatment of identifiable detainees, whether they have been abused, and whether such abuse has been properly investigated. *See, e.g., Dep't of Def. v. FLRA,* 510 U.S. 487, 495 (1994) (holding that the "relevant public interest to be weighed in this balance is the extent to which disclosure would serve the core purpose of FOIA, which is contribut[ing] significantly to public understanding of the operations or activities of the government.").

The public interest in disclosing government malfeasance is well-established."[W]here there is a privacy interest protected by Exemption 7(C) and the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure. Rather, the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred."*Favish,* 541 U.S. at 174. Here, AP has certainly made such a showing. In addition to the public allegations of certain detainees described above, certain military officers and FBI agents who have worked at Guantanamo have also questioned the treatment of detainees, *see, e.g., In re Guantanamo Cases,* 355 F.Supp.2d 443, 474 (D.D.C.2005) (recounting FBI agent's allegations of detainee mistreatment); Neal A. Lewis & Eric Schmitt, *Inquiry Finds Abuses at Guantanamo Bay,* N.Y. Times, May 1, 2005, at A35. Here, by redacting the identities of the abused detainees, DOD has seriously interfered with the ability of the public to engage in the independent fact-finding necessary to properly evaluate the allegations of abuse and DOD's response to it. *See United States DOJ v. Reporters Comm. for Freedom of Press,* 489 U.S. 749, 773 (1989).

**\*5** Therefore, with respect to the records described in paragraphs 8a-g of the Hecker Declaration, the privacy interest is minimal and the public interest is great, thus compelling the Court to conclude that disclosure of this information would constitute neither a clearly unwarranted, nor an unwarranted, invasion of personal privacy. Consequently, the redactions must be removed and the information disclosed.

(b) *Identifying information of detainees involved in allegations of detainee-against-detainee abuse.* DOD has also redacted detainee identifying information from documents concerning detainee-against-detainee abuse, again purportedly pursuant to FOIA Exemptions 6 and 7(c). These documents, maintained in the Detainee Information Management System, consist of reports of allegations of detainee-against-detainee abuse recorded by military personnel in the course of their official duties. *See* Hecker Decl. ¶ 10. Once again, these are "similar files," such that the Court must balance the privacy interest and public interest. *See Wash. Post Co.,* 456 U.S. at 601-03; *Wood,* 432 F.3d at 87 n. 6.

Here, the privacy interests of those detainees who made allegations of abuse by fellow detainees would seem to be minimal at best, for their obvious purpose in making the allegations was to bring them to light. *Cf. Lepelletier,* 164 F.3d at 46-49 ("[A]nalysis under Exemption 6 must include consideration of any interest the individual might have in the release of the

4/25/2008 2:25 PM

information ."). Similarly, there is no reason to believe that any detainee who was observed being abused by another detainee would have any reason to keep his identity private. Arguably the privacy interests of the detainees about whom the allegations were made might be slightly more weighty, but, as noted above, the privacy rights of prisoners in circumstances involving prison discipline are extremely modest, *see Samson,* 126 S.Ct. at 2197;*Hudson,* 468 U.S. at 530, and the Government has failed to point to any case in which the identity of a prisoner accused of abusing a fellow prisoner has been accorded privacy protection under FOIA. Moreover, even though there are only a handful of detainees who fit this category, the Government has failed to make a particularized showing of why any given one of them has a material privacy interest in keeping his identity secret.

In any event, any such privacy interest is substantially outweighed by the public interest in knowing more about the context in which DOD was called upon to evaluate the allegations, an inquiry that can only be fully explored if one knows the particulars about the person whose conduct is in question. For example, without learning the names of the detainees here involved, one cannot know their nationalities or religion, even though much information was previously released pursuant to *AP I* because it was there indexed by name of detainee. How could an FOIA requester meaningfully evaluate the DOD response to a case of detainee-against-detainee abuse if he did not know the nationalities or religions of the detainees' involved, which would necessarily provide some of the context for the incident? More generally, for the same reasons that it was useful to the DOD personnel investigating these incidents to know the identifying information of those involved, such information is similarly useful to those who, by making an FOIA request, seek to scrutinize DOD conduct. Nor can this request be read in isolation from AP's other FOIA requests. For, given the public interest in scrutinizing DOD treatment of the detainees generally, DOD's actions in response to allegations of detainee-against-detainee abuse take meaning in part from how the same detainees were treated by DOD in other aspects of their detention, an evaluation that can only be made if the redactions here in issue are removed.

**\*6** Accordingly, the redacted identifying information contained in the detainee-against-detainee abuse files must be disclosed.

(c) *Detainee identifying information in transfer-release documents.* DOD has redacted, purportedly pursuant to FOIA Exemptions 5, 5 U.S.C. § 552(b)(5), and 6, detainee identifying information from certain documents containing details and explanations of the decisions made to release or transfer detainees from Guantanamo.

By way of background, after an ARB hearing has occurred, the three officers comprising the ARB meet privately and vote to recommend whether the detainee should be released, transferred, or further detained. The panel then submits its assessment, the record, and its recommendations (collectively, "Record of Proceedings and Basis for ARB Decision") to the Designated Civilian Official ("DCO").*See* Hecker Decl. ¶ 3g-3h. The DCO, in turn, reviews the Record of Proceedings, including the recommendation of the ARB, and then makes a decision whether to release, transfer, or continue to detain the detainee. The DCO's decision is documented in an "action memorandum." *See id.* ¶ 3h.If the DCO determines that continued detention is warranted, the enemy combatant will remain in DOD custody and a new review date will be scheduled. *See id.* ¶ 3i.If the DCO determines that a detainee should be transferred from Guantanamo, the proposal is forwarded to interested Government agencies. *See id.* ¶ 3j.DOD then undertakes a process, typically involving the United States Department of State, to determine what measures the transferee government will take to ensure that the detainee will not pose a continuing threat to the United States, as well as to obtain assurances that the detainee will be treated humanely. *See id.* ¶ 3k.DOD has interpreted AP's FOIA request as seeking the Record of Proceedings and the action memoranda.FN3

> FN3. AP does not contest DOD's withholding pursuant to Exemption 5 of the recommendations of the ARB panel and the ARB legal advisor. *See* Normand Decl. ¶ 5; Supp. Normand Decl. ¶ 4.

Exemption 5 exempts from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."5 U.S.C. § 552(b)(5). The traditional civil discovery

privileges, including "the privilege for attorney work-product and what is sometimes called the 'deliberative process' privilege," are thereby incorporated into FOIA. *See DOI v. Klamath Water Users Protective Ass'n,* 532 U.S. 1, 8 (2001).

The deliberative process privilege, which DOD here invokes, serves many important purposes:

to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action.

**\*7** *Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 866 (D.C.Cir.1980); *see also Klamath,* 532 U.S. at 8-9 (holding that the policy behind this privilege is "the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news"); *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 150 (1975) ("The point, plainly made in the Senate Report, is that the 'frank discussion of legal or policy matters' in writing might be inhibited if the discussion were made public; and that the 'decisions' and 'policies formulated' would be the poorer as a result.") (quoting S.Rep. No. 813, p. 9).

As a result, the privilege operates to protect "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency."*Tigue v. U.S. Dep't of Justice,* 312 F.3d 70, 76 (2d Cir.2002); *see also Sears, Roebuck,* 421 U.S. at 150 (holding that privilege focuses on documents "reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated").

To determine whether a given document qualifies for such privilege, courts evaluate whether the document is (1) "predecisional," *i.e.,* "prepared in order to assist an agency decisionmaker in arriving at his decision," and (2) "deliberative," *i.e.,* "actually ... related to the process by which policies are formulated."*Grand Cent. P'ship, Inc. v. Cuomo,* 166 F.3d 473, 482 (2d Cir.1999) (internal quotations omitted). Here, DOD argues that the action memoranda, containing determinations whether to transfer, release, or continue to detain, are preliminary and predecisional because, if the DCO determines that a detainee should be transferred, only then does the Government undertake to obtain assurances from the transferee country. If the Government is unable to obtain assurances or is unsatisfied with the assurances received, the detainee will not be transferred. See Hecker Decl. ¶ j ("[C]ircumstances have arisen in the past where the DOD elected not to transfer detainees to their country of origin because of torture concerns.").

But the DCO's action memoranda do not fall within the scope of the privilege, which, like all privileges, is to be narrowly construed, *see United States v. Weissman,* 195 F.3d 96, 100 (2d Cir.1999) (citing *Univ. of Penn. v. EEOC,* 493 U.S. 182, 189 (1990) ("Privileges should be narrowly construed and expansions cautiously extended."). In any real sense, the DCO's determination is not "predecisional," because it is a final decision by the decisionmaker himself that DOD will transfer the detainee if the requisite assurances are obtained. *Cf. Grand Cent. P'ship,* 166 F.3d at 482;*Hopkins,* 929 F.2d at 85;*Coastal States Gas Corp.,* 617 F.2d at 868. The language of DOD's own regulations suggest as much: "The DCO *decides* whether to release, transfer with conditions, or continue to detain the enemy combatant" and the DCO must "notify the Secretary of Defense of *his decision.* " Implementation of ARB Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba, Encl (4) at ¶ 5c-d (emphasis added), attached as Ex. 2 to Hecker Decl. The agency's analysis is final, and its decision has been made. There is therefore no risk that the public will be misled by premature disclosure of inaccurate information: what the public will learn is that DOD has determined either not to transfer a detainee or to transfer him if adequate assurances are obtained.

**\*8** Furthermore, these documents are not deliberative. A document is deliberative if it is "indicative of the agency's thought

processes,"*Local 3, Int'l Bhd. of Elec. Workers v. NLRB,* 845 F .2d 1177, 1180 (2d Cir.1988), and "reflects the give-and-take of the consultative process,"*Coastal States Gas Corp.,* 617 F.2d at 866;*see also Grand Cent.* P'ship, 166 F.3d at 482 (holding that additional considerations include whether the document "(i) formed an essential link in a specified consultative process, (ii) reflects the personal opinions of the writer rather than the policy of the agency, and (iii) if released, would inaccurately reflect or prematurely disclose the views of the agency" (internal quotations omitted)). The action memoranda are not contemplative, deliberative, analytical documents, weighing the pros and cons of a given course of action. *Cf. Coastal States Gas Corp.,* 617 F.2d at 866. They are, as they are labeled, *action* memoranda-policy, not opinion-the end product of the consultative process, not part of it.

There is, moreover, an even more fundamental flaw in the Government's reliance on deliberative process privilege here, because the action memoranda have in fact already been disclosed to AP, with only the detainee identifying information redacted. *See* Hecker Decl. ¶ 5f. Thus, the agency's analysis has already been substantially disclosed.

The Court therefore finds the deliberative process privilege inapplicable to the claim of redaction under Exemption 5.[FN4] However, DOD alternatively argues that the redactions here at issue still fall within Exemption 5 because "disclosure of such information could interfere with DOD's ability to transfer wartime detainees and the United States' ability to conduct diplomatic relations," Hecker Decl. ¶ 31. It is far from clear, however, what aspect of Exemption 5 is here being invoked. It is true that, although Exemption 5 principally incorporates the traditional civil discovery privileges, it may also extend to certain other privileges, especially those expressly referenced in the legislative history of Exemption 5. *See United States v. Weber Aircraft,* 465 U.S. 792, 800 (1984). But here DOD fails to define the scope of the alternative privilege it purports to invoke or locate its source in any precedent whatsoever.

> FN4. Because of this holding, the Court need not consider whether, as a qualified privilege, the deliberative process is here overcome by a sufficient showing of competing need. *See Rodriguez v. Pataki,* 280 F.Supp.2d 89 (S.D.N.Y.2003); *United States Post Office v. Phelps Dodge Refining Corp.,* 852 F.Supp. 156, 165 (E.D.N.Y.1994).

Moreover, DOD's own language, as quoted above, shows that DOD is here surreptitiously seeking to invoke FOIA Exemption 1-the so-called national security exemption-under the cover of Exemption 5, even though the Government has previously disclaimed any reliance on Exemption 1 in this case.[FN5] The Government cannot have it both ways. *See Fed. Open Market Comm. of Fed. Reserve Sys. v. Merrill,* 443 U.S. 340, 355 (1979) ("We hesitate to construe Exemption 5 to incorporate a civil discovery privilege that would substantially duplicate another exemption. Given that Congress specifically recognized that certain discovery privileges were incorporated into Exemption 5, and dealt with other civil discovery privileges in exemptions other than Exemption 5, a claim that a privilege other than executive privilege or the attorney privilege is covered by Exemption 5 must be viewed with caution."). And even assuming (contrary to fact) that the Court were willing to countenance this attempt to shoehorn Exemption 1 into Exemption 5, DOD has offered only conclusory generalizations for its applicability, thereby failing to create an adequate record that the disclosure of this information would, in fact, compromise the Government's diplomatic relations. The documents in question are the DCO's action memoranda, they have already been disclosed with detainee identifying information redacted, and they do not discuss the Government's concerns about foreign countries.

> FN5. Exemption 1 exempts from disclosure materials that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order."5 U.S.C. § 552(b)(1).

**\*9** Last, DOD, in a single paragraph of its moving papers, invokes Exemption 6, arguing that disclosure of the information could subject the detainees and their family members to harm. But even though, at the Court's instance, DOD submitted *ex parte* specifics as to certain of the claims it is making in the instant litigation, here it has offered nothing but conclusory

speculation. As already determined in *AP I*, this is not enough to carry DOD's burden. *See* 410 F.Supp.2d at 151.

(d) *Detainee family members' identifying information.* Finally, DOD has redacted, purportedly pursuant to FOIA Exemptions 3 and 6, 5 U.S.C. § 552(b)(3) and (b)(6), information identifying family members of two detainees' from correspondence sent by those family members to the detainees and then submitted by the detainees to their ARBs as part of the ARB proceedings.

Exemption 3 provides that material exempted from disclosure by other statutes is also exempt from disclosure under FOIA. Specifically, it exempts from disclosure under FOIA "matters that are ... specifically exempted from disclosure by statute ..., provided that such statute ... establishes particular criteria for withholding or refers to particular types of matters to be withheld."5 U.S.C. § 552(b)(3). To successfully invoke Exemption 3, the agency must establish that "(1) the statute invoked qualifies as an exemption 3 withholding statute, and (2) the materials withheld fall within that statute's scope."*A. Michael's Piano, Inc. v. Fed. Trade Comm'n,* 18 F.3d 138, 143 (2d Cir.1994) (citing *CIA v. Sims,* 471 U.S. 159, 167 (1985)).

DOD argues, and AP does not contest, that 10 U.S.C. § 130c is a withholding statute within the meaning of Exemption 3. Section 130c provides that "the national security official concerned ... may withhold from public disclosure otherwise required by law sensitive information of foreign governments in accordance with this section" if the following requirements are satisfied:

(B) Information eligible for Exemption.-For the purposes of this section, information is sensitive information of a foreign government only if the national security official concerned makes each of the following determinations with respect to the information:

(1) That the information was provided by, otherwise made available by, or produced in cooperation with, a foreign government or international organization.

(2) That the foreign government or international organization is withholding the information from public disclosure (relying for that determination on the written representation of the foreign government or international organization to that effect).

(3) That any of the following conditions are met:

(A) The foreign government or international organization requests, in writing, that the information be withheld.

(B) The information was provided or made available to the United States Government on the condition that it not be released to the public.

**\*10** (C) The information is an item of information, or is in a category of information, that the national security official concerned has specified in regulations prescribed under subsection [ (g) ] as being information the release of which would have an adverse effect on the ability of the United States Government to obtain the same or similar information in the future.

Section 130c thus satisfies Exemption 3's requirement in that it "establishes particular criteria for withholding," 5 U.S.C. § 552(b)(3), and accordingly constitutes a withholding statute.

Following DOD's production to AP on March 3, 2006, pursuant to this Court's Order in *AP I*, of the Combatant Status Review Tribunal documents, which production included personal correspondence transmitted between detainees and their family members by the International Committee of the Red Cross ("ICRC"), known as "Red Cross Messages," the ICRC

formally requested that DOD refrain from publicly releasing such documents in the future. *See* Supp. Hecker Decl. ¶ 4 & Ex. A. Subsequently, Deputy Secretary of Defense Gordon England made a determination that the Red Cross Messages that DOD withheld from production in this case satisfy all the criteria of 10 U.S.C. § 130c. *See* Supp. Hecker Decl. Ex. B. It is on this basis that the Government now argues that this final category of redactions is warranted under Exemption 3.

It is true that an agency's invocation of Exemption 3 may, under certain circumstances, compel a more deferential review, *see Aronson v. IRS,* 973 F.2d 962, 965 (1st Cir.1992) ("[O]rdinary, deferential principles of administrative law, not the FOIA's special, de novo principles, govern review of the IRS's interpretation of this Exemption 3 [withholding] statute and its application to the data at issue."); but *see Landmark Legal Found. v. IRS,* 347 U.S.App. D.C. 370 (D.C.Cir.2001). However, even under the more deferential standard, DOD's determination cannot be justified, for the documents simply do not "arguably" or "logically" fall within the scope of § 130c, *see Aronson,* 973 F.2d at 967. The language of that section, which exempts from production information "provided by, otherwise made available by, or produced in cooperation with" the ICRC, 10 U.S.C. § 130c(B)(1), was plainly intended to protect sensitive information provided by a foreign government or international organization to the U.S. Government, the disclosure of which would harm interests of the foreign government or international organization. Here, by contrast, the Red Cross delivered these documents directly to the detainees (after allowing DOD a review to ensure that classified or other inappropriate information is not transmitted), see Hecker Decl. ¶¶ 7-8, and it was the *detainees* -not the Red Cross-who provided them to the Government (and thereby made them subject to a FOIA request).*See id.* ¶¶ 3e, 5c, 15b (1), 15b(2).[FN6] Furthermore, the ICRC is only vicariously invoking the detainees' interests, and not its own organizational interest in confidentially communicating with the U.S. Government (which would be the sort of interest the statute protects). Under these circumstances, Section 130c simply does not apply, and therefore neither does Exemption 3.

> FN6. In this regard, the Court further notes that the ICRC does not oppose disclosure of Red Cross letters when "the concerned internees have freely expressed their consent to the public release of Red Cross Messages sent or received by them."Supp Hecker Decl., Ex. B.

**\*11** Exemption 6, however, is a closer call. That Exemption requires the Court to "balance the individual's right of privacy against the basic policy of opening agency action to the light of public scrutiny,"*United States Dep't of State v. Ray,* 502 U.S. 164, 175 (1991) (internal quotations omitted), compelling disclosure of the correspondence unless doing so "would constitute a clearly unwarranted invasion of personal privacy,"5 U.S.C. 552(b)(6). The Court previously determined in AP I that, as a general matter, "third parties had even less of an expectation [than the detainees] that the information disclosed by the detainees during the tribunal proceedings would be kept confidential,"410 F.Supp.2d at 150 (quoting *Smith v. Maryland,* 442 U.S. 735, 743-44 (1979) ("a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties.")). However, the Court invited DOD "to make a particularized showing that one or more specific detainees had retained a reasonable expectation of privacy with respect to one or more specific items of their identifying information sufficient to cause the Court to undertake a balancing of interests as to those particular items."*AP I,* 410 F.Supp.2d at 152;*see also id.* at 151 n. 3. Although in *AP I* DOD expressly declined to submit such specifics when invited to do so by the Court, in the instant situation DOD has presented the Court with somewhat more particularized evidence as to the situation of the family members here in issue.

Specifically, as to the family members who wrote the letters submitted by the detainee known as "Detainee (b)(1)," the Government argues that since the detainee testified at his ARB that he only worked for the Taliban (as a driver) because he needed money for medical treatment, this testimony might be perceived as suggesting disloyalty to the Taliban warranting retaliation against his family members. See Hecker Decl. ¶ 15b(1) & Ex. 6. But a careful reading of the ARB transcript shows that at no point did the detainee provide any intelligence or other helpful information about the Taliban to the ARB; rather, the gist of his testimony was simply to argue that his involvement with the Taliban was at a much lower level than charged. *See* Hecker Decl. Ex. 6. It is difficult to see how any of this would invite retaliation against his family. On the contrary, if, as the DOD alleged, the detainee had a higher level position in the Taliban than he claimed, his testimony

would be an instance of "stonewalling" the DOD.

As to the second detainee here in issue ("Detainee b(2)"), however, the Court concludes, with some hesitation, that DOD has met its burden. Detainee b(2) stated during his ARB, in reference to the Taliban, that "[t]hese are the people who have destroyed Afghanistan, so I despise[ ] these people." He was also reluctant to share a letter from his wife, telling the tribunal that "It is a big shame in our culture to read my wife's letter for you, but now I am in a very tough situation with the letter from my wife. Do you want it as evidence?" Hecker Decl. ¶ 15b(2) & Ex. 7. Given all the special circumstances, the Court concludes that the wife had a reasonable expectation of privacy that was not wholly eliminated by her husband's reluctant offer of the letter to the ARB and that the competing interest of the AP in obtaining her identity is modest. The Court concludes, in this one instance, that the Government has met its burden for redacting the wife's identifying information.

**\*12** This one instance aside, AP's motion for summary judgment is hereby granted, and DOD's counter-motion denied, in all other respects. Accordingly, all redactions from all materials here in issue, save the one involving the wife of detainee b(2), must be removed, and the unredacted documents must be furnished to AP within one week of the date hereof.

SO ORDERED.

S.D.N.Y.,2006.
Associated Press v. U.S. Dept. of Defense
Slip Copy, 2006 WL 2707395 (S.D.N.Y.), 34 Media L. Rep. 2251

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Westlaw.

Not Reported in F.3d         FOR EDUCATIONAL USE ONLY         Page 1

Not Reported in F.3d, 2000 WL 1093326 (C.A.D.C.)

**(Cite as: Not Reported in F.3d, 2000 WL 1093326)**

**C**

Juda v. U.S. Customs Service

C.A.D.C.,2000.

Only the Westlaw citation is currently available.

United States Court of Appeals, District of Columbia Circuit.

Olaf Peter JUDA, Appellant

v.

UNITED STATES CUSTOMS SERVICE, Appellee

**No. 99-5333, 98CV00533.**

June 19, 2000.

Before: SILBERMAN, WILLIAMS, and ROGERS, Circuit Judges.

ORDER

PER CURIAM.

*1 Upon consideration of the motion for summary affirmance, the response thereto, and the reply; and the cross-motion for summary reversal, the response thereto, and the reply, it is

ORDERED, for the reasons stated in the accompanying memorandum, that the motion for summary affirmance be denied, the motion for summary reversal be granted, and the case remanded to the district court for further proceedings.

The Clerk is directed to withhold issuance of the mandate herein until seven days after disposition of any timely petition for rehearing or petition for rehearing en banc. *See* Fed. R.App. P. 41(b); D.C.Cir. Rule 41.

MEMORANDUM

Appellant submitted a request under the Freedom of Information Act (FOIA), asking for "all TECS [Treasury Enforcement Communications System] documents"; but the request also explicitly seeks "all documents which show or indicated U.S. Customs activities in regards to my sailing vessel called either ELEVATION or MALEKULA, as well as myself in regards to the smuggling venture of 1991."Appellant concludes by asking for "full and total disclosure" of Customs' involvement in his smuggling venture. Although a requester must "reasonably describe" the records sought, an agency also has a duty to construe a FOIA request liberally. *See Nation Magazine v. United States Customs Serv.,* 71 F.3d 885, 889-90 (D.C.Cir.1995) (quoting 5 U.S.C. § 552(a)(3)). By confining its inquiry to the TECS database, Customs improperly limited its search. Not only did it fail to pursue clear leads to other existing records, but the agency itself has identified at least one other record system (the investigative file pertaining to appellant's arrest) that is likely to produce the information he requests. *See Campbell v. United States Dep't of Justice,* 164 F.3d 20, 27-28 (D.C.Cir.1998).

In view of the breadth of the request and "positive indications of overlooked materials," Customs' failure to search outside the TECS database raises a genuine issue of material fact as to the adequacy of its search. *Valencia-Lucena v. United States Coast Guard,* 180 F.3d 321, 327 (D.C.Cir.1999) (quoting *Founding Church of Scientology v. National Security Agency,* 610 F.2d 824, 837 (D.C.Cir.1979)). Consequently, summary judgment for the Customs Service was not proper.

To support its invocation of FOIA's exemptions, Customs relies on an affidavit that does not provide detailed and specific information demonstrating that the material was properly withheld so as to justify the district court's award of summary judgment on these claims. *See Campbell,* 164 F.3d at 30-31. Of the 24 pages of responsive material, the affidavit does not identify any document by date or title, or give a functional description of the contents. No connection is drawn between the documents and the general standards for claiming an exemption. *See id.* at 30. None of the claimed exemptions is correlated to a page or document, let alone to particular parts of a document, as is required in order to justify withholding information. *See Schiller v. NLRB,* 964 F.2d 1205, 1210 (D.C.Cir.1992). Nor is it clear from the affidavit that all reasonably segregable non-exempt material was released, and the district court did not make a finding on segregability. *See Kimberlin v. Department of Justice,* 139 F.3d 944, 949-50 (D.C.Cir.1998); *Trans-Pacific Policing Agreement v. United States Customs Serv.,* 177 F.3d 1022, 1027-28 (D.C.Cir.1999).

**\*2** Accordingly, we reverse the grant of summary judgment and remand the case to the district court so that Customs can be afforded an opportunity to search outside the TECS database for records responsive to appellant's FOIA request and to proceed as the results of such searches require, and to justify its defenses under Exemptions 2, 7(C), and 7(E).*See Campbell,* 164 F.3d at 29, 37. On remand, the district court can request a more detailed affidavit from Customs, or conduct an in camera review of the materials at issue. *See Quinon v. FBI,* 86 F.3d 1222, 1232 (D.C.Cir.1996). If the court decides that the exemptions were properly invoked, it should also determine whether Customs has withheld any reasonably segregable non-exempt portions of the documents. *See Kimberlin,* 139 F.3d at 950.

C.A.D.C.,2000.

Juda v. U.S. Customs Service

Not Reported in F.3d, 2000 WL 1093326 (C.A.D.C.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.