**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNIDAD LATINA EN ACCIÓN and | : | |
| JUNTA FOR PROGRESSIVE | : | |
| ACTION, INC., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Civ. No. 3:07cv1224 (MRK) |
| v. | : | |
| | : | |
| UNITED STATES DEPARTMENT OF | : | |
| HOMELAND SECURITY, | : | |
| | : | |
| Defendant. | : | |

## RULING ON DOCUMENTS SUBMITTED *IN CAMERA*

Plaintiffs, two community groups based in New Haven, filed this action under the Freedom

of Information Act (FOIA), 5 U.S.C. § 552 *et seq*., to obtain documents from the U.S. Bureau of

Immigration and Customs Enforcement ("ICE"), an investigative arm of the U.S. Department of

Homeland Security ("DHS"), following a federal immigration enforcement action (named "Operation

Return to Sender") that resulted in the arrest of approximately 30 men and women in New Haven

on June 6, 2007. According to Plaintiffs, they sought documents from DHS concerning the

Government's implementation and execution of Operation Return to Sender in New Haven because

they were concerned that the Government may have undertaken the immigration enforcement action

in retaliation for New Haven's adoption of a municipal ID program. *See generally* Jennifer Medina,

"Arrests of 31 in U.S. Sweep Bring Fear in New Haven," *N.Y. Times*, June 8, 2007.

At oral argument on DHS's Motion for Summary Judgment [doc. # 19], the Court suggested

that DHS submit to the Court for its *in camera* inspection certain of the documents listed on the

Government's Consolidated *Vaughn* Index [doc. # 19-6],[1] in the hope that the Court's rulings regarding those documents could facilitate resolution of the pending motion. The Court suggested that Plaintiffs select a discrete number of documents to be submitted to the Court. The parties agreed to the Court's suggestion, and the Government submitted the designated unredacted documents to the Court for its *in camera* inspection. On August 15, 2008, the Court held a telephonic, on-the-record conference (the "Conference") with counsel to discuss the designated documents and to clarify the parties' positions.

## I.

FOIA was adopted by Congress "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976). As the Second Circuit has explained, FOIA "adopts as its most basic premise a policy strongly favoring public disclosure of information in the possession of federal agencies." *Halpern v. FBI*, 181 F.3d 279, 286 (2d Cir. 1999).

Congress also recognized that disclosure of certain information might harm legitimate governmental or private interests and therefore enacted a series of exemptions from disclosure. Nevertheless, because FOIA's fundamental mandate remains one of "full agency disclosure," *Rose*, 425 U.S. at 360, courts must "construe FOIA exemptions narrowly, resolving all doubts in favor of disclosure." *Wood v. FBI*, 432 F.3d 78, 83 (2d Cir. 2005); *see ACLU v. Dep't of Defense*, No. 06-

---

[1] *See generally Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973). DHS's Consolidated *Vaughn* Index [doc. # 19-6] provides a brief description of any documents withheld by the agency, along with its date and Bates number, the subject of the document, a brief description of the document and a statement of the FOIA exemption under which the document was withheld. *See Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 146 (D.C. Cir. 2006) (describing the functions of a *Vaughn* Index).

3140-cv, 2008 WL 4287823, at *3 (2d Cir. Sept. 22, 2008) ("The Act is broadly conceived to reflect a general philosophy of full agency disclosure, and its exemptions are exclusive, and must be narrowly construed.") (citation and quotation marks omitted).  Moreover, the Government bears the burden of establishing that any claimed exemption applies.  *See* 5 U.S.C. § 552(a)(4)(B); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989); *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 356 (2d Cir. 2005); *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 925 (D.C. Cir. 2003).

A brief description of the exemptions at issue follows.  In many cases, DHS relies on several exemptions to support its refusal to produce documents.

Exemption (b)(2) frees from disclosure materials that are "related solely to the internal personnel rules and practices of an agency."  5 U.S.C. § 552(b)(2).  Under this exemption, the agency may withhold trivial internal administrative information of no genuine public interest – referred to as "(b)(2) Low" – or information of public interest where the government demonstrates that "disclosure of the material would risk circumvention of lawful agency regulations" – called "(b)(2) High."  *See Massey v. FBI*, 3 F.3d 620, 622 (2d Cir. 1993) (indicating that Exemption (b)(2) can apply to information concerning non-employee informants); *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1112 (D.C. Cir. 2007) (the record should be used for "predominantly internal" purposes).  For Exemption b(2) High classification, the withheld information must be predominantly internal and its disclosure must significantly risk circumvention of agency regulations or statutes.  *See Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051, 1074 (D.C. Cir. 1981) (en banc).  "Predominantly internal" information includes information that is "designed to establish rules and practices for agency personnel, i.e., law enforcement investigatory techniques," "involves no

3

'secret law' of the agency," and "would risk circumvention of agency regulations" if disclosed. *Id.* at 1073. In *Crooker*, the D.C. Circuit held that portions of a BATF manual were properly withheld under Exemption (b)(2) High because the documents referred to "investigative techniques, in the form of prescribed rules and practices for agency personnel." *Id.* In *Caplan v. Bureau of Alcohol, Tobacco & Firearms*, 587 F.2d 544, 547 (2d Cir. 1978), the Second Circuit described Exemption (b)(2) High documents as those that would "increase the risk of physical harm to those engaged in law enforcement and significantly assist those engaged in criminal activity by acquainting them with the intimate details of the strategies employed in its detection." There, the Second Circuit held that an internal BATF manual on how to conduct searches and seizures was subject to Exemption (b)(2) High. *Id.* at 547.

Exemption (b)(5) excepts from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). To qualify under this exemption, "a document must . . . satisfy two conditions: its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). Courts have recognized at least the following privileges as falling within Exemption (b)(5): work-product doctrine privilege; executive or deliberative process privilege; and attorney-client privilege. *See La Raza*, 411 F.3d at 356.

The deliberative process privilege, which is at issue in this case, encompasses "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Id.* (quotation marks omitted). To

qualify under the deliberative process privilege, a document must be:

> (1) "pre-decisional" – that is, "prepared in order to assist an agency decisionmaker in arriving at his decision," *Grand Central P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999), or put differently, it cannot be "made after the decision and designed to explain it." *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 152 (1975). As *Sears* recognizes, the line between pre-decisional and post-decisional documents can be difficult to draw. *See id.* at 152 n.19;[2] and

> (2) "deliberative" – that is, "actually . . . related to the process by which policies are formulated." *La Raza*, 411 F.3d at 356. To be "deliberative," the record "must bear on the formulation or exercise of policy-oriented judgment." *Grand Central P'ship*, 166 F.3d at 482.

The privilege does not cover purely factual material. *See EPA v. Mink*, 410 U.S. 73, 91 (1973); *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997). The D.C. Circuit has explained that "[t]o test whether disclosure of a document is likely to adversely affect the purposes of the privilege, courts ask themselves whether the document is so candid or personal in nature that public disclosure is likely in the future to stifle honest and frank communication within the agency. 'Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process.'" *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980) (quoting *United States v. Nixon*, 418 U.S. 683, 705 (1974)).

Exemptions (b)(6) and (b)(7)(C) are designed to protect privacy interests. Exemption (b)(6) refers to "personnel and medical files and similar files the disclosure of which would constitute a

---

[2] *See, e.g.*, *Arthur Andersen & Co. v. I.R.S.*, 679 F.2d 254, 258 (D.C. Cir. 1982) ("'[P]redecisional documents are thought generally to reflect the agency "give-and-take" leading up to a decision that is characteristic of the deliberative process; whereas post-decisional documents often represent the agency's position on an issue, or explain such a position, and thus may constitute the "working law" of an agency' which Congress intended by FOIA to make accessible to the public.").

clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The D.C. Circuit has read

Exemption (b)(6) to extend not only to files, but also to "bits of personal information, such as names

and addresses, the release of which would 'create a palpable threat to privacy.'" *Judicial Watch, Inc.*

*v. FDA*, 449 F.3d 141, 152 (D.C. Cir. 2006). The exemption is "intended to 'protect individuals from

the injury and embarrassment that can result from the unnecessary disclosure of personal

information.'" *Wood*, 432 F.3d at 86. As the Second Circuit has explained, "[f]actors that may give

rise to a heightened privacy interest include the presence of sensitive personal information, dignity

of crime victims, and the risk of harm to reputation. . . . [S]uch a privacy right attaches when

information that is sensitive may be linked to certain individuals, not when the individuals involved

are unknown." *ACLU*, No. 06-3140-cv, 2008 WL 4287823, at *21. "Once a more than *de minimis*

privacy interest is implicated the competing interests at stake must be balanced in order to decide

whether disclosure is permitted under FOIA. An invasion of more than a *de minimis* privacy interest

protected by Exemption 6 must be shown to be 'clearly unwarranted' in order to prevail over the

public interest in disclosure." *Fed. Labor Relations Auth. v. Dep't of Veterans Affairs,* 958 F.2d

503, 509 (2d Cir. 1992).

Exemption (b)(7)(C) frees from disclosure "records or information compiled for law

enforcement purposes, but only to the extent that the production of such law enforcement records

or information . . . could reasonably be expected to constitute an unwarranted invasion of personal

privacy." 5 U.S.C. § 552(b)(7)(C). This exemption provides somewhat broader protection for

privacy interests than Exemption (b)(6). *See Nat'l Archives & Records Admin. v. Favish*, 541 U.S.

157, 166 (2004) ("Exemption 7(C)'s comparative breadth is no mere accident in drafting. We know

Congress gave special consideration to the language of Exemption 7(C) because it was the result of

specific amendment to an existing statute."); *Reporters Comm.*, 489 U.S. at 756; *ACLU*, No. 06-3140-cv, 2008 WL 4287823, at *18. Once a legitimate privacy interest is shown, courts must apply a balancing test to determine whether the document should be disclosed:

> First, the citizen must show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake. Second, the citizen must show the information is likely to advance that interest. Otherwise, the invasion is unwarranted.

*Favish*, 541 U.S. at 172; *see Halpern*, 181 F.3d at 297. As the Supreme Court has explained, "[W]here there is a privacy interest protected by Exemption 7(C) and the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure. Rather, the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred." *Favish*, 541 U.S. at 174.

Exemption (b)(7)(E) frees from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). Under Exemption (b)(7)(E), an agency can decline to disclose internal agency materials that relate to "guidelines, techniques, sources, and procedures for law enforcement investigations and prosecutions." *Morley v. CIA*, 508 F.3d 1108, 1129 (D.C. Cir. 2007) (quotation marks omitted). The exemption protects "investigatory techniques and procedures not generally known to the public," *Doherty v. U.S. Dep't of Justice*, 775 F.2d 49, 52 n.4 (2d Cir. 1985), and is similar to Exemption

(b)(2) in that it requires the agency to establish that disclosure would risk circumvention of the law. *See PHE, Inc. v. Dep't of Justice*, 983 F.2d 248, 249-50 (D.C. Cir. 1993); *Hidalgo v. FBI*, 541 F. Supp. 2d 250, 254 (D.D.C. 2008) ("Exemptions 2 and 7(E) allow information about law enforcement techniques to be withheld when publication would allow perpetrators to avoid them . . . ."). For Exemption (b)(7)(E) to apply, this Court must find that the information DHS seeks to withhold was compiled for law enforcement purposes and, if disclosed, could reasonably be expected to risk circumvention of the law. *See Ferguson v. FBI*, 957 F.2d 1059, 1065 (2d Cir. 1992) (setting forth a two-part inquiry for judicial review of exemptions claimed under 5 U.S.C. § 552(b)(7)).

## II.

The parties are in basic agreement about the foregoing legal principles governing this action. Where the parties disagree is in applying these general principles to the particular documents at issue. Having reviewed the withheld unredacted documents *in camera* and consulted with both parties on the record regarding their positions, the Court sets forth below its rulings on the exemptions asserted. The Court recognizes that "[e]ven when FOIA exemptions apply, '[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt.'" *Sussman*, 494 F.3d at 1116 (quoting 5 U.S.C. § 552(b)). Thus, in each of its rulings, the Court identifies which portion of the documents, if any, is reasonably segregable and should therefore be released by DHS despite the applicability of any claimed exemption.

### A.

### Fugitive Case Management System Weekly Arrest Report  (2.42-53311 to 2.43-5311)

According to the Consolidated *Vaughn* Index, DHS withheld these two documents in full on

the basis of Exemptions (b)(2) High, (b)(6), (b)(7)(C) and (b)(7)(E).[3]  The Fugitive Case

Management System Weekly Arrest Reports (the "Arrest Reports") consist of database printouts that

contain specific biographical information about the individuals arrested; the information is particular

to each arrested individual and includes their A-file numbers, social security numbers, dates of birth,

addresses, and the identity of arresting officers, among other information.  *See* Declaration of Catrina

Pavlik-Keenan in Support of DHS's Motion for Summary Judgment [doc. # 19-2] at 10, ¶ 33 ("[T]he

[Fugitive Case Management System] is a narrowly focused system used by the Fugitive Operations

Teams as a central repository recording arrests made by the Fugitive Operations Team.  The database

only contains biographic information.").  Contrary to what Plaintiffs may have supposed, these

documents do not compile generic information on multiple individuals.

      During the Conference, counsel for DHS represented that they would provide the Arrest

Reports for each individual for whom Plaintiffs had provided a consent to disclosure, redacted to

remove any computer coding or web site information.  Plaintiffs do not seek personal information

regarding individuals who have not provided consent.  Any computer coding or web site information

on these documents is covered by both Exemptions (b)(2) High and (b)(7)(E), since the information

is internal to DHS and would disclose information that might significantly risk circumvention of the

law.  *See* Declaration [doc. # 19-2] at 18, ¶ 63 ("the disclosure of these codes . . . could assist

unauthorized parties to decipher the meaning of the codes").  Other courts have similarly allowed

withholding under Exemptions (b)(2) and (b)(7)(E) where disclosure risks exposure of an internal

---

[3]  On the face of these documents provided to the Court, DHS indicated only the following exemptions: "(b)(2) High, (b)(7)(E)."  In the telephonic conference, however, DHS's counsel also made it clear that they were relying on the privacy interest of those to whom the documents refer.

operation or technique and could result in circumvention of the law. *See generally Morley v. CIA*, 508 F.3d at 1129 ("It is self-evident that information revealing security clearance procedures could render those procedures vulnerable and weaken their effectiveness at uncovering background information on potential candidates."); *Miller v. U.S. Dep't of Justice*, 562 F. Supp. 2d 82 (D.D.C. 2008) (withholding psychological profiling form under Exemptions (b)(2) and (b)(7)(E) where release of the form could allow investigatory subjects to circumvent the FBI's ability to use the technique and thus avoid detection); *Piper v. U.S. Dep't of Justice*, 294 F. Supp. 2d 16, 30 (D.D.C. 2003) (withholding polygraph information under Exemption (b)(7)(E) because it could enable future subjects to "extrapolate a pattern or method to the FBI's questioning technique" and thwart FBI strategy). Because its *in camera* review makes apparent to the Court that the withheld documents were predominantly internal and compiled for law enforcement purposes, and that their disclosure could significantly risk circumvention of the law, they were properly withheld under Exemptions (b)(2) High and (b)(7)(E).

As to the issue of whether any portion of the documents is reasonably segregable from the exempted information, Plaintiffs seek generic country of birth information, which the forms contain for each individual listed. At the Court's request, DHS provided Plaintiffs with generic country of birth information for both those arrested and those targeted in the operation. During the Conference, Plaintiffs requested other generic information which is set forth on the Arrest Reports. The Court recognizes, as DHS argues, that as more generic information is provided, the greater is the likelihood that individuals who did not provide consent could be personally identified. That said, if Plaintiffs desire, for example, generic gender information regarding those arrested and those targeted (as they stated during the Conference) and that information is contained within the documents withheld (it

certainly is for those arrested), DHS should provide Plaintiffs with generic gender information regarding those arrested and those targeted – e.g., 10 males and 10 females were targeted in the operation and 5 males and 5 females were arrested.  The Court doubts that the combination of generic country of birth information and generic gender information would allow for identification of particular individuals.

Plaintiffs also seek the name of the arresting officer for each individual arrested.  Many of the withheld records contain identifying information regarding the law enforcement officers who took part in the operation.  DHS objects to providing that information, and the Court has informed the parties that it will issue a separate opinion addressing this issue for all withheld documents.

**B.**

**Operation Return To Sender/New Haven (3.3-52604 to 3.5-52604)**

According to the Consolidated *Vaughn* Index, DHS withheld these three documents in full on the basis of Exemptions (b)(2) High, (b)(6), (b)(7)(C) and (b)(7)(E).  These documents are typewritten and set forth personally identifiable information about many specific individuals, including A-numbers, dates of birth, citizenship and the like.  DHS agreed to release to those individuals for whom Plaintiffs had provided a consent form, the portion of the document that concerns that particular individual.  Without a consent form, however,  DHS correctly withheld disclosure of this highly personal information under Exemption (b)(7)(C).

Exemption (b)(7)(C) "recognizes that the stigma of being associated with any law enforcement investigation affords broad privacy rights to those who are connected in any way with such an investigation unless a significant public interest exists for disclosure." *Miller*, 562 F. Supp. 2d at 121 (citing *Reporters Comm.*, 489 U.S. at 773-75); *see Judicial Watch, Inc. v. Dep't of*

*Commerce*, 337 F. Supp. 2d 146, 180 (D.D.C. 2004) ("Exemption 7(C) protects the identities of suspects and others of investigatory interest who are identified in agency records in connection with law enforcement investigations.") (citing *Reporters Comm.*, 489 U.S. at 780). In balancing the personal privacy interests of the named individuals and the public interest in disclosure, "[n]ames of private individuals are . . . generally exempt from disclosure except, for example, where they are required to confirm or refute allegations of improper government activity." *Sussman*, 494 F.3d at 1115. The Court finds that no such significant public interest exists in disclosing this personally identifiable information where DHS has made available those portions of the documents that concern any individuals for whom Plaintiffs have provided a consent form and has further made the generic information that Plaintiffs requested available to Plaintiffs. Here, disclosure of the remaining information would constitute an unwarranted invasion of the additionally-named individuals' personal privacy. *See Halpern*, 181 F.3d at 297. Thus, DHS properly invoked Exemption (b)(7)(C) to otherwise withhold these three documents.

## C.

### Target Apprehension Charts (3.6-52604 to 3.11-52604)

DHS withheld these six documents on the basis of Exemptions (b)(2) High, (b)(6), (b)(7)(C) and (b)(7)(E). These documents comprise a handwritten "target apprehension chart" that contains columns of personally identifiable information regarding numerous specific individuals. *See* Consolidated *Vaughn* Index [doc. # 19-6] at 10. The document also contains the names of law enforcement personnel assigned to apprehend particular individuals, along with specific information about those individuals, including license plate numbers, addresses, telephone numbers, and other information. DHS represents in its Consolidated *Vaughn* Index that these documents were prepared

internally before execution of the operation, and it is apparent from their face that these are internal operational documents. *See id*. at 10-26.

The Court will rule separately regarding the names of law enforcement personnel. Otherwise, the Court is satisfied that DHS properly withheld these documents under Exemption (b)(7)(E). The documents were compiled for law enforcement purposes and contain operational and internal planning information that reveal law enforcement techniques for such investigations and law enforcement operations and therefore could, if disclosed, reasonably be expected to risk circumvention of the law. *See* Declaration [doc. # 19-2] at 19, ¶ 64 ("the release of this information would allow existing and potential subjects of investigation to alter their behavior and avoid detection by law enforcement officials"); *PHE, Inc.,* 983 F.2d at 249-50; *Hidalgo*, 541 F. Supp. 2d at 254.

While Plaintiffs contend that much is already known about the conduct of the operation, the Court's *in camera* review reveals that the documents in question are internal planning documents that show how the agency specifically planned and staffed the operation. Plaintiffs argue that DHS improperly withheld these documents under Exemption (b)(7)(E) because information describing Fugitive Operations Team procedures is already available to the public. In support of their argument, Plaintiffs cite a publicly available report that the Office of the Inspector General ("OIG") issued in March 2007 entitled *An Assessment of United States Immigration and Customs Enforcement's Fugitive Operations Teams*, *available at* http://www.dhs.gov/xoig/assets/mgmtrpts/ OIG_07-34_Mar07.pdf. Plaintiffs are correct that the OIG Report includes information about the structure of the Fugitive Operations Teams, *id.* at 6-7, as well as the information-receiving and coordinative role of the Fugitive Case Management Unit in Laguna Niguel, California and the

Fugitive Operations Support Center in Burlingon, Vermont, *see id.* at 41-42. Contrary to Plaintiffs' assertions, however, this general report on the overall structure of Fugitive Operations Teams and information gathering, receipt, and processing does not reveal the highly-specific information contained in the withheld documents that, if disclosed, would reveal not only the precise investigative or surveillance techniques immediately preceding the operation but also operation-specific information that could allow unapprehended targets to evade law enforcement personnel in the future. *See NYC Apparel FZE v. U.S. Customs and Border Protection*, 484 F. Supp. 2d 77, 93 (D.D.C. 2007) (withholding documents under Exemption (b)(2)'s more stringent standard because "disclosure of the processing, accounting and storage techniques [used by Customs] may benefit those attempting to violate the law and avoid detection by Customs, [and] the disclosure could risk circumvention of Customs regulations or statutes"); *Jaffe v. CIA*, 573 F. Supp. 377, 387 (D.D.C. 1983) ("The theory underlying this exemption is that disclosure of such information could complicate the task of investigative agencies because potential violators of the law could familiarize themselves with the policies which govern law enforcement methods and frustrate investigations. . . . The exemption does not encompass, however, ordinary manuals or procedures unless they include confidential details of law enforcement programs.") (citations omitted).

The Court's *in camera* review of these documents also convinces the Court that Plaintiffs' reliance on *Rosenfeld v. U.S. Dep't of Justice*, 57 F.3d 803 (9th Cir. 1995), is misplaced. In *Rosenfeld*, which dealt with a request for FBI records pertaining to the investigation of the Free Speech Movement, its leadership, and suspected affiliated individuals, the Government appealed the district court's denial of its request to withhold a portion of a document under Exemption (b)(7)(E). *Id.* The district court held that documents revealing the investigative technique the Government

sought to protect–namely, the use of pretext phone calls–were not properly withheld because Exemption (b)(7)(E) applies to investigative techniques not generally known to the public. *Id.* at 815. The Ninth Circuit found no error in the district court's application of a "routine-technique exception to Exemption 7(E)" and in its "finding that a pretext phone call constitutes an investigative technique generally known to the public." *Id.*

In affirming the district court's holding, the Ninth Circuit stated it "would not serve the purposes of FOIA to allow the government to withhold information to keep secret an investigative technique that is routine and generally known." *Id.* The court was unpersuaded by the Government's assertion that the investigative "technique at issue is more precise, namely, the use of the identity of a particular individual, Mario Savio, as the pretext." *Id.* The court believed that allowing such a broad reading of the exemption would allow the Government to withhold documents "under any circumstances, no matter how obvious the investigative practice at issue, simply by saying that the 'investigative technique' at issue is not the practice but the application of the practice to the particular facts underlying that FOIA request." *Id.*

Here, the Court's *in camera* review of these particular documents leads it to a different conclusion. While the public generally knows that the Government uses surveillance techniques to aid in its investigations, the details, scope, and timing of those techniques are not necessarily well-known to the public. Unlike the information that the Government sought to withhold in *Rosenfeld*, the Court is satisfied by its *in camera* review that this is not an instance in which the Government is attempting to define an otherwise obvious investigatory technique so narrowly that it will fall under Exemption (b)(7)(E). In addition, although Exemption (b)(7)(E) is "generally limited to techniques or procedures that are not well-known to the public, even commonly known procedures

15

may be protected from disclosure if the disclosure could reduce or nullify their effectiveness." *Judicial Watch, Inc.*, 337 F. Supp. 2d at 181. Thus, district courts have applied Exemption (b)(7)(E) even in circumstances where use of a law enforcement technique is generally known to the public but disclosure of the technique's details could risk circumvention of the law. *See, e.g., Boyd v. BATFE*, No. 05-1096, 2008 WL 3540126, at *3 (D.D.C. Aug. 15, 2008) (applying Exemption (b)(7)(E) to the use of confidential informants because disclosure of records would reveal "which indices were employed" and "when, where or how the check was made"); *Cozen O'Connor v. U.S. Dep't of Treasury*, No. 05-4332, 2008 WL 3271154, at *23 (E.D. Pa. Aug. 7, 2008) (applying Exemption (b)(7)(E) because "[t]errorist organizations and hostile nations could avoid or misdirect . . . investigations and implementation if they knew what databases and what government sources were being used to gather information about them"); *Maguire v. Mawn*, No. 02 Civ. 2164, 2004 WL 1124673, at *3 (S.D.N.Y. May 19, 2004) ("Although the public may know that banks often employ bait money, the public does not know whether and how a specific bank employs bait money.").

Plaintiffs further argue that DHS improperly withheld these particular documents because detailed information concerning the June 6, 2007 operation is already in the public domain by way of immigration proceedings concerning certain individuals apprehended as a result of the operation. Even though it is the Government's burden to show that withheld information is subject to nondisclosure pursuant to a FOIA exemption, where a party asserts that withheld material is publicly available, that party "carries the burden of *production* on that issue." *Inner City Press v. Bd., Fed. Res. System*, 463 F.3d 239, 245 (2d Cir. 2006) (emphasis in original). Although *Inner City Press* dealt with a challenge to the Government's withholding of documents pursuant to Exemption (b)(4), the Second Circuit's discussion of the public domain exception applies to other exemptions. *See* 463

F.3d at 244 (citing cases addressing Exemptions (b)(3), (b)(4), and (b)(7)). The Second Circuit explained the underlying rationale of the public domain doctrine as follows: "if identical information is truly public, then enforcement of an exemption cannot fulfill its purposes." *Id.* (citing to *Niagara Mohawk Power Corp. v. U.S. Dept' of Energy*, 169 F.3d 16, 19 (D.C. Cir. 1999)). "[T]he public domain exception [is limited] to information that is 'freely available,'" *id.* (citing *Reporters Comm.*, 489 U.S. at 764), and the party requesting disclosure satisfies its burden of production only when it points to "specific information in the public domain that appears to duplicate that being withheld." *Id.* at 249; *see also Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1280 (D.C. Cir. 1992) (rejecting a challenge to withholding under Exemption (b)(7) because the "public domain cases . . . require the requester to point to 'specific' information identical to that being withheld"). As the D.C. Circuit recently stated, "'[p]rior disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure." *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007) (emphasis in original). Furthermore, "prior agency disclosures do not necessarily result in an agency's waiver to subsequent claims of exemption." *Bowen v. U.S. FDA*, 925 F.2d 1225, 1228 (9th Cir. 1991) (allowing withholding under Exemption (b)(7)(E) in a criminal case even though "a small portion of the requested materials [had] been made public because of . . . [an expert's] testimony in [the requester's] state court criminal trial").

In *Inner City Press*, the public domain dispute related to information contained in a bank merger application that discussed the banks' relationships with subprime lenders. 463 F.3d at 242. The plaintiff argued that the information was in the public domain since publicly available SEC forms appeared to require the same information that the agency sought to withhold from the plaintiff. *Id.* at 248. Although the Second Circuit concluded that the information required by the SEC forms

was different from the more specific information included in the withheld bank merger application, *id.* at 251, the court noted that had the plaintiff met its burden of production, *Reporters Committee* would not bar the application's disclosure since the SEC forms containing such duplicate information would be readily accessible and easily searchable on the SEC's online, free-of-charge database and thus "freely available" for purposes of the public domain exception. *Id.* at 252.

The Court is convinced that Plaintiffs have not satisfied the requisite burden of production with respect to the law enforcement techniques they allege are publicly available. As an initial matter, the Court notes that the additional documentation Plaintiffs submitted to the Court on August 30, 2008 is not duplicative of the specific information contained in the withheld documents. Moreover, unlike *Inner City Press*, Plaintiffs have not demonstrated that the documents upon which they rely in support of their position – namely, I-213 and I-831 Forms provided to certain apprehended individuals in connection with their removal proceedings – are readily accessible, easily searchable, or "freely available." As the D.C. Circuit has observed, this Court "must be confident that the information sought is truly public and that the requester receive no more than what is publicly available before we find a waiver." *Cottone v. Reno*, 193 F.3d 550, 555 (D.C. Cir. 1999) (concluding that the requesting party had "discharged his burden of production by pointing to specific tapes which, having been played in open court and received into evidence, reside in the public domain and mirror precisely the information that he has requested"). The Court has no such confidence in this case.

Furthermore, even if portions of information contained in the withheld documents were otherwise known to some, the withheld documents appear to contain much information that is otherwise unknown to the public. As such they are not appropriate to disclose given that other law

enforcement operations will undoubtedly occur in the future and some who were targeted in this very operation were not apprehended. *See Miller*, 562 F. Supp. 2d at 124 (withholding under Exemption (b)(7)(E) appropriate where release of information could allow investigatory targets to "develop countermeasures and thus avoid detection") (quotation marks omitted); *Fisher v. U.S. Dep't of Justice*, 772 F. Supp. 7, 12 (D.D.C. 1991) (withholding under Exemption (b)(7)(E) appropriate where disclosure "would reveal investigative techniques and procedures, thereby impairing the FBI's future effectiveness" and "could alert subjects in drug investigations about techniques used to aid the FBI"). The Court also finds that the information in these six documents is not reasonably segregable and thus the documents are properly withheld in their entirety.

## D.

### Operational Stage Location (3.14-52604)

DHS withheld this document on the basis of Exemptions (b)(2) High and (b)(7)(E). DHS claims that the document contains "sensitive information." In truth, it does not. The document is a MapQuest map of locations in New Haven. While it may be a revelation to suspects that law enforcement authorities use MapQuest on occasion to locate particular addresses, the Court doubts that circumvention of the law will occur as a result of the release of this particular map. During the Conference, DHS's attorneys agreed to release this document to Plaintiffs.

## E.

### Operation Return to Sender Statistics (3.17-52604)

DHS withheld this document on the basis of Exemptions (b)(2) High, (b)(7)(E), (b)(6) and (b)(7)(C). The document contains personal identifiable information about several individuals who were either targeted or arrested, setting forth their names, addresses, photographs, the time of

apprehension and the operational team (by number only) that arrested the individual or sought the individual. *See* Consolidated *Vaughn* Index [doc. # 19-6] at 30. As discussed during the Conference, for those individuals for whom Plaintiffs have provided a consent form, DHS will provide them with their own individual information. DHS properly withheld the information for those who have not provided consent under Exemptions (b)(6) and (b)(7)(C), as the information was compiled for law enforcement purposes, is highly personal, and would constitute a clearly unwarranted invasion of personal privacy that is not outweighed by any public interest in the disclosure of this highly specific, personally-identifying information. *See* Declaration [doc. # 19-2] at 21, ¶ 71 ("disclosure of this information would not inform the Plaintiffs or the general public about ICE's performance of its mission . . . and/or how ICE actually conducts its internal operations and investigations"); *Massey*, 3 F.3d at 625 ("[D]isclosure of the identities of private persons involved or possibly implicated in criminal investigations would be [unlikely] to shed light upon the FBI's performance of its public duties.").

However, it is difficult for the Court to see how the mere number of the team to which each individual was assigned would disclose law enforcement techniques or information that could lead to circumvention of the law such that withholding under Exemption (b)(7)(E) is proper. Therefore, for those individuals who have provided consent forms, DHS should provide each of them with all of the information that relates to that particular individual, including the team number for that individual. To the extent that Plaintiffs seek such information, DHS should release the previously-withheld team number information to Plaintiffs.

**F.**

**Teams 1-4 (3.20-52604 to 3.29-52604)**

DHS withheld these seven documents on the basis of Exemptions (b)(2) High, (b)(6), (b)(7)(C) and (b)(7)(E). These documents contain personal identifiable information regarding individuals targeted in the operation, as well as information regarding the names of specific law enforcement team members, their cellular phone numbers, the time team members went into and out of certain houses and certain information (including names) of "who gave consent [sic]." *See* Consolidated *Vaughn* Index [doc. # 19-6] at 36-39.

DHS properly withheld the personally identifiable information under Exemptions (b)(6) and (b)(7)(C), except that if Plaintiffs have provided DHS with a consent form for any particular individual listed in these documents, DHS should release that individual's personal information to that person, including the time in and the time out information. The Court will rule in a separate decision on release of the names of law enforcement personnel involved in this operation.

The cell phone numbers of law enforcement personnel were properly withheld from disclosure under Exemptions (b)(2) High and (b)(7)(E) because the records were compiled for law enforcement purposes, were predominantly internal to ICE and prepared in anticipation of and to assist with ICE activity, and could significantly risk circumvention of the law if disclosed. Additionally, DHS properly withheld the information under Exemption (b)(7)(C) because Plaintiffs have not asserted any discernible public interest in the disclosure of law enforcement personnel's cell phone numbers, and the privacy interest of such individuals in avoiding hostility and unwarranted harassment makes non-disclosure of this particular information especially proper under Exemption (b)(7)(C). *See Doherty*, 775 F.2d at 52 n.2 (holding that Exemption (b)(7)(C) "covers investigatory

records compiled for law enforcement purposes to the extent that they constitute an unwarranted invasion of personal privacy" and "protects the identities of investigative agents"); *Miller*, 562 F. Supp. 2d at 119-20 (authorizing withholding of similar FBI, BATFE, and DEA personnel information under Exemption (b)(7)(C)).

That leaves the information bearing on the issue of consent, including the names of certain individuals who are identified in the documents as having provided consent to enter premises. Apparently, many of those arrested in the operation contend that no consent was provided and they may pursue civil damage actions as a result. DHS says that if they do so and seek consent information in such an action, DHS will address those requests when they receive them. However, DHS argues that it does not have permission to release the names of individuals who provided consent, that those individuals might be in jeopardy if their names were publicly released, and that the manner in which the agency conducts its operations might harm future law enforcement operations. The Court is concerned that release of the names of specific individuals whom DHS claims provided consent could place them in jeopardy and unless they consented to release of their names, the Court does not believe that disclosure is appropriate under Exemptions (b)(7)(C) and (b)(7)(E). *See Massey*, 3 F.3d at 624 ("It is generally recognized that the mention of an individual's name in a law enforcement file will engender comment and speculation and carr[ies] a stigmatizing connotation.") (citations and quotation marks omitted); *Miller*, 562 F. Supp. 2d at 120-21(withholding third party identifying information on the basis of FBI Headquarter's declaration that release of identifying information could subject such individuals to harassment, embarrassment, undue public attention, and threatened personal safety).

Plaintiffs argued at the Conference that the names of individuals who provided consent are

already in the public domain by way of active immigration proceedings against certain individuals apprehended during the raid and that DHS therefore improperly withheld this information under the asserted FOIA exemptions. The burden is on the Plaintiffs to produce evidence demonstrating that the exact information they seek is freely available in the public domain. *See supra* Part II.C. As the D.C. Circuit has stated, "FOIA plaintiffs cannot simply show that similar information has been released, but must establish that a specific fact already has been placed in the public domain." *Public Citizen v. Dep't of State*, 11 F.3d 198, 201 (D.C. Cir. 1993) (examining a public domain challenge to information withheld under Exemption (b)(1)). Unlike the investigatory techniques that Plaintiffs unsuccessfully argued had been released into the public domain, the documentation that Plaintiffs attached to their August 30, 2008 letter to the Court raises a legitimate question as to whether Plaintiffs have met their burden of production that specific facts already exist in the public domain regarding the names of particular individuals who consented to law enforcement personnel's entry and/or search of the premises at which certain individuals were apprehended.

Plaintiffs argue that their August 30, 2008 submission to the Court, which includes reports of Immigration Customs and Enforcement officers participating in the June 6, 2007 raid, demonstrates that detailed information concerning the raid is already in the public domain. However, Plaintiffs have made no showing that the I-213 and I-831 Forms pertaining to the apprehended individuals' removal proceedings are part of an administrative record that members of the public can readily access. Current Department of Justice regulations provide that removal hearings "shall be open to the public, except that the immigration judge may, in his or her discretion, close proceedings as provided in § 1003.27 of this chapter." 8 C.F.R. § 1240.10. Removal proceedings generate an administrative record, which includes the "hearing before the immigration

23

judge, including the testimony, exhibits, applications, proffers, and requests, the immigration judge's decision, and all written orders, motions, appeals, briefs, and other papers filed in the proceedings." 8 C.F.R. § 1240.9. However, it appears to the Court that disclosure of any such record requires the submission of a FOIA request. *See* 28 C.F.R. §§ 16.1-16.3. Moreover, the D.C. Circuit has made clear that even if material that is now claimed as exempt was previously provided to opposing counsel as discovery, that does not mean that the information entered the public domain. *See Cottone*, 193 F.3d at 556 ([F]or materials that "were not played in court but were simply provided to [the plaintiff's] counsel as *Brady* material, Exemption 3 remains inviolate. This is so because a constitutionally compelled disclosure to a single party simply does not enter the public domain.").

At this time, therefore, the Court is not satisfied that the additional documentation submitted – namely, I-213 and I-831 Forms related to the removal proceedings of certain apprehended individuals that reference the names of individuals who provided consent – is part of a permanent administrative record that is "freely available" to the public. *See Cottone*, 193 F.3d at 554, 556 (differentiating between "tapes played in open court and admitted into evidence," "the court reporter's transcript, the parties' briefs, and the judge's orders and opinions," and *Brady* material simply disclosed to opposing counsel). Plaintiffs have not shown that such information is available pursuant to a FOIA request and have thus failed to carry their burden of production that the specific names of individuals who provided consent is in the public domain. *See Inner City Press*, 463 F.3d at 245; *Wolf v. CIA*, 473 F.3d at 378. Since the Plaintiffs have not yet demonstrated that these specific facts are in the public domain, DHS properly withheld this information.

However, the Court does not discount the possibility that Plaintiffs can show that this precise information is already publicly available, and if Plaintiffs request it, the Court will provide Plaintiffs

with an opportunity to show the Court that the names of those who provided consent are in the public domain. Of course, the most that Plaintiffs could obtain from such an effort is the names on these documents of those who provided consent, and if those same names are already publicly available, one might question whether the effort is worth the fight. The Court will leave that issue to Plaintiffs and their counsel, however.

For particular individuals who have submitted release forms to DHS, the Government should release to those individuals the specific information contained in these forms that relates to them less any reference to an identified individual that is alleged to have given consent to law enforcement's entry and/or search of the premises. If the "consent" section of these documents indicates that law enforcement personnel spoke to an individual but that individual is not identified (as occurs on some of the forms), then DHS should also release that information since it is not protected under Exemptions (b)(7)(C) and (b)(7)(E).

## G.

### Personally Identifiable Information (3.31-52604 to 3.81-52604)

DHS withheld these sixteen documents under Exemptions (b)(2) High, (b)(6), (b)(7)(C) and (b)(7)(E). These documents contain personal identifiable information about specific individuals, including photographs, dates of birth, driver license numbers, and addresses. *See* Consolidated *Vaughn* Index [doc. # 19-6] at 43. During the Conference, counsel for DHS confirmed that to the extent Plaintiffs have provided a consent form for any individuals listed in these documents, DHS will provide that individual with their own personal information.

As an initial matter, the withheld information is not "predominantly internal" to DHS and cannot be withheld under Exemption (b)(2) High. *See* 5 U.S.C. § 552(b) (exempting materials

"related solely to the internal personnel rules and practices of an agency").  The Court's *in camera* review, however, makes clear that the records were compiled for law enforcement purposes.  Given the highly personal aspects of the information contained in these documents, it would not be appropriate for DHS to provide this information to anyone other than the person providing a consent form, because its disclosure could reasonably be expected to constitute an unwarranted invasion of personal privacy under Exemption (b)(7)(C) that is not outweighed by any overriding public interest in this particular information.  *See* 5 U.S.C. § (b)(7)(C); *Halpern*, 181 F.3d at 297.  The Court is satisfied that the nature of the information is such that withholding is also proper under Exemption (b)(6) because the individuals' privacy interest in this information prevails over any public interest in disclosure.  *See Fed. Labor Relations Auth.*, 958 F.2d at 509.

In addition, information contained in the records that does not identify individuals was properly withheld under Exemption (b)(7)(E) since the records were compiled for law enforcement purposes and if disclosed, "could adversely affect future investigations and operations by providing the public with the details and type of information the agency obtained in the course of preparing for the execution of the law enforcement operation."  Consolidated *Vaughn* Index [doc. # 19-6] at 45.  The Court finds this to be especially true since there are targeted individuals who have not yet been apprehended.  Finally, because the information is not reasonably segregable, DHS properly withheld these documents in their entirety under Exemptions (b)(6), (b)(7)(C) and (b)(7)(E).

## H.

### Email re Call from Mayor DeStefano (3.88-52604)

This is an internal email chain regarding information requested by New Haven's Mayor regarding Operation Return to Sender.  DHS has withheld this document on the basis of Exemptions

(b)(5), (b)(6) and (b)(7)(C). *See* Consolidated *Vaughn* Index [doc. # 19-6] at 54-56. The Court will

rule separately regarding the names and telephone numbers of the law enforcement personnel set

forth in the email chain.

That leaves only a small portion of the email chain that refers to the Mayor's request and what

information is required to answer the Mayor's inquiries. The Court is frankly bewildered at DHS's

assertion that Exemption (b)(5) applies to this portion of the email. DHS does not claim attorney-

client or work product privilege with respect to this document but only the deliberative process

privilege. That privilege is designed

> to assure that subordinates within an agency will feel free to provide the
> decisionmaker with their uninhibited opinions and recommendations without fear of
> later being subject to public ridicule or criticism; to protect against premature
> disclosure of proposed policies before they have been finally formulated or adopted;
> and to protect against confusing the issues and misleading the public by
> dissemination of documents suggesting reasons and rationales for a course of action
> which were not in fact the ultimate reasons for the agency's action.

*Coastal States Gas Corp.*, 617 F.2d at 866. The privilege does not apply to purely factual material.

*See EPA v. Mink*, 410 U.S. at 91; *Grand Central P'ship, Inc.* 166 F.3d at 482; *Local 3, Int'l Bhd. of*

*Electrical Workers, AFL-CIO v. N.L.R.B.*, 845 F.2d 1177, 1180 (2d Cir. 1988); *In re Sealed Case*, 121

F.3d at 737.

Here, the portion of the email chain that has been provided to the Court merely lists the purely

factual information that would be needed to respond to the Mayor's request. Putting aside for the

moment whether this document is pre-decisional, it is certainly not deliberative. *See Grand Central*

*P'ship, Inc.*, 166 F.3d at 483-84 (finding an email between HUD employees to be deliberative because

it "formed an important, if not essential, link in HUD's consultative process," "clearly reflect[ed] the

personal opinions of its writer," and "had a direct bearing on the actual exercise of a policy judgment"

but finding Exemption (b)(5) inapplicable to another document that lacked "the slightest indication that [it] formed an 'essential link' in the agency's policy development"). The Court is unconvinced that the redacted information, which is essentially an email notification to other agency personnel that the author responded to the Mayor's inquiry, relates to either policy formulation or policy-oriented judgment. Moreover, as the Supreme Court has stated, "communications made after [a] decision [that are] designed to explain it" are not properly withheld under Exemption (b)(5). *Sears, Roebuck, & Co.*, 421 U.S. at 151-52. This particular communication appears to do nothing more than identify what information is needed to satisfy the Mayor's request for information.

Furthermore, even the last portion of the response, which seems to be the author's aside to other agency personnel regarding how to consistently handle such inquiries, is not protected by Exemption (b)(5). The deliberative process privilege encompassed in Exemption (b)(5) "does not protect a document which is merely peripheral to actual policy formation; the record must bear on the formulation or exercise of policy-oriented judgment." *Grand Central P'ship, Inc.*, 166 F.3d at 482. Moreover, the information in this email would not "expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Dudman Commc'ns v. Dep't of Airforce*, 815 F.2d 1565, 1568 (D.C. Cir. 1987). Further, it lacks the "'give-and-take' leading up to a decision that is characteristic of the deliberative process." *Arthur Andersen & Co.*, 679 F.2d at 258.

Even if the Court were to find that the document was deliberative, the Court is unpersuaded by DHS's argument that the email pertains to a decision concerning how to respond to the Mayor's request and is therefore "pre-decisional" for the purpose of Exemption (b)(5). *See* Def.'s Mem. Supp. Mot. Summ. J. [doc. # 19-1] at 17 ("ICE properly asserted the deliberative process privilege to

withhold documents compiled and prepared for the purpose of responding to the Mayor of New Haven's questions regarding the operation. . . . All these records are predecisional since they were all prepared in order to assist ICE in arriving at a decision."). A document may be pre-decisional where it is "prepared in order to assist an agency decisionmaker in arriving at his decision" and "reflects[s] the personal opinions of the writer rather than the policy of the agency." *Cuomo*, 166 F.3d at 482 (quotation marks omitted). This document appears to the Court to do neither of these two things.

DHS's argument begs the question whether this particular email exchange concerns the development of agency policy that has yet to be adopted or rather the implementation or explanation of an already-adopted policy–here, the policy underlying Operation Return to Sender in New Haven. If the Court were to accept DHS's assertion of the deliberative process privilege for this email exchange, it would be enlarging the scope of Exemption (b)(5) by allowing each successive conversation that addressed an already-adopted policy to be characterized as the formulation of new agency policy. Allowing for such a liberal characterization of agency policy and decisionmaking would elide any distinction between pre-decisional and post-decisional documents, *see Sears*, 421 U.S. at 132 n.19, and would undermine FOIA's general presumption favoring disclosure, *see Wood*, 432 F.3d at 83.[4]

Accordingly, the Court rejects DHS's argument that the communication falls within the deliberative process privilege because the document is neither "pre-decisional" nor "deliberative." In short, DHS has not carried its burden of demonstrating that these documents were properly

_____

[4] The Court recognizes that there might be situations in which the deliberative process privilege applies to documents produced after a policy has been rendered but that are pre-decisional in their own right inasmuch as they relate to some final agency action. *See Judicial Watch, Inc.*, 449 F.3d at 151 (D.C. Cir. 2006). The Court's *in camera* review reveals that this is not such a situation.

withheld under Exemption (b)(5), and DHS should therefore disclose the portion of this email withheld on the basis of that exemption.

## I.

### ICE Email Chain re Draft Response to Mayor (3.93-52604 to 3.96-52604, 3.117-52604)

These documents contain internal emails presumably among DHS personnel seeking information and comments on drafts of a response to the Mayor's concerns regarding Operation Return to Sender. It appears from the copies provided to the Court that DHS withheld the names and telephone numbers of the DHS personnel involved in the email string. The Court will rule on those matters in a separate opinion.

As an initial matter, it appears to the Court that the queries contained in documents 3.93-52604 to 3.96-52604 were withheld in full under Exemptions (b)(2) High and (b)(7)(E). The Court finds that the queries were improperly withheld under Exemption (b)(2) High because the information, if disclosed, would not significantly risk circumvention of the law. Similarly, the queries were improperly withheld under Exemption (b)(7)(E) because the documents were not investigatory records compiled for law enforcement purposes and would not, if disclosed, risk circumvention of the law. DHS should therefore disclose the queries withheld on the basis of Exemptions (b)(2) High and (b)(7)(E).[5]

What was further withheld from disclosure under Exemption (b)(5) look like draft sections of information sought by ICE personnel to incorporate into the Government's response to questions asked by New Haven's Mayor about the operation. These draft responses provide purely factual

_____

[5] It appears to the Court that the queries in the email string of document 3.117-52604 were disclosed (as well they should have been, the Court might add).

information about the operation. Again, putting aside the issue of whether these documents are pre- or post-decisional (since they all post-date the operation), they are not deliberative at all and do not reflect a debate over policy. "A document is deliberative when it is actually . . . related to the process by which policies are formulated." *Grand Central P'ship*, 166 F.3d at 482 (citation and quotation marks omitted). "[T]he privilege does not protect a document which is merely peripheral to actual policy formation; the record must bear on the formulation or exercise of policy-oriented judgment." *Id.*; *see Tigue v. U.S. Dep't of Justice*, 312 F.3d 70, 80 (2d Cir. 2002) (same).

"To be protected under Exemption 5, the kind and scope of discretion involved must be of such significance that disclosure genuinely could be thought likely to diminish the candor of agency deliberation in the future." *Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1436 n.8 (D.C. Cir. 1992). As the D.C. Circuit has explained, the "key question in Exemption 5 cases [is] whether the disclosure of materials would expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Dudman Commc'ns*, 815 F.2d at 1568. The answer to that question as it relates to these particular documents is "No," because the documents in question appear to merely gather and set forth purely factual information about the operation in response to questions from the Mayor. *See Mink*, 410 U.S. at 87-88; *Grand Central P'ship*, 166 F.3d at 482. In those circumstances, the Court does not believe invocation of Exemption (b)(5) is appropriate. *See Playboy Enter., Inc. v. Dep't of Justice*, 677 F.2d 931, 935 (D.C. Cir. 1982) ("A report does not become a part of the deliberative process merely because it contains only those facts which the person making the report thinks material.").

The deliberative process privilege also does not protect communications "made after the

decision and designed to explain it." *Sears, Roebuck, & Co.*, 421 U.S. at 152. Because Exemption (b)(5) shields only pre-decisional, not post-decisional, communications, it "permits the withholding of documents that reflect the thought process in developing law and policy, but requires disclosure of all opinions and interpretations implementing the agency's law and policy." *Cozen O'Connor*, No. 05-4332, 2008 WL 3271154, at *17 (citing *Sears*, 421 U.S. at 152-53). As stated above, the information that DHS withheld under Exemption (b)(5) appears to be information gathered for a draft response to the Mayor's inquiry that sets forth the normal parameters of ICE fugitive operations as well as facts related to the implementation of Operation Return to Sender. DHS asserts that the documents fall within Exemption (b)(5) since they are the type of documents – recommendations, drafts, and suggestions – "prepared in order to assist ICE in arriving at a decision." Def. Mem. Supp. Summ. J. [doc. # 19-1] at 17. DHS has characterized its "exchange of subjective opinions among ICE personnel," *id.*, over how to respond to the Mayor's fact-based inquiry regarding a particular ICE operation as deliberation worthy of protection under Exemption (b)(5). However, after reviewing the documents *in camera*, it is apparent that the information requested for inclusion in ICE's response to the Mayor's inquiry is nothing more than an answer to a purely factual question concerning what transpired on June 6, 2007. Contrary to DHS's assertions, the withheld purely factual information does not reflect personal opinions of ICE personnel or concern the formulation of agency policy. Thus, Exemption (b)(5) is inapplicable and DHS should disclose the information withheld on the basis of this exemption.

### J.

### Law Enforcement Agent Notes (3.144-52604 to 3.146-52604)

The withheld portions of these three documents set forth names and telephone numbers of

what appear to be law enforcement personnel, issues that this Court will take up in a later ruling.

## K.

### Conference Call with Mayor DeStefano (3.147-52604)

This document appears to be internal DHS notes of a conference call with New Haven's Mayor on June 8, 2007. Apparently, DHS has released the document but redacted the name of a law enforcement officer (on which the Court will rule later) and three tasks that are listed under a portion of the notes that is captioned "Get Backs from ICE." DHS withheld that portion of the document on the basis of Exemptions (b)(2) High and (b)(5). *See* Consolidated *Vaughn* Index [doc. # 19-6] at 65-66.

The withheld portion of this document does not contain information which if available would significantly risk circumvention of the law within the meaning of Exemption (b)(2) High. Nor is the withheld portion deliberative in any ordinary sense of that word. It is a list of factual information that needed to be gathered following the call with the Mayor as well as a designation of which offices would be contacted to determine what information ICE could release. The Court does not see how this summary of next steps, or "to-do list," is deliberative. It does not relate to policy formulation, *see Grand Central P'ship*, 166 F.3d at 482, or "expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Dudman Commc'ns*, 815 F.2d at 1568. The Court therefore highly doubts that disclosure of the redacted information would result in subordinates failing to offer their "uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism," risk "premature disclosure of proposed policies," or "confus[e] the issues and mislead[] the public." *Coastal States Gas Corp.*, 617 F.2d at 866. In sum, the information that DHS redacted is not the type

33

of information that the deliberative process is designed to protect, and it was thus improperly withheld under Exemption (b)(5).  DHS should therefore disclose the portion of the document withheld on the basis of this exemption.

### III.

DHS is ordered promptly to disclose the improperly withheld information identified in the Court's opinion and to furnish the Plaintiffs with similar previously-withheld information contained in documents not submitted to the Court for its *in camera* review.  After consulting with one another about any documents that remain in dispute, the parties should provide the Court with a joint proposal identifying next steps no later than **October 14, 2008**.  Upon receipt of the joint proposal, the Court will schedule an on-the-record telephone conference with the parties.

IT IS SO ORDERED.


/s/_____Mark R. Kravitz_____
United States District Judge


Dated at New Haven, Connecticut: **September 30, 2008**.